UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

================================================== X

**EDWARD D. FAGAN, ESQ.,**
                    **Plaintiffs,**

                    **vs.**

**JAMES F. LOWY, ESQ., INTERNATIONAL
LAW GROUP, LLC, FLORIDA LAW GROUP,
LLC, et Al., ROBERT J. HANTMAN, ESQ., et
Al.,**
                    **Defendants.**

================================================== X

07-CV -10293(SAS)


**MEMORANDUM OF LAW IN
SUPPORT OF
ORDER TO SHOW CAUSE
(With Temporary Restraints)**

## A.     Introduction

This Memorandum of Law is being submitted by defendants James F. Lowy, Esq.,

International Law Group, LLC, Florida Law Group, LLC (collectively "Lowy" or "Lowy Defendants")

in support of an application for an Order to Show Cause (with Temporary Restraints).

The accompanying Declaration of Michael R. Perle, with exhibits  ("Perle Decl.") and

Affidavit of James F. Lowy ("Lowy Aff.")  set forth the facts pertinent to this application. The relief

sought includes the imposition of requirements that condition the right of plaintiff Edward D. Fagan

("Fagan") to proceed in 07-CV -10293(SAS) ("the First Case") upon: (i) payment by Fagan of all

outstanding sanctions and cost/attorney fees awards imposed on him since 2005 by the Southern

and Eastern Districts, which total at least +$415,000 (exclusive of interest[1]) and (ii) posting of a

bond under Loc. Civ. Rule 54.2. In addition, the Lowy defendants seek  (iii) in accordance with the

---

[1]  This includes totals of + $350,000 imposed by Judge Kram in 2005 in Ass'n of Holocaust
Victims for Restoration of Artwork (Etc.) v Bk. Austria [Etc.], No. 04 Civ. 3600, 2005 Westlaw
3099592 (S.D.N.Y. 11/17/ 2005) (Exhibit F to Perle Declaration); +$15,000 imposed in Molefi v.
The Oppenheimer Trust, 2007 WL 538547 (E.D.N.Y. 2007) (Exhibit E),, and $5,000 in sanctions
and +$45,000 in fees and costs imposed by Judge Scheindlin in Kaprun in 2007. On January 7,
2008, (i) Rebecca Williams, Esq., of the firm of Stroock Stroock and Levan confirmed to me that
none of the fees and costs imposed by Judge Kram were paid and the total now due from Fagan
is approximately $380,000, and (ii) Jay R. Rice, Esq. confirmed to me that none of the +$15,000
in fees and costs awarded to his firm in Molefi have been paid by Fagan.

procedures established in the <u>Martin-Trigona</u> cases and progeny,[2] an order requiring submission by Fagan to the Court for leave to proceed before making any further filings, serving any pleading or order, or initiating any new action, whether in his own name, or on behalf of another party, which in any was (A) relate to, or touch upon the subject matter of <u>In Re: Ski Train Fire in Kaprun Austria on November 11, 2000</u>, 01-MDL-1428 ("Kaprun"),  or (B) are directed at  (1) any attorneys who have appeared in that action, (2) any attorneys who represent either other attorneys who have appeared in that action, or (3) any other parties who in any way have had any involvement with Fagan with respect to <u>Kaprun</u>.

In addition, the Lowy defendants seek an order enjoining Fagan from any further action, including service of a summons or complaint, in a certain action apparently filed by Fagan on November 19, 2007 captioned <u>Edward D. Fagan, Esq., Dr. Bernd Geier and Dr. Gerhard Podovsovnick vs. James F. Lowy, Esq., International Law Group,  Florida Law Group, LLC, Michael R. Perle, Esq., and Michael R. Perle, PC</u>, New York Supreme Court, Index No. 115473/2007 (Exhibit B[3]) ("the Second Case").

## B.    **Background**

<u>Kaprun</u> is a Multi-District Litigation, representing the consolidation in this district before Hon. Shira A. Scheindlin of cases docketed as 03-CV-8960 (SAS); 03-CV-8961 (SAS); 06-CV-2811(SAS); 07-CV-935 (SA); 07-CV-3881 (SAS); 07-CV-4104 (SAS). All of the consolidated cases relate to claims arising from the deaths, or injuries resulting from a tunnel fire in Kaprun, Austria on November 11, 2000. Those injured and killed in the Kaprun fire included several U.S. Citizens, and also +150 non-U.S. citizens. On June 19, 2007, Judge Scheindlin dismissed, on forum <u>non convenies grounds</u>, the claims of the non-US citizens represented by Fagan, as lead counsel. Defendant Lowy was one of Fagan's co-counsel, as was defendant Hantman, but supposedly most

---

[2] <u>In re Martin-Trigona ("Martin-Trigona I"),</u> 737 F.2d 1254 (2Cir.1984); <u>In re Martin-Trigona ("Martin-Trigona II")</u>, 763 F.2d 140 (2 Cir.1985).

[3] All references in the form "Exhibit __" are to exhibits annexed to the Declaration of Michael R. Perle.  All references in the form "Lowy Exhibit _" are to exhibits annexed to the Affidavit of James F. Lowy.

of the foreign plaintiffs had retainers only with Fagan.

On August 16, 2007, Judge Scheindlin issued a decision and order sanctioning Fagan for ethical misconduct, and disqualified him because of such misconduct and conflicts of interest from continuing as counsel for the non-U.S. plaintiffs. The motion to disqualify Fagan, though filed by counsel for the defendants, was joined in by all of the attorneys representing American plaintiffs in Kaprun.[4] That disqualification was underpinned by Judge Scheindlin's findings that "....[i]n recent years Fagan has engaged in a pattern of unethical behavior...[and various Southern and Eastern District judges have found]...Fagan's conduct worthy of reproach and sanctions," that he was facing possible loss of his law license and that he was $13.6 million in debt (Exhibit A, 10, 29-30).

The extremis Fagan was in then (and continues in now), both professionally (facing possible disbarment) and financially, was the central reason for disqualifying him Kaprun, instead of merely sanctioning him for misconduct. Essentially the Court reasoned that because of his desperate economic situation, in tandem with the looming possibility of his disbarment,[5] Fagan's own interests and desperation, rather than best interests of the clients, were driving his actions in the case.

Since his disqualification in Kaprun, Fagan has increased the frequency, ferocity and heavy-handedness of his misconduct both by filing frivolous, retaliatory claims against virtually every other the lawyer representing any plaintiffs in Kaprun, including the lawyers for the American plaintiffs, as well as Messrs. Lowy and Hantman.[6] Notably, at one time every one of these lawyers was at

---

[4] The U.S. citizens were represented by Jay J. Rice, Esq., the firm of Nagel Rice, LLC, Robert A. Swift, Esq., the firm of Kohn Swift,& Graf, the firm of Speir Krause, LLC, Ken Nolan, Esq., and German Lawyer. All of the foregoing, together with Michael Witti, Esq., a German lawyer, are collectively referred to hereafter as "the American Plaintiffs' lawyers.

[5] Fagan also has been disciplined at least twice in New Jersey (in 2002 and 2003). In addition, hearings have been concluded, and a decision is pending. In Office of Attorney Ethics v. Fagan, N.J. Supreme Ct. Dkt. XIV-2000-0135E, Fagan is charged with intentionally misappropriating over $480,000 from aged clients. If sustained these charges would result in automatic disbarment. In re Wilson, 81 N.J. 451, 453, 409 A. 2d 1153 (1979); In re Noonan, 102 N.J. 157, 160, 506 A. 2d 722 (1986).

[6] In the wake of his Kaprun disqualification, on September 24, 2007 Fagan apparently filed in Supreme Court-New York County an action naming as defendants all of the lawyers for the American defendants, entitled Fagan v. Jay Rice, Esq., Nagel Rice, LLC, Robert A. Swift, Esq., Kohn Swift,& Graf, LLC, Speir Krause, LLC, Ken Nolan, Esq., and Michael Witti, Esq., Index.

one time allied with Fagan. For essentially the same reasons identified by Judge Scheindlin as a basis for disqualifying Fagan in <u>Kaprun</u>, the possibility of imposing additional monetary sanctions on Fagan, on top of the $\pm$$415,000 he already owes, can do nothing to deter him from further misconduct. Plainly, for so long as Fagan holds on to his law license, only relief which is pre-emptive and prophylactic will be meaningful insofar as arresting his compulsive filing of meritless, retaliatory complaints, and other actions which seek to blame others, in one way or another, for the dismissal in June 2007 of the <u>Kaprun</u> claims, and his disqualification in August 2007.

The Lowy defendants submit that the need for the specifically preemptive relief sought in this application is self-evident from the disqualification decision. That need has been bolstered by by the further misconduct described in the Lowy affidavit and Perle declaration. Indeed, as Fagan has become more desperate, and embittered, and the possibility of his disbarment looms ever larger, he essentially has nothing to lose, the threat he poses to the legal system and legal profession has risen to a level Judge Scheindlin could not have imagined in August 2007.

In the Second Case, the additional "plaintiffs" Fagan has named are two foreign nationals, Gerhard Podovsovnik ("Podovsovnik") and Bernd Geier ("Geier"). Although neither is <u>Kaprun</u> "victim" or "survivor," and they clearly have no claims, or standing to sue, they each can freely join the judgment-proof Fagan in filing a frivolous complaint since as foreign nationals they put nothing at risk. The "Second Case" is manifestly nothing more than a shameless exercise in "judge-shopping" and harassment, attempting first to prevent Judge Scheindlin from presiding over the matters involved in the First Case, by filing a superseding state court action duplicating the now-removed First Case. See <u>Semmes Motors, Inc. v. Ford Motor Co.</u>, 429 F.2d 1197, 1202-03 (2 Cir.1970; <u>Kellen Co., Inc. v. Calphalon Corp.</u> 54 F.Supp.2d 218, 221-22 (S.D.N.Y.1999).

In addition to the obvious purpose of sidestepping Judge Scheindlin (who subsequently recused herself from the First Case), the other plain purpose of the Second Case is to intimidate or harass Lowy's lawyer, the undersigned, Michael R. Perle, ("Perle"). Perle is named as a

---

No.112892/07, but he has yet to serve the complaint.

defendant, based upon a bizarre theory, which Fagan denominates "legal malpractice," though the complaint in the Second Case fails to allege Perle ever had any attorney-client relationship with Fagan, or either of the other two plaintiffs, or their privies. Indeed, the complaint acknowledges that <u>Perle's only prior contact with Fagan was as a New Jersey lawyer representing Fagan's creditor/now adversary</u> The Lions Group, Ltd. ("LGL") and LGL's principal, Harvey Grossman, Esq. ("Grossman") in increasingly hostile arms-length dealings with Fagan from 2001 through 2006. Apart from the claims against Perle, the subject matter, the theory, and the "injury" alleged in the Second Case to have been caused to "the plaintiffs" by the Lowy defendants cannot be distinguished from their counterparts in the complaint in the First Case. Notably in Judge Scheindlin's January 3 decision in <u>Kaprun</u>, in which she again refused again to recuse herself, she inadvertently referred to the First and the Second Cases as being a single case (Exhibit C, 3).

More disturbing even than the actual filing of the Second Case was the preceding series of blatantly abusive, extortionate messages which Fagan directed by at Perle's clients Grossman and LGL before a complaint was apparently filed in the Second Case. In them Fagan <u>explicitly</u> sought through threats to pressure Mr. Grossman into intervening to force Perle to withdraw from the representation of Lowy in the First Case. It is for this reason that, In addition to the bond and other relief sought herein as to the First Case, and an order enjoining any further prosecution of the Second Case, the Lowy defendants seek an order sought restraining Fagan from communicating with, or taking any action against Perle's clients, LGL and Grossman.

### **LEGAL ARGUMENT AND AUTHORITIES**.

**POINT I**      **THE COURT MUST CONDITION ALLOWING FAGAN TO PROCEED FURTHER ON ANY BASIS IN THE FIRST CASE, OR IN ANY OTHER CASE IN WHICH a COMPLAINT WAS NOT SERVED BY THE TIME FIRST CASE WAS REMOVED, UPON FULL PAYMENT OF ALL OUTSTANDING  SANCTIONS AND FEE AND COSTS AWARDS IMPOSED BY THE SOUTHERN AND EASTERN DISTRICTS.**

Fagan's history in the Southern and Eastern Districts as a sanctions magnet and serial violator of <u>Rule</u> 11 did not begin with Judge Kram's decision in <u>Ass'n of Holocaust Victims for Restoration of Artwork (Etc.)</u> in November 2005 (Exhibit A, 17).  It stretches back to at least 1994.

See Windows Headquarters, Inc. v. MAI Basic Four, Inc., 1994 L 673519 (S.D.N.Y.1994) and 1996 WL 63046 (S.D.N.Y.1996). Whether any of the earlier monetary sanctions were paid is unknown but it is undisputed that none of the +$415,0000 in sanctions and awards of fees and costs imposed since 2005 have been paid.

In the First Case only Fagan himself is the plaintiff. The only interest he is pursuing is unabashedly his self-interest. He is not portraying himself as a proxy for his former clients. Not coincidentally, it was the obvious dominance of that same self-interest over the interests of the clients themselves which led in Kaprun to him being disqualified, not merely sanctioned. At the same time, he remains a lawyer. Not only does Fagan have a history of sanctions, largely they imposed because of the filing of similarly retaliatory, harassing claims and applications directed at formerly allied counsel, see Molefi, 2007 WL 538547, or claims in which there was no actual plaintiff. The Court's own interest in maintaining the integrity of its outstanding orders, coupled with its clear power under the All Writs Act to so, should commend the issuance of an order conditioning his ability to proceed in the First Case (or any successor case involving the same subject matter in which Fagan himself is a pro se plaintiff) upon Fagan first making payment of all outstanding sanctions, and fee/cost awards (except to the extent payment may be secured by a supercedeas bond). See Bressler v. Liebman, 1997 WL 466553, *6-7 (S.D.N.Y. 1997) (applying 28 U.S.C. §1927 against the plaintiff, a much sanctioned lawyer hugely in debt, who had sued the attorneys for his adversaries as well as the original adversaries themselves, "a stratagem that has further multiplied the already multiplicitous claims," id. at *1[7]); Brazilian Inv. Advisory Services, LTDA v. United

---

[7] 28 U.S.C. §1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally any excess costs, expenses and attorney's fees reasonably incurred because of such conduct.

In Bressler, the court found that not only plaintiff's attorney, Marino, but also plaintiff Bressler, because he was also an attorney, were both subject to a potential award of attorneys fees and costs under §1927 and sanctions and an award of fees under Rule 11:

Merchants and Mfrs., Inc., 123 F.R.D. 477, 480 (S.D.N.Y.,1989); Blauinsel Stiftung v. Sumitomo Corp., 2001 WL 1602118 (S.D.N.Y.2001) (where plaintiffs' counsel, as a means of avoiding the court's prior orders, re-filed substantially the same litigation in state court, but added a nominal "new" plaintiff); see also Connecticut Coalition Against Millstone v. Dominion Nuclear Connecticut, 2004 WL 1040109 (D.Conn 2004) (enforcing Conn. D.Ct.Loc. Rule 16(g) providing that "[t]he Clerk shall not accept for filing any paper from an attorney or pro se litigant against whom a final order of monetary sanctions has been imposed until the sanctions have been paid in full."); accord, Reynolds v. Blumenthal, 2004 WL 1040103 (D.Conn 2004).

Until and unless Fagan is required to pay all outstanding sanctions and fee/costs awards imposed by the courts of the Southern District, those awards will stand as empty gestures, which do not either serve their intended deterrent purpose, bring any measure of justice to Fagan's past victims, or in any way disable him from adding new victims to his "hit-list." Needless to say, if Fagan actually did pay the outstanding sanctions and awards, it would also provide some measure of comfort that he finally was taking the orders of this Court with at least some degree of seriousness.

---

Bressler, although he is the client in this case, is also an attorney admitted to practice before this Court. See Amended Complt. ¶ 3. The Court of Appeals has previously upheld the applicability of § 1927 sanctions to an attorney who is acting pro se. See Sassower v. Field, 973 F.2d 75, 80 (2d Cir.1992) ("[S]ection 1927 ... is available for use against Doris Sassower who, though acting pro se, was a lawyer, at least at the time of this litigation ."). In so ruling, the Court of Appeals relied on its view that the statute is intended to apply to all persons having "lawyer-like credentials." Id.

* * *

....[T]he particular circumstances of this action make it especially appropriate to fit Bressler within the parameters of the statute. The multiplicity and vexatiousness of the proceedings in the present federal action result in part from the fact that most of these claims were previously litigated in state court and in state court, Bressler represented himself. Moreover, Bressler's central role in the current litigation has been patent. For example, at a conference held on May 29, 1997, at which the viability of his claims and the possibility of sanctions were discussed, Bressler spoke at least as often as his counsel, had clearly undertaken most of the legal research himself, and was in general acting more as a co-counsel than as a client. Under these unique circumstances, Bressler is properly subject to sanctions under § 1927.

**POINT II**        **IN LIGHT OF FAGAN'S RECENT HISTORY OF UNETHICAL CONDUCT, DISMISSALS, SPURIOUS CLAIMS AGAINST OTHER ATTORNEYS, AND SANCTIONS, THE VAPIDITY OF THE CLAIMS, AND THE FACT THAT HE PUTS NOTHING AT RISK BY CONTINUING TO FILE SUCH CLAIMS IN THE PENDING FIRST CASE, BACK-STOPPED BY THE DUPLICATIVE, EVEN MORE PATENTLY VEXATIOUS SECOND CASE, THE COURT MUST CONDITION FAGAN'S RIGHT TO PROCEED ON ANY BASIS IN THE FIRST CASE UPON FAGAN POSTING A BOND IN AN AMOUNT SUFFICIENT TO SECURE THE PAYMENT OF ANY SANCTIONS AND COSTS WHICH MAY BE BE AWARDED TO PLAINTIFFS.**

As in <u>Bressler</u>, Fagan's "financial condition favors a requirement that he post security prior to continuing with the action." <u>Bressler</u>, 1997 WL 466553 at *4, citing "<u>Herbstein v. Bruetman</u>, 141 F.R.D. 246, 247 (S.D.N.Y.1992) (requiring security of a defendant in part because defendant was subject to an $18 million default judgment in another court)." <u>Bressler</u> also provides a ready model for the application of <u>Local Civ. Rule</u> 54.2, since here as well, "'the merits of plaintiff's case [are] questionable,' [and thus] security bonds are considered appropriate..," citing <u>Spitzer v. Shanley Corp</u>., 151 F.R.D. 264, 264 (S.D.N.Y.1993). <u>Local Civ. Rule</u> 54.2 provides

> The court, on motion or on its own initiative, may order any party to file an original bond for costs or additional security for costs in such an amount and so conditioned as it may designate. For failure to comply with the order the court may make such orders in regard to non-compliance as are just, and among others the following: an order striking out pleadings or staying further proceedings until the bond is filed or dismissing the action or rendering a judgment by default against the non-complying party.

While the standards for applying <u>Rule 54.2</u> to require the posting of a bond by a plaintiff are somewhat fluid, the courts of the Southern and Eastern District have settled on essentially five factors as guiding the inquiry: "(1) the financial condition and ability to pay of the party who would post the bond; (2) whether that party is a non-resident or foreign corporation; (3) the merits of the underlying claims; (4) the extent and scope of discovery; (5) the legal costs expected to be incurred; and (6) compliance with past court orders." <u>Pfizer, Inc. v. Y2K Shipping & Trading, Inc.</u>, 207 F.R.D. 23, 24 (E.D.N.Y.2001); <u>Selletti v. Carey,</u> 173 F.R.D. 96, 100-101 (S.D.N.Y.1997); <u>Bressler</u>, 1997 WL 466553, at *3; <u>Livnat v. Lavi</u>, 1997 WL 563799, at *3 (S.D.N.Y. Sept. 9, 1997); <u>Beverly Hills Design Studio v. Morris</u>, 126 F.R.D. 33, 36 (S.D.N.Y.1989); <u>Gold v. Fields</u>, 1993 WL 212672 (S.D.N.Y 1993) (imposing bond requirements on plaintiffs in light of the facts, <u>inter alia</u>,

they were "(1)... foreign citizens with apparently no assets in this district, and (2) [had] already

engaged in sanctionable conduct"); see also, Galerie Furstenberg v. Coffaro, 697 F.Supp. 1282,

1293 (S.D.N.Y.1988).

Fagan's "financial condition," i.e., profound insolvency, is a fact established by case law;

Oilex A.G. v. Mitsui & Co. (U.S.A.), Inc., 669 F. Supp. 85, 88 (S.D.N.Y.1987) ("Where, as here, it

appears that a party will be unable to pay the reasonable costs to which the opposing party will be

entitled should it prevail, the court is well within its discretion to order the posting of security").  By

definition, there exists as to Fagan the "...high risk that the plaintiff, [until recently] a debtor in

bankruptcy, will be unable to pay the defendant's costs should the defendant prevail [because, as

Fagan has repeatedly confirmed, he]...'has no liquid assets except claims before this Court and

claims in other districts...'."Atlanta Shipping Corp., Inc. v. Chemical Bank, 631 F.Supp. 335, 352

(S.D.N.Y.,1986).

The financial situations of both the plaintiff and his lawyer in Bressler are directly analogous

to that of Fagan in the dual roles here of lawyer and client:

> Mr. Bressler's financial condition favors a requirement that he post security prior to
> continuing with the action. He is subject to a $2 million surcharge in the Monmouth
> County, New Jersey action. See Herbstein v. Bruetman, 141 F.R.D. 246, 247
> (S.D.N.Y.1992) (requiring security of a defendant in part because defendant was
> subject to an $18 million default judgment in another court). In fact, Bressler has
> pleaded that he has declared personal bankruptcy as a result of the surcharge. See
> Amended Complt., ¶ 40 .... Plaintiff was forced to declare personal bankruptcy.")
> More recently, Bressler advised through counsel that he was insolvent and could not
> satisfy any judgment against him.

Bressler, 1997 WL 466553 at *4. Fagan is also like Bressler's lawyer who "didn't have a dime."

Based on that combination facts, the court held "the imposition of a bond requirement against [the

lawyer was imperative].....on the basis of [the lawyer's]...professed inability to satisfy any sanctions

that might be ordered."  id.,

Needless to say, given Fagan's financial circumstances, even if e had actually brought this

matter in good faith, a bond would be mandated. But increasing the risk exponentially with regard

to Fagan, beyond even that in Bressler,  is the distinct possibility he may soon be disbarred. While

this by itself might not end the case, it would certainly leave him without even a basis for hope of

ever successfully bringing to fruition any "real" case he might be involved in such as Alkow v. Pearlman, 07 Civ 2285 (GBD)." Moreover, despite nominally being a "New York lawyer," Fagan has only a "virtual office" in New York. He has no real "presence," and certainly no meaningful assets in New York. He puts at risk nothing in terms of "assets" by filing frivolous claims in New York. And In the Second Case, he is joined by two foreign nationals who likewise have no "reachable assets."

With regard to the "merits" of the underlying claims,  they must be gauged in light of the facts that: (i) Fagan has apparently indiscriminately sued not only Lowy and Hantman, but also every other attorney who appeared on behalf of any of the plaintiffs in Kaprun; it would seem implausible that he honestly believes every one of them is responsible for his fall from grace. (ii) The alleged activities of the Lowy defendants (and Hantman) which are the subject of his claims relating to Kaprun are attributed to a period beginning at least three months after the claims of the Kaprun plaintiffs who Fagan represented were dismissed on forum non-conveniens grounds, and at least one month after Fagan was disqualified; they obviously cannot have any causal relationship with either the dismissal or the disqualification.

Moreover, the theory of all of the claims relating to Kaprun (Counts I, II and II) not only lack any actual basis in law, they all appear instead to be grounded in Fagan's distorted moral code -- namely that Lowy had some sort of affirmative duty both to champion Fagan, and support Fagan's defiance and circumvention of the disqualification order, instead of following-up on Judge Scheindlin's suggestion that he contact Fagan's former clients about representing them. Plainly, all of the Kaprun related claims rest on the totally unworthy premises that the real party in interest in Kaprun was and remains Fagan, not the clients he formerly represented, and that he has a continuing property interest in his relationship with the former clients, a concept repudiated again by Judge Scheindlin in the January 3 decision (Exhibit C, 3).

The remaining substantive claims, Counts IV, V and Vi, all rest on the equally dubious proposition that Fagan has a right to sue Lowy now just because he believes will have certain future claims for fees from Lowy relating to the Alkow v. Pearlman case at the time these claims mature, i.e., if and when a recovery is achieved in the case, and that at such point Lowy will then

"attempt to cheat Plaintiff and his team out of [the money due them]..." As noted in the Notice of Removal, Judge Daniels rejected the notion that the representation of clients in <u>Alkow</u> was an appropriate subject for litigation in a separate case, and the issue was resolved once Lowy's pro hac admission removed Fagan's ability to push him aside. None of these claims in the First Case appear to be capable of withstanding a motion to dismiss under <u>Rule</u> 12(b)(6).

Fagan's recent past history of course provides a ready predictor of "the extent and scope of discovery" if this action were to proceed. That history, consisting of a virtually unbroken record of dismissals, and large malpractice and other judgments against him in suits brought by ex-clients, shows that Fagan, through his penchant for sounding false alarms, and setting off wild goose chases, still has an uncanny ability to enlarge "the extent and scope of discovery," and related costs, wildly beyond any reasonable expectations. The best illustration in this regard is the size of the recent fee and cost awards against Fagan, based in substantial part upon discovery costs.

Fagan's record of "...compliance with past court orders..." is one of brazen defiance of and contempt for such orders – not limited to his failure to pay sanctions and costs. This was most recently underscored on January 3 by Judge Scheindlin, who warned him again that his continuing attempt to intrude himself into <u>Kaprun</u>, in brazen disregard of the disqualification order, was inviting a further round of sanctions (Exhibit C, 3).

Finally, there are other closely related factors which have an obvious and direct bearing on the question of a bond. The first is Fagan's characteristic compulsion to try every case "in the press" through inflammatory out-of-court statements, which has also been cited at a factor supporting the imposition of a bond. At the same time he has been trying to push Lowy out of <u>Alkow</u> through this lawsuit, and by filing a motion under seal in <u>Alkow,</u> rejected by Judge Daniels, he has also been feeding stories to the press intended to alienate Lowy from the <u>Alkow</u> plaintiffs; see <u>Selletti v. Carey</u>, 173 F.R.D. 96, 99-100 (S.D.N.Y.1997).

The second factor is the likelihood that Fagan may not be practicing law much longer. Closely related is the third, and most compelling factor  -- Fagan's intolerably outrageous conduct in threatening with reprisal Harvey Grossman, and his company, who are not parties in this action,

but are clients of Perle, Lowy's counsel. Fagan in unmistakable terms warned them that unless they pressure Perle into withdraw from representation of Lowy, they too would be sued. In light of all of the foregoing, particularly the latter, the Lowy defendants submit that the imposition of a bond requirement here is mandatory, in addition to requiring Fagan to pay all outstanding sanctions and fee/cost awards.

Based upon Fagan's recent history, his penchant for repetitive, vexatious motion practice, and the many dozens of hours already expended by counsel in dealing with Fagan's fulminations, at least $150,000 could easily be consumed by the Lowy defendants in legal fees and costs before this matter is finally put to its well-deserved death. Accordingly the Lowy defendants suggest a bond in the amount of at least $150,000 would be appropriate.

**POINT III**     **IN LIGHT OF FAGAN'S HISTORY OF MISCONDUCT, HIS PENCHANT FOR FILING MALICIOUS, SCORE-SETTLING LITIGATION AGAINST OTHER LAWYERS, HIS CONSIDERATION OF SUING JUDGE SCHEINDLIN, HIS ATTEMPT TO INTIMIDATE THE CLIENTS OF MR. LOWY'S ATTORNEY IN ORDER TO PRESSURE HIM TO WITHDRAW, THE LACK OF MEANINGFUL DETERRENCE POSED BY ANY TREAT OF ADDITIONAL SANCTIONS, THE POSSIBILITY HE MAY SOON BE DISBARRED, AND THE HAZARD FAGAN POSES TO THE LEGAL SYSTEM AND THE LEGAL PROFESSION, ANY FURTHER FILINGS BY FAGAN IN ANY COURT OF THE UNITED STATES MUST BE SUBJECT TO PRIOR SUBMISSION FOR REVIEW AND AUTHORIZATION BY THIS COURT.**

Fagan has plainly entered the select circle formerly populated by other <u>pro se</u> luminaries chronically at war with the rest of world such as the subjects of the <u>In Re Martin-Trigona</u> decisions, <u>In re Martin-Trigona ("Martin-Trigona I")</u>, 737 F.2d 1254 (2Cir.1984); <u>In re Martin-Trigona ("Martin-Trigona II")</u>, 763 F.2d 140 (2 Cir.1985), <u>Sassower v. Abrams</u>, 833 F.Supp. 253 (S.D.N.Y.1993) and progeny; e.g., <u>Iwachiw v. New York State Dept. of Motor Vehicles</u>, 396 F.3d 525, 528 (2 Cir. 2005); <u>Davey v. Dolan</u>, 453 F.Supp.2d 749, 757 (S.D.N.Y.,2006). He must be dealt with as they were:

> When a party files repeated lawsuits involving the same nucleus of operative facts, a district court has the inherent power to enjoin him from filing vexatious lawsuits in the future. See <u>Malley v. N.Y. City Bd. of Educ.</u>, 112 F.3d 69, 69 (2d Cir.1997) (affirming injunction where the plaintiff had filed repeated lawsuits concerning the same nucleus of operative facts.); <u>Safir v. United States Lines, Inc.</u>, 792 F.2d 19, 24 (2d Cir.1986) ("Ultimately the question the court must answer is whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial

process and harass other parties."); <u>Raffe v. John Doe</u>, 619 F.Supp. 891, 898 (S.D.N.Y.1985) (Conner, J.) (enjoining litigant from filing future lawsuits when that litigant had a history of filing vexatious lawsuits). Moreover, the court has a constitutional duty to enjoin the filing of frivolous lawsuits in order to preserve judicial resources when the litigant is likely to file more suits in the future. See <u>In re Martin-Trigona</u>, 737 F.2d 1254, 1261 (2d Cir.1984) (noting that injunctive relief is particularly appropriate when the plaintiff appears judgment-proof because sanctions would be ineffective); see also <u>In re Hartford Textile Corp.</u>, 659 F.2d 299, 305 (2d Cir.1981), cert. denied,455 U.S. 1018, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982) ("The United States Courts are not powerless to protect the public, including litigants ... from the depredations of those ... who abuse the process of the Courts to harass and annoy others with meritless, frivolous, vexatious or repetitive ... proceedings."). Furthermore, "the traditional standards for injunctive relief, i.e. irreparable injury and inadequate remedy at law, do not apply to the issuance of an injunction against a vexatious litigant." In re Martin-Trigona, 737 F.2d at 1262.

In the present case, we have little difficulty concluding that the circumstances necessitate some restriction on future litigation by Salem. <u>Salem has instituted numerous lawsuits and counterclaims against plaintiff and plaintiff's counsel which have no merit and which needlessly waste precious judicial resources in addition to harassing plaintiff and his counsel. While we recognize that the imposition of monetary sanctions might be warranted, it is unlikely that such sanctions would successfully curb future litigation by Salem as he appears to be nearly judgment-proof. Salem has still not paid the default judgment entered against him in 1999, and in the current lawsuit in which plaintiff sought to set aside a fraudulent conveyance frustrating collection of this judgment, Salem has merely repeated his previous efforts to obtain vacatur of the default judgment. Therefore, because monetary sanctions would be insufficient to deter future litigation, an injunction is warranted.</u> However, we are mindful that the injunction must be fashioned carefully to avoid prejudicing Salem's legitimate due process rights.

Accordingly, Salem is hereby enjoined from filing or prosecuting, without leave of this Court, further actions  or proceedings in the federal courts against Neshewat or his counsel Paul J. Goldstein and Goldstein & Metzger, LLP seeking review of or relief from the default judgment entered against him in New York State Supreme Court. See <u>Polur v. Raffe</u>, 912 F.2d 52, 57 (2d Cir.1990). However, the injunction does not extend to state courts because "[a]buse of state judicial processes is not per se a threat to the jurisdiction of Article III courts and does not per se implicate other federal interests." <u>In re Martin-Trigona</u>,  737 F.2d at 1263.

<u>Neshewat v. Salem</u>, 365 F.Supp.2d 508 at 529-530 (S.D.N.Y.,2005) (Emphasis added).

Here as in <u>Neshewat</u>, both the First and Second Cases, and no doubt <u>Fagan v. Nagel Rice</u> as well, all involve Fagan attempting to blame others for the dismissal of his former clients' claims, and his own disqualification in <u>Kaprun</u>, i.e., ".....the same factual grouping, transaction, or series of transactions, [and thus] ....are deemed to be part of the same cause of action and the later claim will be barred without regard to whether it is based upon different legal theories or seeks different or additional relief"; <u>United States v. Alfano</u>, 34 F.Supp.2d 827, 833-34 (E.D.N.Y.1999), citing <u>Bd.</u>

of Managers of Windridge Condominiums One v. Horn, 234 A.D.2d 249, 250, 651 N.Y.S.2d 326, 327 (2d Dep't 1996); see also Interoceanica Corp. v. Sound Pilots, Inc., 107 F.3d 86, 90 (2d Cir.1997); Kellen Co., Inc. v. Calphalon Corp., 54 F.Supp.2d 218, 222 (S.D.N.Y.1999).

The First Case and the Second Case are exactly the same case with respect to the Kaprun related claims against the Lowy defendants, differing only in name, index number and the forum in which they are currently lodged. Fagan's reasons for initiating the Second Case were transparently strategic – to harass Lowy's counsel and to sidestep the removal and Judge Scheindlin, Semmes Motors, Inc. v. Ford Motor Co., 429 F.2d 1197, 1202-03 (2 Cir. 1970). Under such circumstances, when dealing with a desperate lawyer/pro se plaintiff such as Fagan, who for obvious reasons cannot be effectively controlled with monetary sanctions, the only meaningful option is to subject him to the Martin-Trigona regime before he strikes again[8] – namely the entry of a standing order which requires that Fagan submit for review by this Court, and obtain this Court's permission by formal order, before being permitted to file any new complaint, serve any heretofore unfiled complaint, or to take any step further in any matter relating to Kaprun, whether in a state or a federal court, whether it targets Judge Scheindlin, any lawyer, or any other party in any way because of some alleged involvement with Kaprun.

The All Writs Act, 28 U.S.C. § 1651was one of the two grounds previously cited to support for removal of the First Case to this Court. As explained in Davey v. Dolan, 453 F.Supp.2d 749, 757, the All Writs Act also vests in this Court the power to enter an order enjoining a prolific litigant who was been repeatedly sanctioned, from commencing or prosecuting, without leave of Court, any

---

[8] Compare Fagan's shameless conduct with that of the lawyer disbarred by New York and New Jersey, Matter of Kramer, 247 A.D.2d 81, 677 N.Y.S.2d 576 (1 Dept.,1998); In re Kramer, 172 N.J. 609, 800 A.2d 111, 117-119 (2002) whose activities included investigation of a federal judge:

> Overall, the evidence presented at the hearing demonstrates that respondent has shown neither remorse nor self-control. Neither the public censure and private reprimand nor the temporary suspension he received from this court, nor the public reprimand from the Supreme Court of New Jersey, have deterred his misconduct. He appears unable to appreciate the magnitude of the harm he causes to his clients and to the courts before which he practices. [800 A.2d at 113-114]

later-commenced action in either a federal or <u>state</u> court (i.e., the Second case)  which is duplicative of the case pending before this Court, or involves the same nucleus of operative facts, citing, <u>inter alia</u>, <u>Malley v. N.Y. City Bd. of Educ</u>., 112 F.3d 69; <u>In re Martin-Trigona</u>, 737 F.2d at 1261-62; <u>In re Hartford Textile Corp</u>., 659 F.2d 299, 305 (2d Cir.1981) ("The United States Courts are not powerless to protect the public, including litigants ... from the depredations of those ... who abuse the process of the Courts to harass and annoy others with meritless, frivolous, vexatious or repetitive ... proceedings.").  The fact that in the later state court case the same litigant who brought the previously pending case in federal court may join additional plaintiffs or add different defendants, is immaterial. <u>Kellen Co., Inc. v. Calphalon Corp.,</u> 54 F.Supp.2d 218, 221-22 (S.D.N.Y.1999).

   <u>Kidd v. Andrews,</u> 340 F.Supp.2d 333, at 335-36 (W.D.N.Y.2004) noted that in <u>Semmes Motors</u>, 429 F.2d at 1203, the Second Circuit had already pronounced that it would not tolerate "any exception [to the first-filed rule] for cases where the same party is plaintiff in both actions [in the same court because of]...the danger that plaintiffs may engage in forum shopping or, more accurately, judge shopping.... Those considerations, too, weigh against allowing plaintiff to proceed in both fora simultaneously." <u>Kidd</u> definitively rejected the further argument, to be anticipated here from Fagan, that the "filed-filed" rule should not be applied to restrain his right to proceed in the Second Case, because he was the plaintiff in a previously filed action, and "....[the second] case is sufficiently distinct [from the First Case in both the parties joined and remedies sought]...." <u>Kidd</u> held this was "......a distinction without a difference,..[and at odds with entire body of decisional law that would]...require a plaintiff to try his whole cause of action and his whole case  at one time," citing <u>Alfano</u>, 34 F.Supp.2d at 833-34; see also <u>Regions Bank v. Wieder & Mastroianni, P.C.</u>, 170 F.Supp.2d 436, 440-41 (S.D.N.Y.2001) staying plaintiff from proceeding in a second case in Georgia, even though it involved at least one defendant which could not be joined in the first-filed Southern District. See also  <u>Kaempfer v. Brown,</u> 684 F. Supp 319, 321-22 (D.D.C.1988).

**POINT III**    **AN INJUNCTION SHOULD BE GRANTED AGAINST FAGAN PROCEEDING WITH THE SECOND CASE.**

The Anti-Injunction Act, 28 U.S.C. § 2283 does not bar, or even have relevance to a federal court's power to enjoin the prosecution of a duplicative state court case where, as here, the federal court was seized of jurisdiction before the initiation of the state court case. Dombrowski v. Pfister, 380 U.S. 479, 484, n. 2, 85 S.Ct. 1116, 1119 n. 2, 14 L.Ed.2d 22 (1965). On the contrary,, the All-Writs Act 28 U.S.C. § 1651(a) was intended to grant federal courts the power to enjoin a later action in state court which encroaches upon its previously invoked jurisdiction. In re Baldwin-United Corp., 770 F.2d 328, 335-36 (2d Cir. 1985). "[F]ederal injunctive relief may be necessary to prevent a state court from so interfering with a federal court's consideration or disposition of a case as to seriously impair the federal court's flexibility and authority to decide that case." Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 295, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970) (dicta).

This power includes the authority to issue injunctions to protect the exclusive federal jurisdiction gained over of a case that has been removed from state court. In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 134 F.3d 133, 145 (3d Cir.1998); cf., Kaempfer v. Brown, 684 F. Supp 319, 321-22. See Yonkers Racing Corp. v. City of Yonkers, 858 F.2d 855, 863-865 (2 Cir.1988); Atlantic Coast Line R.R. Co. v. Brotherhood of Locomotive Engineers, 398 U.S. 281, 295, 90 S.Ct., 1739, 1747, 26 L.Ed.2d 234 (1970) (dicta); Neuman v. Goldberg, 159 B.R. 681, 685 (S.D.N.Y.1993) (upon filing of a notice of removal based on § 1651(a), the state court was immediately stripped of jurisdiction).

This Court has the authority to enjoin the duplicative second suit in state court, whether or not it has also subjected plaintiff to a full Martin-Trigona regime. But the standards to be applied in considering the imposition of an injunction are similar to, or overlap with those which come into play in considering the imposition of a bond, or the imposition of a Martin-Trigona order; see, Neshewat, 365 F.Supp.2d at 529-530. Compare Kellen Co., Inc.,, 54 F.Supp.2d at 221-22; Kidd, 340 F.Supp.2d 333, at 335-36; Regions Bank v. Wieder & Mastroianni, P.C., 170 F.Supp.2d at

440-41. The generally recognized considerations were recently adumbrated by Magistrate Judge

In <u>Kashelkar v. Bluestone</u>, 2007 WL 2791432 at *4-5 (S.D.N.Y.2007) as follows:

> "The equity power of a court to give injunctive relief against vexatious litigation is an ancient one which has been codified in the All Writs Statute." <u>Polur v. Raffe</u>, 912 F.2d 52, 57 (2d Cir.1990) (quoting <u>In re Hartford Textile Corp.</u>, 681 F.2d 895, 897 (2d Cir.1982)); accord <u>Word v. Croce</u>, 230 F.Supp.2d 504, 514 (S.D.N.Y.2002). This authority allows a district court to enjoin individuals, including pro se litigants, from filing further vexatious litigation. <u>Sathianathan v. Smith Barney, Inc.</u>, No. 04 Civ. 7122(DAB)(FM), 2006 WL 538152, at *32 (S.D.N.Y. Feb. 24, 2006).
>
> Before restricting a litigant's future access to the courts, a court should consider five factors:
>
> > (1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties.
>
> <u>Safir v. United States Lines, Inc.</u>, 792 F.2d 19, 24 (2d Cir.1986). "Ultimately, the question the court must answer is whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties." <u>Id</u>.
>
> Plaintiff's litigiousness and refusal to accept other courts' rejection of claims identical to those asserted in this action justifies restricting Plaintiff's ability to sue Defendants, yet again. <u>Plaintiff has repeatedly sued attorneys in this Court and in the New York courts, simply because they successfully represented their clients in frivolous litigation which he initiated</u>. "Not only does this consume valuable judicial resources, but it typically requires a response and the concomitant consumption of resources by opposing counsel. Whether viewed as a deliberate endeavor intended to harass and antagonize opposing parties, or as the result of cognitive dissonance and an <u>inability to accept judicial rulings, such behavior is unacceptable</u>." <u>Fitzgerald</u>, 1999 WL 1021568, at *5.

<u>Fagan's history of vexatiousness and sanctions is enshrined in the case law</u>. As recently as January 3, Judge Scheindlin warned Fagan of the further jeopardy he faces  because of his refusal to accept the court's ruling on disqualification. Even more clearly than the First Case, the gravamen of the Second Case is Dagan's repudiation of the same rulings in <u>Kaprun</u> confirmed again on January 3. Equally plain, the Second Case was a blatant attempt both to avoid the effect of the removal of the First Case and Judge Scheindlin, following her acceptance of the First, and to disable Low's counsel from effectively representing him in the First Case.

Dagan's bad faith in filing the Second Case is also unmistakable from the nature of the "claims" pled. As even a cursory review of the contacts in 2006 between Perle and Dagan shows that he had to know on November 19, the date the complaint was filed in the Second Case (three days after he says he first saw the Notice of Removal), that he had no basis for any malpractice claim, or a fiduciary claim based on Perle having a "duty" to <u>Dagan</u> to produce financing for <u>Kaprun</u>. It is also obvious from the one-way flow of emails that the only" relationship" between Perle and Dagan during 2006 was one Dagan hectoring  Perle for money, and Perle's disregard of Dagan. That "relationship" ended with Perle brushing-off Dagan's incessant, and eventually threatening demands upon Perle and his clients Grossman and LGL for assistance in finding him more money.

As the complaint itself states, Fagan himself recognizes his relationship with Perle, Grossman and LGL  was  adversarial <u>in 2006</u>. There is absolutely nothing in their communications, nearly all of which consists of unsolicited emails from Fagan, which remotely suggests that Perle's relationship with Fagan was anything other than one of wary, arms-length annoyance, ending with rejection of Fagan's overtures seeking his and Grossman's assistance, essentially as brokers, in meeting Dagan's <u>financial -- never his legal needs</u>. There is absolutely nothing which suggests any relationship of trust with <u>Fagan</u>, or indicates that Perle's loyalty was ever other than to LGL and Grossman, Fagan's unhappy creditors and present adversaries.

It is black letter law that without an actual attorney-client relationship, there cannot be a cognizable claim of "attorney-malpractice."As the Court further held <u>Jacobs v. Law Offices of Leonard N. Flamm</u>, 2005 WL 1844642, at *6-7 (S.D.N.Y.2005). "As a threshold matter, it is necessary for a plaintiff to establish the existence of an attorney-client relationship at the time of the alleged malpractice. <u>Tabner v. Drake</u>, 780 N.Y.S.2d 85, 88 (3 Dep't 2004) (citing <u>Hansen v. Caffry</u>, 720 N.Y.S.2d 258 (3 Depot 2001)." <u>There no allegation in the second complaint that an "attorney-client" relationship ever existed between Perle and Fagan, or that any relationship at all ever existed between Perle and the remaining "plaintiffs," who he has never met</u>.

The fact that Fagan believed Perle may have been in a position to help him financially cannot be equated with Fagan having the power to unilaterally impose any <u>duty</u> to do so on Perle,

whatever Perle's capabilities may have been. As Judge Chin held in <u>Jacobs</u> in dismissing the "fiduciary" claim there, which presumably has its counterpart in the allusions in the Second Case to Perle having a "special relationship" his Fagan, "... it is difficult to imagine any such claim that is not based on a purported attorney-client relationship. In any event, Jacobs has not articulated any. Accordingly, the breach of fiduciary duty claim [must be].... dismissed on this basis as well." 2005 WL 1844642 at *7.

Plainly nothing about the communications in 2006 was <u>legal</u> in nature. Fagan was not seeking any "legal advice" from Perle or Grossman. Unlike Perle's earlier communications with Mr. Goldman, the broker, nothing in Fagan's emails even touched upon the subordination issue, or any other <u>legal</u> question. The only issue was Dagan's need for <u>money</u>. Even if there had been an allegation of an actual attorney-client relationship, he would still

> have the burden of showing that communications to and from Clark were made "solely for the purpose of the [defendants] seeking legal advice and its counsel rendering it,"<u>In re John Doe Corp.,</u> 675 F.2d 482, 488 (2d Cir.1982), and not for the purpose of advancing a party's business ventures, see <u>In re Gaming Lottery Securities Investigation</u>, 2000 WL 1171166 at *6 ("Since the disclosures made to Magnuson were made for transmission to licensing authorities, defendants have not demonstrated that the disclosures would not have been made but for the sake of securing, advancing, or supplying legal representation.") (citation and internal quotation marks omitted); see also <u>Duttle v. Bandler & Kass</u>, 127 F.R.D. 46, 52 (S.D.N.Y.1989).... [T]he mere [receipt of a communication by a party who happens to be an attorney]... does not render the [communication]...privileged unless they reflect communications made to obtain his [legal] advice.").

<u>Renner v. Chase Manhattan Bank</u>, 2001 WL 388044 at *1 (S.D.N.Y.).  If Fagan honestly thought he had some basis for believing Perle actually had an attorney-client or other fiduciary relationship with him in 2006, his remedy was not a lawsuit against Perle but rather a motion to disqualify Perle. See <u>Levin v. Raynor</u>, 2004 WL 2937831, 34 Employee Benefits Cas. 1696, 66 Fed. R. Evid. Serv. 36 (S.D.N.Y.2004),.

Moreover, all of this communication was directed to the offices Messrs. Perle and Grossman in <u>New Jersey</u>. Both are New Jersey lawyers, though Perle also practices in New York. LAL's only office is in New Jersey. Because the communications were by email, where Fagan was communicating with them from at the time is unknown. It is clear that he now resides in New

Jersey. Through the summer of 2007, to support the filing of a voluntary bankruptcy in Florida he was claiming Florida residency, and that he had no actual office in either New York or New Jersey. In other words, if, _arguendo_, there were a basis for any claim against Perle for malpractice, negligence, or breach of contract due to the alleged "special relationship" with Fagan, it likely would be governed by New Jersey law.

Under New Jersey law, as it likely is everywhere, "[b]eing a fiduciary is antithetical to adversarial relationships or conflicting interests, which the parties obviously have the potential to have and may actually have had in this case." Lippincott v. Estate of Coles, 2005 WL 3454765 at *4 (N.J.App.Div.2005). Fagan himself is a lawyer. There is no allegation in the complaint in the Second Case that Perle ever had an attorney-client relationship with Fagan. The complaint itself acknowledges that in the 2006 contacts, all unilaterally thrust upon Perle by Fagan, Fagan was aware that LGL and Grossman, whose interests Perle was representing, potentially were then, and now actually are his adversaries. (Exhibit B, ¶20, n.2) Given this awareness, he cannot have regarded Perle as simultaneously having any sort of fiduciary relationship with him.

But even if Fagan had a deluded belief that Perle was his lawyer or fiduciary, that unreasonable belief would not support the existence of such a relationship:

> In general, only the party [actually] retaining the services of an attorney can bring a legal malpractice action against the attorney. Catizone v. Wolff, 71 F.Supp.2d 365, 368 (S.D.N.Y.1999)... A party's "unilateral belief" that he is represented by counsel "does not confer upon him the status of client unless there is a reasonable basis for his belief." Id. at 371.

Uehigashi v. Kanamori, 161 F.Supp.2d 221, at 225-26 (S.D.N.Y.2001).

The "new plaintiffs" in the Second Case are complete strangers to Perle. They cannot claim any sort of vicarious "special relationship" based on some relationship of their own with Fagan:

> There is absolutely no evidence in any part of the record, which indicates that the Lippincotts ever had any contact or ever met Mr. Henkel. Therefore, the requisite elements of legal malpractice are absent. They are the existence of an attorney/client relationship creating a duty of care upon the attorney, the breach of such a duty, proximate causation of damages sustained and actual damages. [Conklin v. Hannoch Weisman, 145 N.J. 395 (1996) ].
>
> There having been no attorney/client relationship, there could have been no reliance by the Lippincotts on anything that Mr. Henkel did either as an attorney or as an

escrow agent, and I base that decision on the lack of an attorney/client relationship and the very specific terms of the escrow agreement. I also dismiss all claims against Mr. Henkel in his alleged fiduciary relationship to the Lippincotts

Lippincott, 2005 WL 3454765 at *4.

Under both New Jersey or New York law, there also is a requirement that plaintiff must be able to show some proximate causal relationship between the alleged breach of "duty," i.e., Perle's failure to produce the "nominal money" Fagan was demanding, and whatever damage is claimed, presumably based upon either the demise of the Kaprun claims on forum grounds in 2007 (an infirmity which was obvious from the outset of the case, or Dagan's disqualification, also in 2007.

In addition, to support a professional malpractice claim, New Jersey law imposes the requirement that the party suing a professional must submit an "affidavit of merit." See N.J.S.A. 2A:53A-27. Such an affidavit is required even if the claim is presented as a negligence or contract claim if the underlying factual allegations require proof of a professional relationship with the plaintiff, and deviation from the professional standard of care applicable to that specific profession. See Darwin v. Gooberman, 339 N.J.Super. 467, 772 A.2d 399, at 408 (App .Div.2000). Levinson v. D'Alfonso & Stein, 320 N.J.Super. 312, 727 A.2d 87 (App. Div.1999). It seems implausible that Fagan, who is currently ineligible to practice in New Jersey, and is facing disbarment there, would be able to recruit any credible lawyer to issue an affidavit opining that Perle had an attorney-client relationship with him in 2006 based on Fagan pestering Perle to help him, let alone that Fagan's loss of the Kaprun case and disqualification could possibly have any causal connection with any contact between Perle and Fagan in 2006.

Fagan does not contend Perle any longer had any "special relationship" with him as of November 16, 2007, when he states first saw the September 2007 emails, attached as "Exhibit G" to the Notice of Removal. Those emails were offered to show Fagan's efforts, following his disqualification, to circumvent the disqualification order and continue to run the Kaprun case before the district court. Presumably they were a significant element in Judge Scheindlin's decision to treat the removed case as related to Kaprun. The additional October 1-2, 2007 emails between Fagan and Podovsovnik (Lowy 3 &4), showing Fagan and Podovsovnik debating the wisdom of suing

Judge Scheindlin, are being offered on the same basis. Both lawyer and client enjoy an absolute immunity with respect to the presenting of these exhibits as parts of the pleadings in the First Case:

> Plaintiff's second cause of action alleges that libelous statements were made by Z & C in two affirmations submitted in connection with the appeal of the Second Action. ...pertinent statements made in pleadings and in other legal papers in the course of litigation are absolutely privileged (Wiener v. Weintraub, 22 N.Y.2d 330, 292 N.Y.S.2d 667, 239 N.E.2d 540 [1968];Mosesson v. Jacob D. Fuchsberg Law Firm, 257 A.D.2d 381, 683 N.Y.S.2d 88 [1st Dept. 1999] )...[except for example]... the absolute privilege may be lost in a few rare instances (none of which have been cited by plaintiff). For instance, where a party has manipulated the legal process or initiated litigation for the purpose of defaming another, the privilege is lost (see Savage Is Loose Co. v. United Artists Theatre Circuit, 413 F.Supp. 555 [S.D.N.Y. 1976]. Counsel in the case enjoys an absolute immunity from suit.

Mintz & Gold, LLP v. Zimmerman, ____ N.Y.S.2d ____, 17 Misc.3d 972, 2007 WL 3101156 2007 N.Y. Slip Op. 27435 at *3 (N.Y.Sup.N.Y.County 2007).N.Y. 1968. See also, Wiener v. Weintraub 22 N.Y.2d 330, at 330,  239 N.E.2d 540, 292 N.Y.S.2d 667, at 668 (1968):

> There can, of course, be no doubt that statements made by counsel and parties in the course of 'judicial proceedings' and privileged as long as such statements 'are material and pertinent to the questions involved * * * irrespective of the motive' with which they are made.

While the "exception" might apply to Fagan, it obviously has no application to Perle or Lowy's purely defensive use of documents, regardless of whether Fagan or Podovsovnik, the authors of those emails, may believe they were "privileged" or "confidential" on some basis. In defending himself in a suit brought by Fagan or Fagan and Podovsovnik, Lowy has an absolute right under the "self-defense exception" to use putatively "privileged information" to defend himself against claims based on him having some sort of "fiduciary" or "attorney-client" relationship with Dagan or Podovsovnik. First Federal Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co.,110 F.R.D. 557, 565-66 (S.D.N.Y.1986). Moreover, the only materiality of the documents in question is that they expose Dagan's defiance of the disqualification order. As such, any claim of "priviliege" would be overcome under the "crime-fraud" exception, given their contumacious nature.

Even more fundamentally, when these emails were written (i) Dagan himself had already been disqualified, and the recipients included various other persons who were neither attorneys in the case nor actual Kaprun clients, e.g., Geier, Podovsovnik, Dagan's ex-wife

("elizfagan424@aol.com"), as well as "consultants and money "finders. Thus, by definition, the emails in question were never either "confidential" or attorney-client communications.

Regarding the actual allegations against Lowy in the Second Case, all that is alleged is that he appeared on behalf of the foreign plaintiffs in Kaprun. No facts are alleged there that would support a finding he had any attorney-client relationship with either Fagan himself, or either of the two new "plaintiffs" before, during, or after any pertinent time. Neither Fagan, nor either of the foreign plaintiffs in the Second Case was himself a plaintiff in the actual Kaprun case.

> The attorney-client privilege belongs to the client. [Only] [c]lients may invoke the privilege to prevent their lawyer from divulging communications made in confidence to their lawyer "while acting in the capacity of professional legal adviser for the purpose of obtaining legal advice.

Doe, 709 F.2d at 1046. Only an actual Kaprun plaintiff could have standing to assert such a claim against Lowy, whether for revealing allegedly "privileged information" or "malpractice." Regardless of how they characterize their relationships with any persons who actually were plaintiffs in Kaprun, Fagan, the disqualified former lawyer, and Geir and Podovsovnik, have no any cognizable claim against Lowy with regard to any alleged release of such information, and lack standing to assert such a claim. Uehigashi, 161 F.Supp.2d at 225-26; see also Lucas v. Lalime, 998 F.Supp. 263, 268 (W.D.N.Y.1998):

> It is a firmly established rule in New York that where there is no privity of contract, a plaintiff may not sue an attorney for simple negligence, absent proof of fraud, collusion, malicious acts or other special circumstances. United Bank of Kuwait PLC v. Enventure Energy, 755 F.Supp. 1195, 1200-1201 (S.D.N.Y.1989); Scomello v. Caronia, 232 A.D.2d 625, 648 N.Y.S.2d 688 (2d Dep't 1996) (plaintiff could not sue for legal malpractice on behalf of her children, where children were not in privity with plaintiff's attorney); Michalic by Nakovics v. Klat, 128 A.D.2d 505, 512 N.Y.S.2d 436 (2d Dep't 1987) (non-client mother could not sue father's attorney for mere negligence in handling custody litigation); Viscardi v. Lerner, 125 A.D.2d 662, 510 N.Y.S.2d 183 (2d Dep't 1986) (intended beneficiaries of will could not sue attorney who drafted will); Conti v. Polizzotto, 169 Misc.2d 354, 646 N.Y.S.2d 259 (S.Ct. Kings Co.1996), aff'd,663 N.Y.S.2d 293 (2d Dep't 1997) (to sustain cause of action for legal malpractice sounding in negligence, privity must exist between plaintiffs and defendant).

Apart from the lack of any plausible basis for finding any attorney-client or other fiduciary relationship with Perle, if any of the plaintiffs in the Second Case has suffered any "injury" to his business, it clearly resulted from the demise of the Kaprun claims as the result of Fagan losing the

forum motion, and/or <u>Fagan's</u> disqualification in August 2007, not from anything Lowy did or did not do in September-October 2007.

Other than the "claims" against Perle, and the "malpractice" claims against Lowy in the Second Case, everything else in the Second Case complaint merely repeats a claim or allegation made in the First Case. Plainly neither Fagan nor his "co-plaintiffs" in the Second Case have any "objective good faith expectation of prevailing." That surely was not why the case was filed. The only reason it was filed was in fact to impose "...(3)...needless expense to other parties [and]....an [to impose] unnecessary burden on the courts and their personnel."

For all of the foregoing reasons Fagan's prosecution of the Second Case must be enjoined.

### POINT IV    THE TEMPORARY RESTRAINTS INCORPORATED IN THE ORDER TO SHOW CAUSE ISSUED BY THE STATE COURT SHOULD BE DISSOLVED, AND THE RESTRAINTS FORMALLY VACATED.

This point addresses a housekeeping matter. Fagan began the First Case on an Order to Show Cause entered in by the New York Supreme Court on October 31, 2007. It included breathtakingly broad, and clearly <u>ultra vires</u> temporary restraints upon, <u>inter alia</u>, (i) Lowy's communication with any of the <u>Kaprun</u> plaintiffs <u>formerly</u> represented by Fagan, and (ii) Lowy's further participation in pending federal cases, in particular <u>Alkow v. Pearlman</u>, 2285 (GBD), which is pending before Judge Daniels. <u>Alkow</u> is a case in which the plaintiffs originally retained <u>Lowy</u>, not Fagan. When the temporary restraints were brought to the attention of Judge Daniels on November 6, before removal of the First Case, he flatly stated he considered them meaningless.

However, no order was ever formally entered in the Southern District after the removal of the First Case to vacate the restraints or discharge the Order to Show Cause. The Lowy defendants submit that the temporary restraints, although their duration was the left open in the state court order to show cause, automatically expired no later than 10 days after removal, absent any application or order under <u>Local Civ. Rule</u> 65(b) to extend them. "After removal, interlocutory orders of the state court are transformed into orders of the court to which the case is removed." <u>In re Diet Drugs,</u> 282 F.2d 220, at 231-32 (3d Cir.2002). As the Third Circuit explained there in an

accompanying footnote

> ....whenever a case is removed, interlocutory state court orders are transformed by operation of 28 U.S.C. § 1450 into orders of the federal district court to which the action is removed. The district court is thereupon free to treat the order as it would any such interlocutory order it might itself have entered." Nissho-Iwai Am. Corp. v. Kline, 845 F.2d 1300, 1304 (5th Cir.1988).

282 F at 232, n.7. This Court is free to simply disregard the October 31, 2007 order to show cause, the return date on which has longed passed. But for purposes of clarity, and the preemption of any future Fagan applications based thereon,  the Lowy defendants respectfully suggest that an order be entered which discharges the order to show cause entered by the Supreme Court of New York on October 31, 2006, and vacates the temporary restraints contained therein.

## CONCLUSION

For all of the foregoing reasons, the Lowy defendants urge that an Order to Show Cause be entered in the form presented, including the proposed temporary restraints, and that the relief sought be granted on the return date.

Dated: January 13, 2008

                              Respectfully submitted,

                              MICHAEL R. PERLE, PC

                              By:   Michael R. Perle
                              1265 Paterson Plank Road
                              Secaucus, New Jersey 07094
                              201-864-0200 & 646-688-4904
                              m.perle@earthlink.net
                              Attorney for Defendants James
                              F. Lowy and International Law Group