UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
—————————————————————X

EDWARD D. FAGAN, ESQ., DR. BERND GEIER
and DR. GERHARD PODOVSOVNIK,                          07-CV -10293 (LAK)

                    Plaintiffs,

          vs.

JAMES F. LOWY, ESQ., INTERNATIONAL LAW          **DECLARATION IN SUPPORT OF
GROUP, LLC, FLORIDA LAW GROUP, LLC,              ORDER TO SHOW CAUSE AND RULE
MICHAEL R. PERLE, ESQ., and MICHAEL R.          65(b) STATEMENT IN SUPPORT OF
PERLE, PC,                                       TEMPORARY RESTRAINTS**

                    Defendants.
—————————————————————X

MICHAEL R. PERLE, an Attorney-at-Law admitted to practice in the State of New York,

under penalty of perjury declares as follows:

1. <u>Introduction.</u> I am the attorney in the within action for James F. Lowy, Esq. ("Lowy"),

International Law Group, LLC ("ILG"), and Florida Law Group, LLC ("FLG") (collectively "Lowy"

or "Lowy defendants"). They, together with together with Robert J. Hantman, Esq. and Hantman

& Associates (collectively "Hantman"), were sued by Edward D. Fagan, pro se ("Fagan") in the

above-captioned case ("the First Case"), originally filed on October 29 in the Supreme Court of

New York -- New York County (Ind. No. 114562/2007) and removed to this Court on November

13, 2007. I am making the declaration in tandem with the affidavit of Mr. Lowy in support of

temporary and <u>pendente lite</u> relief being sought by Order to Show Cause.

2. <u>Kaprun and Removal of the First Case.</u> Fagan, the plaintiff in the First Case, is a

lawyer much-sanctioned in this district, who is currently fighting disbarment in New Jersey. As

noted by the Hon. Shira A. Scheindlin, U.S.D.J, in sanctioning and disqualifying Fagan on

August 16, 2007 from continuing as counsel for certain plaintiffs in <u>In Re: Ski Train Fire in

Kaprun Austria on November 11, 2000</u>, 01-MDL-1428 ("<u>Kaprun</u>"), "[i]n recent years Fagan has

engaged in a pattern of unethical behavior...[and various Southern and Eastern District judges

have found]...Fagan's conduct worthy of reproach and sanctions." (Exhibit A,10, & n. 29).

3.  Kaprun is a Multi-District Litigation, representing the consolidation in this district before Judge Sheindlin of several cases, including 03-CV-8960 (SAS); 03-CV-8961 (SAS); 06-CV-2811(SAS); 07-CV-935 (SA); 07-CV-3881 (SAS); 07-CV-4104 (SAS). All of the consolidated cases relate to claims arising from the deaths of, or injuries resulting from a tunnel fire in Kaprun, Austria on November 11, 2000. Those injured and killed in the Kaprun fire included several U.S. Citizens, and also +150 non-U.S. citizens. Fagan, before being disqualified, was lead counsel for the non-U.S. plaintiffs. The U.S. citizens were represented by Jay J. Rice, Esq., the firm of Nagel Rice, LLC, Robert A. Swift, Esq., the firm of Kohn Swift,& Graf, the firm of Speir Krause, LLC, and Ken Nolan, Esq., and a German Lawyer, Michael Witti, Esq., was associated with the lawyers for the American plaintiffs. Mr. Lowy was one of Fagan's co-counsel. Mr. Hantman also became a co-counsel in 2006. Supposedly most of the foreign plaintiffs only had retainers with Fagan.

4.  The actual claims of claims of the foreign defendants, who had been represented by Fagan, as well as Messrs. Lowy and Hantman, were dismissed by Judge Scheindlin on forum non conveniens grounds on  June 16, 2007. At that time a motion to disqualify Fagan brought by the defendants was pending. That motion was joined in by the counsel for the American plaintiffs. In a August 16 decision and order, Judge Scheindlin sanctioned Fagan and disqualified him from representing any plaintiffs in Kaprun, based upon both Fagan's conflicts of interest and his unethical conduct in the case. In the decision, Judge Scheindlin also suggested that Messrs. Lowy and Hantman contact the foreign Kaprun plaintiffs who supposedly had retained the now-disqualified Fagan, to determine if they wished to retain Lowy or Hantman so that they would have continuing representation in Kaprun (Exhibit A, 30). At that point a motion for re-consideration of the dismissal on forum grounds remained pending before the court.

5.  Although expressed somewhat incoherently, the "gravamen" of the First Case, insofar as it pertains to Kaprun and Mr. Lowy, seems to be that Mr. Lowy, (i) by contacting the Kaprun plaintiffs in the wake of Fagan's disqualification in order to preserve their rights in the district

court, as Judge Scheindlin suggested in the decision (id., at 30), violated some unexplained duty of abject loyalty to Fagan; (ii) this "duty" commanded Mr. Lowy to abjure the Court's suggestion and instead champion Fagan's absolute right to continue as counsel in the case for the foreign plaintiffs; (iii) Mr. Lowy violated this "duty" by communicating with the former-Fagan clients regarding the possibility of them retaining him to represent them going forward, in defiance of Fagan's wishes. The related premises of the theory seem necessarily to be that despite his disqualification, the foreign plaintiffs in Kaprun remained Fagan's clients, and he, not the clients themselves, was the real party in interest in Kaprun, and accordingly, it remained his right to run the Kaprun case, despite his disqualification.

6.   This position essentially boils down to the inherently frivolous (and contumacious) proposition that Fagan was, and still is, free to disregard the disqualification and give legal guidance to his former Kaprun clients. In a decision on January 3, 2008 in Kaprun, Judge Scheindlin recognized that Fagan was continuing in his attempts to run the Kaprun case, reflected by him continuing frivolous to file motions in Kaprun, though he lacked standing to do so as either a lawyer or a party. She warned him that such conduct "may warrant the imposition of [further sanctions]" (Exhibit C, 3). Judge Scheindlin was not aware that since Fagan's disqualification in Kaprun, both the frequency and ferocity of his misconduct, exemplified by his actions regarding Mr. Lowy, and now me, have actually progressively increased – far beyond what she was aware of or could imagine.

7.   The Pending Action Filed Against the Lawyers for the American Plaintiffs in Kaprun, and Fagan's Consideration of Suing Judge Scheindlin. The inherently wrongful premises of Fagan's claims in the First Case self-define them as frivolous, and mandate the relief sought herein. However, a multitude of the other retaliatory actions have been directed by Fagan against both Mr. Lowy and others in the wake of his disqualification, and by themselves warrant an immediate referral of Fagan to the District Disciplinary Committee, as well as the grant of the relief sought here in the Order to Show Cause. The first in time, but last known example is the

retaliatory action Fagan apparently filed on September 24, 2007 in Supreme Court-New York County (in the wake of his <u>Kaprun</u> disqualification) naming as defendants all of the lawyers for the American defendants, <u>Fagan v. Jay Rice, Esq., Nagel Rice, LLC, Robert A. Swift, Esq., Kohn Swift,& Graf, LLC, Speir Krause, LLC, Ken Nolan, Esq., and Michael Witti, Esq.</u>, Index. No.112892/07. However, Fagan first advised the defendants in <u>Fagan v. Nagel Rice, et al.</u> of the suit on December 24, 2007, and still has not served them with a summons or an actual complaint (Exhibit D, 1).  With that case, plus the First Case, it seems Fagan has now sued every lawyer who appeared for any plaintiffs in <u>Kaprun</u>.  Even more alarmingly, as detailed in Mr. Lowy's Affidavit (Lowy Exhibits 3 and 4[1]), simultaneously consideration was being given by Fagan and Gerhard Podovsovnik (see below) to filing a suit against Judge Scheindlin, in addition to the retaliatory suit against the attorneys for the American plaintiffs in <u>Kaprun</u>,.

  8.  <u>The Second Case Filed Against Lowy, et Al.</u> The First Case was filed by Fagan on October 29, 2007. Unbeknownst to Mr. Lowy or me until after December 14, 2007, on November 19, 2007, after removal of the First Case on November 13, 2007), Fagan filed another complaint in Supreme Court -- New York County (Exhibit B), this time with the caption <u>Edward D. Fagan, Esq., Dr. Bernd Geier and Dr. Gerhard Podovsovnick vs. James F. Lowy, Esq., International Law Group,  Florida Law Group, LLC, Michael R. Perle, Esq., and Michael R. Perle, PC</u>, Index No. 115473/2007 ("the Second Case"). In the complaint in the Second case Fagan also named as additional "plaintiffs" two foreign nationals, Gerhard Podovsovnik ("Podovsovnik") and Bernd Geier ("Geier"). The Second Case is a duplication of the First, with the major only differences being that the undersigned is named as a defendant, and Mr. Hantman is omitted. Despite naming the additional "plaintiffs" and substituting me for Mr. Hantman as one of the defendants, the subject matter, the theory, and the "injury" allegedly

---

[1] References in the form "Lowy Exhibit _" are to the exhibits annexed to Mr. Lowy's affidavit.

caused, or "threatened" by the conduct of the Lowy defendants (now plus me) cannot be meaningfully distinguished from their counterparts in the pending First Case.

9.   Notably in Judge Scheindlin's January 3, 2008 decision and order in <u>Kaprun</u>, she inadvertently referred to  the First Case and the Second case as actually being a single case (Exhibit C, 3). Judge Scheindlin's conflation of the complaints in the First and Second Case reflects the same point immediately evident from  a comparison of their contents -- the Second Case is nothing more than a shameless attempt exercise in <u>judge-shopping</u>, seeking both to circumvent the removal of the First Case, and the assignment of that case to Judge Scheindlin. As shown in the accompanying affidavit of Mr. Lowy, the Second Case is also transparently aimed at disrupting my representation of Mr. Lowy in the First Case, and my collaboration with him in <u>Alkow v. Pearlman</u>, 07 CV 2285 (GBD). The Second Case, if anything, is even more directly focused than the First Case upon actions allegedly taken by Mr. Lowy, as a lawyer in <u>Kaprun</u> in September-October 2007, in the wake of Fagan's disqualification.

10.   The only "differences" between the two complaints are that (i) the Second Case relates only to <u>Kaprun,</u> and (ii) it names as additional defendants me and my law firm, on the basis of some alleged, but never-defined "special relationship" I supposedly had with Mr. Fagan during a period beginning and ending within 2006, and my actions beginning in November 2007, after this "relationship ended,  in representing  Mr. Lowy in the First Case. Coincidentally, the nature of the "claims" in the Second Case also appear to be framed in exactly the same amorphous terms as the claims against the other <u>Kaprun</u> lawyers in <u>Fagan v. Nagel Rice, et al.</u>

11.   <u>The Need for a Bond and Other Relief.</u> The Order to Show Cause with temporary restraints which the Lowy defendants are applying for includes a request for relief based upon the procedures established in the <u>In Martin-Trigona</u> cases and progeny,[2] and a bond under <u>Loc. Civ. Rule</u> 54.2. The extremis which Fagan is in both professionally (facing disbarment) and

---

[2]  <u>In re Martin-Trigona ("Martin-Trigona I"),</u> 737 F.2d 1254 (2Cir.1984); <u>In re Martin-Trigona ("Martin-Trigona II"),</u> 763 F.2d 140 (2 Cir.1985).

financially ($13.6 million in debt) was laid-out in excruciating detail in the disqualification decision (Exhibit A, 8-15). Notably, this total includes at least +$415,000 in sanctions and fee/costs awards (exclusive interest) imposed on Fagan by the Southern and Eastern Districts since 2005, all of which apparently remain outstanding.[3]

12.   Despite thumbing his nose at the courts of the Southern and Eastern Districts for several years, Fagan has remained free to practice before courts in these districts, and use the court system to settle scores, file frivolous claims, and, even more outlandishly, to continue to engage in the same conduct which prompted these sanctions. Plainly, since the previous sanctions and awards have done nothing to deter his misconduct to this point, the threat, or even imposition of additional fee awards or monetary sanctions will do nothing to deter further misconduct. Instead, the lack of any real consequences to date seems to have emboldened him to make extortionate threats and to file even more repetitive, frivolous claims against virtually every lawyer who at one point was allied with him in Kaprun. For this reason that the Lowy defendants believe that as long as Fagan holds on to his law license, only relief which is pre-emptive and prophylactic can be meaningful in interdicting his compulsive misconduct.

13.   The relief under Martin-Trigona must extend to any successor case, or related case which Fagan might seek to commence, or prosecute in any forum against any lawyer who was served as counsel for, or appeared on behalf of any plaintiff in Kaprun, or now appears on behalf of any the Lowy defendants in the First Case, or any client of any such lawyer. It must mandate that (i) an application must be made to this Court by Fagan for permission to proceed

---

[3]   This includes totals of + $350,000 imposed by Judge Kram in 2005 in Ass'n of Holocaust Victims for Restoration of Artwork (Etc.) v Bk. Austria [Etc.], No. 04 Civ. 3600, 2005 Westlaw 3099592 (S.D.N.Y. 11/17/ 2005) (Exhibit F); +$15,000 imposed in Molefi v. The Oppenheimer Trust, 03 Civ 5361, 2007 WL 538547 (E.D.N.Y. 2/15/07) (Exhibit F) and $5,000 in sanctions and +$45,00 in fees and costs imposed by Judge Scheindlin in Kaprun in 2007. In addition Fagan owes over $3.5 on malpractice judgments. On January 7, 2008, (i) Rebecca Williams, Esq., of the firm of Stroock Stroock and Levan confirmed to me that none of the fees and costs imposed by Judge Kram were paid and the total now due from Fagan is approximately $380,000, and (ii) Jay R. Rice, Esq. confirmed to me none of the +$15,000 in fees + costs awarded to his firm in Molefi have been paid by Fagan. Review of the dockets in both cases indicates Fagan has never paid the sanctions.

in any such action in which the complaint was not served as of the date of removal of the First Case to this Court, and (ii) a formal order of this Court granting Fagan leave to proceed with the filing or service of any new submission, or with further prosecution of any such case.

14.    Additionally, the Lowy defendants seek an order requiring that, as a condition to Fagan being allowed to proceed in the First Case, he must pay all outstanding sanctions and fee awards, and pursuant to <u>Local Civ. Rule</u> 54.2 post an additional bond of $150,000 to secure payment of any sanctions or fees which may be awarded against him in the First Case. They also propose that he be required to post an additional bond in an equivalent amount in any related or similar case for which he may be granted leave to proceed. The need for such relief is amply supported in the Lowy Affidavit showing that (i) Fagan clearly has become a hazard to the legal system and the legal profession, and (ii) the threat of additional money sanctions or awards of fees is meaningless with respect to Fagan, who is facing disbarment, currently owes over $400,000 in previously imposed sanctions and fee/cost awards, and is $13.6 million in debt, including at least $3.5 million in unpaid malpractice judgments.

15.    <u>The Bad Faith in Filing The "Second Case" is Manifest from The "Theory" as to Michael Perle.</u> In addition, injunctive relief is sought against prosecution of the "Second Case." The "theory" on which I am named as a defendant in the Second Case is bizarre even by Fagan's standards. I am supposedly being sued for "malpractice," despite the lack of any allegation in the complaint(i)  that I have ever had contractual or other relationship of any kind, or even met or communicated with Podovsovnik, Geier, or any actual Kaprun plaintiff, or (ii) that I ever had an attorney-client relationship or other relationship, with Fagan, other than adversarial and/or arms-length. There are also absolutely no allegations in the complaint in the Second Case that I ever have had any confidentiality or other agreement with Fagan, Podovsovnik, Geier, or any actual <u>Kaprun</u> plaintiff which could have created any sort of obligation with respect to unspecified "confidential information."

16.  <u>The Relationship of Fagan with My Clients, Harvey Grossman and The Lions Group,</u> <u>Ltd.</u> What is perhaps most astonishing about Fagan filing a claim against me in the Second Case for "attorney malpractice" is that the claimed "special relationship" with Fagan is not based on any alleged attorney-client or fiduciary relationship between me and Fagan, or even any member of his family, but rather my activity as and attorney for and representative of Harvey Grossman ("Mr. Grossman") and Lions Group, Ltd. ("LGL"), who Fagan <u>incorrectly</u> alleges are collectively my "principal client" (Exhibit B, ¶¶ 20-21, n.2). That indeed is the sole basis for the alleged "special relationship."[4] But it gets more bizarre. Among the tangled themes of the complaint, one is that I am actually representing Mr. Lowy only in order somehow to advance the interests of LGL and Mr. Grossman (<u>Id.</u>). If so, it would merely confirm that during the entire time in 2006 where it is alleged in the complaint that I had supposedly "special relationship" with Fagan, it was clear to Fagan I was representing the <u>adverse</u> interest of LGL and Mr. Grossman in all of my dealings with him, and that he was never my "client."

17.  As the complaint asserts <u>correctly</u>, Mr. Grossman (a New Jersey attorney)  and LGL are now, and have been creditors of Fagan for nearly 10 years and <u>formal adversaries</u> of Fagan for some time. Mr. Grossman and I have been close friends almost since we both began practicing law in New Jersey in 1971. My first dealings with Mr. Fagan were in 2000-2001, in the course of representing LGL. Mr. Grossman, through LGL, first became active in the litigation "funding business" on a very limited scale approximately 12 years ago. Around 2001 he underwent multiple coronary bypass surgery, which for some time drastically limited his ability to continue his law practice. During that period, embracing almost of all of the actual transactions between LGL and Fagan, he concentrated most of his time on LGL's business. He was initially captivated by the "champion of the Jews" image Fagan had constructed for himself and remained to some extent under Fagan's spell for several years beginning in about 1998. In

---

[4]  In 2006-07, my total billings to Mr. Grossman and LGL were $0.00.

response to this pitch, he supported Fagan's efforts in the Holocaust cases by advancing several hundred thousand dollars to purchase part of Fagan's anticipated fees.

18.    However, the spell cast by Fagan began to lift after LGL found itself in constant litigation from 2001 forward with Fagan's ex-wife and his many other creditors, all of whom claimed lien positions, or asserted claims in conflict with Fagan's representations, and the assignments he had made by Fagan to LGL. Beginning in 2001 I represented LGL as a would-be intervener in Fagan's divorce. There, LGL's direct adversary was Fagan's ex-wife, as well as several other creditors, all competing to be paid out of the Holocaust fees. Although Fagan did ultimately receive fees in the millions on the Holocaust cases, LGL never was able to recoup even the actual advances because of the large litigation expenses it expended in fighting with his ex-wife and other Fagan creditors to share in the Holocaust fees which Fagan had assigned to LGL. As it turned out, Fagan had made multiple, conflicting assignments, and/or pledged fees in the Holocaust cases which in some cases he was barred from doing under non-assignment orders issued in the divorce proceeding. As a result, despite the successful conclusion of the Holocaust cases around the year 2001, LGL came up far short. Having no real choice, LGL agreed in 2001 to accept instead what was to be the assignment of a first lien position on Fagan's fees in the new Kaprun case. Thereafter, LGL also made further advances to Fagan, in response to his pleas for funds to support his family, in return for assignments of additional portions of anticipated Kaprun fees.

19.    I also represented LGL in later litigation brought against Fagan in 2003-04 by a former Fagan client and creditor, the late Andrew Decter, who claimed a competing secured position on Fagan's anticipated fees Kaprun. In the course of suing Fagan, Decter later added LGL as a defendant, and challenged LGL's priority of lien on Kaprun. Fagan represented himself. After securing a +$700,000 judgment against Fagan, Decter voluntarily dismissed the case as to LGL. All of my dealings with Fagan through the divorce, the Decter case and other matters relating to Fagan, were solely on behalf of LGL, based upon LGL being Fagan's

creditor, and LGL's need to compete for a position with other Fagan creditors. LGL had the same wary, arms-length, potentially adversarial relationship with Fagan as the rest of his other creditors.

20.    It was as a result of representing LGL in this role, not through any "special relationship" or attorney-client relationship with Fagan, that I developed a considerable familiarity with Fagan's troubled legal and personal history. Fagan no doubt assumes it is likely I would be asked by LGL to represent it in the litigation Fagan has threatened in the complaint in the Second Case to launch against LGL (Exhibit B, ¶ 20, n. 2)).  I assume it is this assumption, plus my knowledge of Fagan's foibles, which account for the zeal with which Fagan has sought to prevent me from representing Mr. Lowy, or even from serving as Mr. Lowy's local counsel in Alkow v. Pearlman, 07 CV 2285 (GBD).

21.    The Subordination Issue. The "special relationship" which Fagan alleges he shared with me is identified as being based upon my contacts with him in 2006. These are the facts as to any such "contacts." By 2006, Mr. Grossman had recovered his health sufficiently to resume his law practice. He had also by then dramatically curtailed LGL's operations, and was no longer becoming involved in financing any major litigation except matters in which he was participating as a lawyer. The complaint in the Second Case alleges that "...in early spring 2006, Plaintiff Fagan approached Defendant Perle and ...Grossman and...LGL...to assist him with the further prosecution of The Kaprun Cases [by securing financing]...." Those assertions are wrong, but that is immaterial. In actuality, what occurred is that in early spring 2006 Mr. Grossman and I were approached not by Fagan but rather by a third-party, Steven F. Goldman. Mr. Goldman is a non-practicing lawyer who is currently affiliated  -- as an independent broker -- with Peachtree Financial, a major litigation "funder." I have represented Peachtree, as well as other litigation funders, in addition to LGL. I also have represented Mr. Goldman on some minor matters. Mr. Goldman and I frequently spoke in 2006 because he sought my  assistance with regard to Peachtree matters in contacting other funders I represented.

22.  Mr. Goldman  apparently had been enlisted by Fagan earlier in 2006, as a broker, to help Fagan in securing "funding" to continue in <u>Kaprun</u> and at least meet his living expenses and obligations to his children and ex-wife. Mr. Goldman also had undertaken to find an established law firm in New York which could provide Fagan with a "home." Mr. Goldman believed this was needed in order to lend Fagan some credibility both with the defendants and with any potential funders which might be approached to make an investment in <u>Kaprun</u>. However, the immediate reason for Mr. Goldman contacting me was the recorded first lien position which LGL held covering, <u>inter alia</u>, any fees or other moneys which might become due Fagan out of the proceeds of a recovery in <u>Kaprun</u>. This effectively meant no other funder could consider an investment unless LGL were willing to <u>subordinate</u> its first lien position in whole or in part to "new money." Mr. Goldman made the predictable and obvious "pitch" to me that: (i) Fagan did not have enough money, or any money to bring <u>Kaprun</u> to the point it could be settled at a reasonable amount; (ii) in order to protect LGL's own investment, "new money" would have to invested by another funder so that Fagan could complete the case, and resolve it on a reasonable basis sufficient to repay LGL; (iii) Fagan was on the verge of bankruptcy; (iv) if he entered bankruptcy, LGL's lien position would be under attack from other creditors, etc.

23.  Mr. Goldman also apprised me of the problems he having in finding any credible lawyer in New York City to provide Fagan with a "home," something which Mr. Goldman regarded as the other prerequisite for securing additional funding for <u>Kaprun</u>. He eventually sought my suggestion of a lawyer who might be interested. To my great regret, I, suggested Mr. Hantman, a friend of 30 years and my former suite-mate in New York.

24.  An  introduction of Fagan to Mr. Hantman ensued (Exhibit Q) and did produce an association between them in <u>Kaprun</u>. It soon turned contentious, but in the short interim, Fagan was able to use Mr. Hantman's office, and extract $100,000 from a client of Mr. Hantman, Hunter Singer. Fagan also enlisted Mr. Hantman's office within this period to prepare various "Executive Summaries" in order to help Fagan to "market" <u>Kaprun</u> to potential "investors."

Copies of a draft document were sent by Mr. Hantman to me and Mr. Grossman in June 2006, with the express request that they be forwarded to potential "investors." However, we did not do so because the document was incomplete. Despite Mr. Goldman's vigorous efforts, his quest for more funding for <u>Kaprun</u> came to naught. By August 2006 he advised me he had given up.

25. <u>Contact in 2006 with Fagan; The Email Bombardment of "Harvey & Mike."</u> In August of 2006 (not the spring), after Mr. Goldman had given-up, Fagan himself began to <u>directly</u> hound me, Mr. Grossman, and Mr. Grossman's wife (a non-lawyer who was principal in LGL) to aid him in obtaining money for both <u>Kaprun</u> and for the support of his family. LGL is a New Jersey company which is located in Mr. Grossman's law office All of his communications to both of us were to our offices in <u>New Jersey</u>.. At that point it is my understanding Mr. Fagan had no New York office and was living in either New Jersey or Florida. Fagan contacted me and Mr. Grossman not as lawyers but rather only as a source of additional funding, i.e., either directly or as brokers. Notably, unlike Mr. Goldman, he never sought to engage either me or Mr. Grossman on the issue of subordination. <u>His only purpose was to seek money</u>. Fagan hoped (a) that I would be in a position to help him in finding new money, because he knew, I assume from Mr. Goldman, I represented other entities in the litigation funding business. He also no doubt believed that Mr. Grossman could help him, if he wanted to, by inducing people who had been co-investors on LGL transactions, to invest money in <u>Kaprun</u>, or by paving the way for Fagan to approach other funders Mr. Grossman had business relationships with.

26. Fagan's basic message at the time to us was one of desperation -- that he was unable even to pay his own barest living expenses, or meet his obligations to his children and ex-wife, let alone finance the <u>Kaprun</u> case, which he coupled with veiled threats that he would challenge LGL's first lien position unless new money were forthcoming. Beginning in August 2006, and continuing over the next three months, Fagan unloaded on me and Mr. Grossman an avalanche of unsolicited emails, and voice-mail messages, accompanied in a few instances with attachments of documents, pleadings, and marketing summaries, often sending several emails

in a single day. As the emails from Fagan reflect, we studiously avoided responding to most of them, or to the many voice-mails, although it proved impossible to totally avoid Fagan's calls. The email messages to "Michael [Perle] & Harvey [Grossman]" all had similar themes, beginning on August 18, 2006 (Exhibit P, #1[5]), as follows (with original formatting retained):

> It was good talking to you and you should know that things are FINALLY GOING GREAT again in Kaprun.
>
> Everything we wanted to achieve at yesterdays conference we achieved AND MORE.  Those present were the new US team (Ed Fagan, Robert Hantman, Bryan Ha [Hantman's associate] and James Lowy), Ken Nolan for the American victims, Gordon Haesloop for Omniglow, Brant Bishop and Robert Gilmore for Siemens AG and Siemens Corp, Paul Rooney for Bosch Rexroth Corp. and Arti Soni for Bosch Rexroth AG.
> * * *
> - we got permission to file Amended Complaints AGAINST US DEFENDANTS over whom there is NO QUESTION ABOUT JURISDICTION;
> - we got permission to move against the Republic of Austria;
> - we got an expedited timetable that is good for us;
> - the Judge consolidated and bifurcated the Omniglow, Siemens & Bosch claims from all the other claims so these claims can go forward separately and fast (she told the defendants they should be happy that she was giving us permission to file Amended Complaints because it brings MORE DEFENDANTS and MORE MONEY to the table; and
> - ON HER OWN INITIATIVE SHE APPOINTED HER MAGISTRATE JUDGE THEODORE H. KATZ AS A SETTLEMENT MASTER.  I have found Judge Katz to be incredibly fair and KNOWS this case and ALL the defendants including OE, Verbund-AHP, GBK and others very well as he has handled one or more of the discovery issues against every one of the defendants.  EVERYONE - ALL DEFENDANTS (Omniglow, Siemens, Bosch, Republic of Austria, its ministires, agencies and other organs, OE, Verbund-AHP, GBK, Westinghouse, WIKA Instruments, The Bosch Group), all of us as plaintiffs counsel and representatives of the victims and survivors will be "invited" to participate in REAL SETTLEMENT DISCUSSIONS.
>
> You know full well what this combination now means in the context of this case and as security for the funders.
>
> With this email, I am sending you a copy of Judge Scheindlin's Order Referring the Case to Judge Katz for Settlement - look at her handwritten note - "ASAP PLEASE" - it speaks VOLUMES.
> I am also sending the copy of the Proposed Case Managment Order # 3 that explains what she did in greater detail and we are awaiting her signature on another Order.

---

[5] All of the referenced emails from this period are set forth in chronological order in Exhibit P; the "#'s" appear on each email.

Finally, I am sending you copies of MY PRESENTATION that got us to this legal position.   Enjoy the reading and PLEASE help me with funders. The Case desperately needs money so we can finish it and I need money to survive.   I will call later to see how you can help.  Hantman can help because his fees will also guarantee the loan but this MUST be done within a matter of weeks.

It helps us all - and protects the monies HARVEY has put into and has invested in me and Kaprun.

27.  Although this email also prompted no response from "Harvey & Mike," on August 18,

2006, Fagan sent another email to us regarding his problems with other creditors:

Here is a copy of the letter I am sending to Judge Convery [the judge in his divorce case].  I believe it is absolutely necessary to let him know from me what I think is going on and that I intend to take the appropriate action to respond to this, as outlined in my letter.

Please give me a call if you wish to discuss this and if you wish to join in an application against what Decter and Edry did without notice to any of the other legitimate and known creditors, such as Harvey Grossman and The Lions Group, and which I believe may prejudice the rights of such creditors.

You may reach me via email or on my Cell Phone (973) 568-6441.  Thank you.

[Exhibit P, #2] [Emphasis added]

28.  Again he received no response from us, but Fagan persisted. Another email to "Dear

Harvey & Michael" followed on August 30 (Exhibit P, #3), which in pertinent part read as follows:

PLEASE PLEASE PLEASE HELP ME. I NEED THE MONEY TO HELP KEEP ME ALIVE AND KEEP MOVING THE CASES TIL THEN. BUT WE ARE GOING TO HAVE A SETTLEMENT.

Another email to "Harvey & Michael" followed an hour later (Exhibit P, #4):

I just got a letter from OMNIGLOW where they are trying to avoid responding to our discovery - which is fine - my response will go tomorrow with another 50 Demands and deposition notices. The last paragraph of the letter says "I am available to meet with you, trial schedules notwithstanding, in advance of the upcoming settlement meetings with Magistrate Judge Katz, to discuss the respective positions about the term structure and resolution of claims against Omniglow, for the Europeans that you represent".

He did not say to see IF we can settle - he wants to talk "term structure" and ONLY for the Europeans that "I" represent. This will happen before the end of this month.

PLEASE PLEASE PLEASE HELP ME. I NEED THE MONEY TO HELP KEEP

ME ALIVE AND KEEP MOVING THE CASES TIL THEN. BUT WE ARE GOING TO HAVE A SETTLEMENT.

On August 30 at 4:49 PM Fagan sent a third email to "Harvey & Michael"(Exhibit P, #5):

We are getting there BUT I NEED THE MONEY I told you about. PLEASE RESPOND.

Finally there was a fourth email on August 30 to "Harvey & Michael" at 8:13 PM (Exhibit P, #6):

We JUST got the order and it is HUGE for us. It has EVERYTHING we wanted her to include.

We are BACK like in the old days where we are WINNING everything.

We have potential days for Settlement Negotiations in October AND November and a Judge COMMITTED to settling.

We have the first defendant - Omniglow - that has TOLD us they want to settle with the European victim and survivor families.
We have THE JUDGE allowing us to move forward against the Republic, its ministries, its companies AND the FOREIGN DEFENDANTS.
* * *
Enjoy the reading and PLEASE HELP WITH INTERIM MONEY OR ALL THIS IS MEANINGLESS.

29.  These begging emails prompted no direct response from "Dear Harvey and Michael" but  Fagan was undeterred; on September 11, 2006, he wrote to us, "PLEASE respond to my emails and calls and help so we can finish the Kaprun case properly and quickly.  (Exhibit P, #7). A similar email to "Harvey & Michael" followed on September 15 (Exhibit P, #8), to which Fagan attached a marketing document entitled "Revised Executive Summary." In the email he expressly urged us to forward it to "potential funders"; viz:

Here is a Revised Executive Summary of the Potential Investment in the Kaprun Case.
|* * *
**Please get this out to the potential funders you know. We REALLY NEED the money to help finish the case and to protect the investment we all have in it.** If you set up the meetings, Hantman, Lowy and I will attend, but you guys should PLEASE make the initial contact so we know that the people we are talking to are interested and need to discuss details.
Please try to set up at least 3 meetings with potential funders between now and the end of the month.

Please get back to me today by phone to confirm that you have this and will start working on getting these funders lined up.

*Fagan v. Lowy, 07Civ10293 (SAS), M. Perle Decl. in Support of OSC, 1/15/08, p. 15*

I am still in Tampa through mid-day but am travelling to NJ to be with my kids overnight and then to be in NY tomorrow to work on Kaprun and then I leave for Europe tomorrow night.
Lets be in touch.
Thanks.
Ed
PS I am going to "drop" in on Judge Katz's chambers tomorrow to give them the Courtesy copies of the new complaints - it is really just a way to be able to say "HEH, WHEN IS THE 1st SETTLEMENT MEETING"?

30.    Following transmission of the "Revised Executive Summary of the Potential Investment in the Kaprun Case....,", I did provided a copy to one funder/client to mollify Fagan.. However, having nothing to tell Fagan, wishing to avoid further unnecessary entanglement with Fagan, neither I nor Mr. Grossman responded either to this email, or several voice-mails araound the same time. This a prompted new barrage on September 25 (Exhibit P, #8); viz:

Now to business - PLEASE PLEASE PLEASE HELP. Here is what we need and here is the support for it.

No joke - I am in trouble of being able to live day to day and of being able to make it to the end. The end can and should be great and here is why.
With this email, I am providing you with a Budget that I worked out for the next 7 months. These are expense items that are absolutely necessary. You will note that the monies that were SUPPOSED to be raised when Robert and I first got together included monies that I needed to SURVIVE because I put everything I had into the case are NOT included in this budget. The budget is what the essential team members need to be able to do the work and to finish the case.

This is a REAL BUDGET coming from someone who knows budgets in cases like this.

You might think that I am CRAZY for believing we should spend this kind of money. Well I WOULD be crazy if I did NOT believe we need to spend this kind of money. The FACTS are on our side. The LAW is on our side. The JUDGES seem to be on our side. The DAMAGE awards in NY and Florida Court are on our side. The risks are minimal if non existent. The amount of money need will be recovered and paid back FIRST.

With this email you are getting 4 groups of documents, all of which flow from the Budget and the work we need to do in the coming weeks, months.

# 1 - The Budget - we MUST get this and I suggest that you Robert and Eric [Leavor, a prospective "funder"] give this your most urgent attention.

# 2 - Analysis of Potential Settlement Amounts from Defendants in Both Groupings. Note: Even if my numbers are 20%, 30%, 40%, 50% 60 % or even 70% too high they STILL provide us with a HUGE Settlement Fund from which

we can help meet the goals of our clients.

# 3 - Summary Selection of Some Relevant and Instructive Cases in Florida and NY - showing the Settlement Numbers I am projecting are REAL. One of the most important cases is the Hackert v. First Alert Inc case in NY Federal Court. It shows the standard and amounts Courts will allow based upon length and conditions of the suffering of the decedent and the injuries suffered by the family survivors. This is a VERY IMPORTANT case for us.

# 4 - Copies of the cases themselves - read and enjoy them. Note - The Florida Cases come with Part 2 of this email.

DO NOT GIVE THESE MATERIALS TO ANYONE ELSE WITHOUT DISCUSSING IT WITH ME FIRST.

PLEASE HELP.

31.    None of these "materials to anyone else," or read by us. Another email on September 25 to "Harvey & Mike" followed a minute later, with multiple attachments (Exhibit P, #9): "Here are the Florida Cases [referring to new cases he was filing?]. PLEASE PLEASE PLEASE HELP." Despite the "PLEASE PLEASE PLEASE HELP[s]," we again failed to respond. In a September 27 email (Exhibit P, #10), Fagan's tone became threatening; <u>viz</u>:

I have been calling for two days and I had hoped to hear from one of you. Before that I sent you emails after emails and got nothing.
My situation is VERY SERIOUS. I am worse off than I was in March 2006, when you sent me to Robert Hantman and we all know how that ended.

Let me see if I can put things into proper perspective.

<u>If I do NOT get the money that is needed to finish Kaprun and to survive, I think you should consider whatever monies as you believe I owe you as LOST.</u>

32.    Apparently on September 27 Fagan did reach Mr. Grossman by telephone, and took Mr. Grossman's willingness to speak with him  as an invitation to resume the email bombardment of "Harvey & Mike" on September 28 (Exhibit P, #11):

<u>It was good talking to you Harvey yesterday and I PRAY you and Mike can find a way to help with $23,000 per month</u> for the next two months. You are absolutely right Harvey that a Chapter 11 WOULD weaken the positions of persons who ultimately should be paid from the fees I earn in Kaprun. Which is why I NEED this help and I NEED it NOW ! ! ! I believe it will ONLY be you or Mike who can help now. Hantman failed completely on this front. It does not mean that he will not be useful and helpful to us as far as guaranteeing repayment of these and other monies put in to the case. He will but realistically I cannot rely upon him for

the things we thought he could or would or even committed to do regarding money for me/the case.

I did NOT put the number out of thin air. The number is so I can survive to get in a European investor who I have been working with - remember the budget I sent you - OR so I can get a written settlement offer from one of the defendants that we can use and KNOW we are going to get the money.

For your purposes, the $23,000 per month is broken down as follows:

# 1 - $ 6,500 for Elizabeth and the kids.

# 2 - $ 3,500 for me to be able to be in NJ/NY to push the cases.

# 3 - $ 4,000 per month for the expert to keep him happy and to get the reports needed to keep ALL the defendants in the cases.

# 4 - $ 4,000 per month for depositions (Reporters and witness fees) for legal standing and damages experts that we are taking in October and November and which are already scheduled for Vienna, South Carolina and maybe Germany or Japan.

# 5 - $ 2,000 per month for an economist to give damage projections;

# 6 - $ 1,500 for travel costs to and from Austria for meetings

# 7 - $ 1,000 office and support staff costs (copying, mails, fed ex etc to complete discovery and prepare for Settlement Discussions).

# 8 - $ 500 per month miscellaneous.

You can write the checks if you like - frankly I do NOT want the money - I just want to know that we can finish the case since we are SO CLOSE and can ALL end up whole IF we finish it properly.

Looking forward to your call.

And, during the day, I will be sending additional information to you.

PLEASE CALL.

33.  We did not call, but Fagan sent us another email on September 28 again soliciting

$23,000 per month. He "supported" this by forwarding a self-congratulatory message seeking

money for Kaprun, which apparently Fagan had previously emailed to other prospective funders

(e.g. Eric Leavor),  as well as Kaprun lawyers, including Hantman and Lowy (Exhibit P, #12):

.... I am NOT sitting here twiddling my thumbs. I am working my - _ _ _ - off but *"To finish the race, this race car needs GAS ! ! !"*
It is not how much we will get - we will get plenty. It is GETTING to the finish line to collect the prize money.
To quote the inimitable Jerry McGuire *"Help me, help you"* so I can scream at the defendants "Show Me The Money"!

In another  email to "Harvey & Mike," on September 29 Fagan wrote (Exhibit P, #13):

I spoke to Harvey yesterday [actually on September 27] and HOPED to hear something today. I KNOW it is before the holidays but I CANNOT last much longer and I am VERY WORRIED that you may NEVER see any more money from me.
The facts are simple, without your or one of your colleagues IMMEDIATE infusion of cash, I will NOT be able to take the Court Ordered depositions, I will NOT be able to afford to get the experts' report we need to keep the defendants

in the case, and I will NOT be able to afford to prepare for the Settlement Conference. AND my family has NO MONEY.

So while on the one hand things are GREAT with the case - NO ONE KNOWS WE HAVE NO MONEY. And, therefore in a few days, when this becomes apparent whatever monies you - Harvey - think you may be entitled to - you should write them off !

PLEASE HELP me and PLEASE HELP protect your investment.

PS Here are Supplemental Discovery Demands I just served BUT CANNOT afford to finish.

Another email followed seven minutes later on September 29 (Exhibit P, #14):

Here is an example of what I will NOT be able to do - then the cases fall apart and your investment is in the toilet. PLEASE get me the $23,000 per month I told you is the minimum I need to get by and to be able to get more money to sustain the cases, me and my family.

Three minutes later on September 29 there was another email (Exhibit P, #15):

I CAN SETTLE THIS but I need the $23,000 in October and $23,000 in November to be able to do this.

I have the evidence against these guys BUT I need to have the money to finish the damn case for us ALL.

PLEASE HELP me and PLEASE HELP yourselves.

34.  On October 4, 2007, Fagan emailed "Harvey and Mike" (Exhibit P, #16) as follows:
* * *

The Florida case has been transferred to NY. Discovery is started. We have DEEP pocket defendants. We have upcoming Settlement Negotiations. I am pushing the claims very fast and the claims WILL start to settle in 90 - 120 days.

But, the money issue is HORRIBLE.

I cannot impress upon you enough the seriousness of the situation. Your investment is at risk and if I do NOT get the money I need to finish the case and to survive, you should consider your investment lost.

As for your discussing further investment from Hantman's guy, I believe that is a serious mistake. What happened to the guys that Mike told me he was getting in touch with? What happened to the guys Mike said he anticipated getting a favorable response from weeks ago?

You have much to protect and it is such a little amount that I am asking for. Please do NOT fall into a false sense of security that I will simple be able to survive and that I can get the money from somewhere else and that in the end, you will not have to put in more money and in the end you will still get whatever it is that you claim you are owed.

I MUST get this money by the end of this week. There are Court Ordered depositions in 10 days and there are many other things that need to be done and because Hantman failed to do his job to get more money I am behind in personal and professional financial obligations and these have already caused problems and things will only get worse.

Despite ALL the garbage, I have done wonders with this case and I have brought

it to a point where it WILL be settled. But to do that I MUST survive for the next 90-120 days. I need $23,000 per month from you - or whomever you can find. I have sold off some of my interests to secure the expert - that does not reduce the amount needed, it only allows the money to be freed up to go to take care of my professional and personal expenses. I am trying to find money from other places but your help is needed. PLEASE confirm that you will get this to me by Friday. Thanks.

35.  On October 4, Fagan cc'd me and Mr. Grossman on an email to Mr. Hantman -- this

time demanding from Mr. Hantman  the same $23,000 a month (Exhibit P, #17):

Please respond to this email.
                              * * *
Please note that [I] have raised money myself to pay the experts. That is MY contribution to the remaining $250,000 that is needed.
I am going to Germany this weekend to work on Kaprun and other cases, to prepare witnesses for upcoming deposition and to meet with potential investors. Kindly advise in writing by return email that you will be putting in your $23-25,000 per month assessment/ contribution/share for the next 3 - 4 months either from your own money or by getting it from someone else *(not Jim Lowy who is already picking up some of the slack that resulted from the delay in getting in other monies)*. You can get it by working with Harvey or Mike if you like but just get it. The combination of all the money makes it possible for us to do the case properly, to have the necessary experts, to be able to pay the bills and for the core team members to be able to function properly.

36.  Although we continued to ignore him, on October 12, Fagan, unsolicited, sent us as

email attachments various papers he had filed in Kaprun  --with another threat (Exhibit P, #18[6]):

As you can see I have done INCREDIBLE things - almost in spite of all the problems caused by the person to whom you sent me [Hantman].

Bottom line is that I keep calling and get NO RETURN PHONE CALL. I have tried to work with you, I have tried to explain the seriousness of the situation but it is as if you seem to believe that even if you do nothing to help fix the situation that you will get paid. I would NOT assume that if I were you.

I am literally at the end of my rope. The case is going great BUT you are doing

---

[6] Unlike the rest, this email bore the subject title, "Fwd: Kaprun - Status Report - Again Good News - CONFIDENTIAL NOT TO BE DISCLOSED TO PERSONS OUTSIDE OUR GROUP." "CONFIDENTIAL" in the title referred not to the message to "Harvey and Mke," but instead to the attachments (which are not included in Exhibit P, #18), which consisted of documents which had either been filed by then, or were about to be filed in with the court in  Kaprun, with exception of the attached forwarded email, entitled "12 October 2006 Report to Cooperating Counsel." Mr. Lowy was among those copied on the forwarded email, along with various non-lawyer/non-client "consultants." All the "status report" dealt with was to advise that Fagan and Mr. Lowy planned to go to Austria for the following week. Mr. Lowy was copied on all such emails (see Exhibit B, ¶¶ 81, 83, 84).

nothing to help protect YOUR OWN INVESTMENT - whatever that is.
It is NOT fair that I should have to suffer with ALL these problems because [Robert Hantman] the guy that I was directed too by YOU Mike (and with whom you continue to try to work on this case) has caused and continues to cause me so many problems by first not putting in the monies he was supposed to and then by NOT providing the accounting he was supposed to provide and finally by not doing work that is need in the case.

**If you want to protect your ability to get paid back WHATEVER monies you may thing I owe you, I suggest you return my calls and organize the money I need to finish the case and to survive. Otherwise, you can assume that you have NO FURTHER claim to any monies I may generate from Kaprun.**
**You can also assume that because of the enormous pressure, I may have to file a Chapter 11 (which would NOT be good for anyone) just to protect the case, my business and my family. I have tried to avoid that but your failure to cooperate with me is leaving me fewer and fewer opotions.**
**Your UCC filing at this point is probably worthless.**
I am very sorry to have had to write this down. I have called, left messages, tried to tell you of the good things on the one hand and the hard things on the other hand. I have received NOTHING back. **No promised call or follow through from Harvey or from you Mike.**
Please contact me urgently and advise me how you intend to help fix this and help protect your investment. I cannot be responsible for protecting it any longer.
**I need the money I told you about to survive and to finish Kaprun. It is in your best interest to help me not ignore me.**     [Emphasis added]

37.   We continued to ignore his emails. Fagan was undeterred. More threats followed:

As a follow up to yesterday, let me see if I can put things into perspective. I have COURT ORDERED depositions this coming week in Salzburg, Vienna and Munich. As I sit here today, (i) I do NOT have the money to pay the experts who are supposed to be deposed, (ii) I do NOT have the money to pay the Court reporter, (iii) I do NOT have money for hotels, travel or food, (iv) I do NOT have the money to do the things I have to do to keep the case going, (v) I do NOT have the money to get the experts needed to prepare the submission that is due to Judge Katz on 24 October to try to settle the case, and (vi) most importantly I do NOT have the money to maintain my family.
**With that as a back drop, how can you possibly believe that your UCC filing is going to save me or you or anybody or that you would be entitled to re-payment of any monies given all that has happened in the last 6 months?**
Things are GREAT on the one hand but DISASTEROUS on the other hand. I CAN settle this case (or at least one of the claims with one of the defendants) BEFORE the end of the year. **BUT I NEED that $55,000 per month to make it.**

**PLEASE DO NOT IGNORE THIS ANYMORE and PLEASE CALL ME so we can find a way to fix this.** [ Exhibit P, #19] [Emphasis added]

38.  In September I had actually spoken to a client about the possibility of being a funder

in Kaprun, but I around the middle of October that after doing some checking on Kaprun and

Fagan, that my client had no interest in making any investment in either the case or in Fagan. Apparently Fagan was then in Europe; on his return we received yet another abusive email demanding money from "Harvey and Mike" on October 23 (Exhibit P, #20):

> I am on my way back to the US. I just completed a very big week with depositions but I CANNOT get the transcripts because we DON'T have the money.
>
> I NEED that additional $ 5,500 - $7,500 per month for October, November and December.
>
> I have heard and received NOTHING from Hantman. I hope you fixed it otherwise there could be serious consequences for us all.
> We MUST talk tomorrow to find a way to fix this. I CANNOT stall any longer. And, it is NOT fair that the people who SHOULD be contributing are sitting back and are NOT helping with the finances or the work and are just waiting to see if I can pull it off, if so, they think they will be able to recover whatever they claim to be their investment or their secured positions or be paid for services. The situations have drastically changed and such attitudes are prejudicial to the interests of others and to the case.
> I look forward to finding a way to resolving what should be a MINOR issue.

39. On October 30, our continuing lack of response prompted more nasty Fagan emails, this time implying we were causing his children to starve (Exhibit P, #21):

> <u>I waited for a return phone call from last week and got none. I tried calling and left multiple messages and got no return phone call.</u>
> <u>I do NOT understand why it is that I am not getting help to survive and to finish the case</u>. To the extent that Harvey actually believes he has an interest to protect, I would expect him to take actions to help protect that interest - whatever it is - especially in light of the actions/inactions and/or difficulties caused by Robert Hantman (the guy you sent me to) and the failure to come up with the promised and required monies and the actions that were detrimental to the case and which I had to spend tens of thousands of dollars in out of pocket monies, hundreds of hours and give up an additional percentage to try to quiet and fix the problems.
> As I continue to point out on the one hand things are GREAT. On the other hand, things are horrible. I CANNOT be expected to fix these problems. I expected your help and have gotten NONE.
> <u>I/the case needs $ 55,000 in the coming two months. I expect you to find a way to put in money NOW to protect whatever you believe is your investment. The bigger you believe is your investment, the more I would expect you to put in.</u>
> Please do NOT kid yourselves into thinking that I will be able to get by and that there will be no advserse affect if you do NOT put in money.
> I have stripped myself AGAIN down to the bone to be able to pay the costs of Kaprun. Given what has gone on in the last months and years, I can assure you that I am NOT doing that to help you, anyone other "investor" else get money from this case. If you help me finish the case and survive, I will fight for whatever

is a reasonable amount of money for you to be re-paid. If you do not, you should consider your entire "investment" lost ! ! !

The case has enormous expenses. We have deposition transcripts to pay for. We have motion practice coming up. We have Settlement Conferences being convened. We need experts reports.

Also, my children need to eat. My ex-wife needs to money to take care of herself and the house. I have bankruptcy and ethics lawyers to pay. I have personal needs to be paid for. I will not go into personal health issues that should be taken care of but which are being postponed because I have to use money for other things.

I CANNOT do my job with all these distractions.

You went into this as a business and I am telling you that your business investment will NOT survive and will NOT be protected if you do NOT help with these monies. I have been told you are "working" on this for months now but NOTHING has happened. It is really simple. Either you find a way to put in money or you can consider your "investment" GONE ! ! !

I do NOT understand why I have to write these emails and I do NOT understand why you have not started to put the needed monies in to help.

I know there have been times when payments did NOT come when they should have BUT that is not this case. You KNOW where we are in Kaprun. You see the Orders and the results I have been getting. You are experts in litigation funding. Plus, you - Harvey - and I have a long history. I would hate to see the final chapter in our history end this way. There is very little that you need to do to help fix these problems (some of which are directly related to someone you sent me to). By helping them, you do not just help me, you protect YOURSELF. We are close to resolving the case so everyone gets taken care of and your help is long overdue.

Please call me to confirm that you have received this message and to inform me when I can expect the first contribution. [Emphasis added]

40.   Threats to Mr. Hantman. At the same time Fagan was attempting through to extract

money from Mr. Hantman, who forwarded me Fagan's October 30 email to him (Exhibit P, #22):

...whether not Hunter [Singer[7]] puts in more money, you MUST dig into your pocket and HELP with money. Please don't tell me you don't have any money. You and I both know that is not entirely correct.

The only issue is how much can you put in without hurting other things. PLEASE focus on that. No one wants to hurt you but then again none of us want to get hurt any more financially as we push this case to the first settlement in the coming months.

Mr. Hantman also sent me his outraged response (Exhibit P, #23) to Fagan's perceived threat:

What is your "threat" to hurt me? Please clarify as this is a most serious, unethical and perhaps, illegal threat considering I helped you raise over $100,000, have put a substantial amount of time and money into this case and

---

[7]   I.e., Mr. Hantman's client, who had previously advanced $100,000 to Fagan.

have supported the case without a signed written agreement from you in spite of promises to provide same.

I fully intend to bring this matter up with the Court unless your threat and demand for money is retracted immediately.

41. <u>Ending the Email Barrage.</u> By November 2006 not only It had become apparent Fagan was "radioactive" as far as funders were concerned. Mr. Grossman also had received information Fagan already might be the subject of an involuntary bankruptcy petition. In the hope of shutting down the email assault, <u>I responded to Fagan on November 14, 2006</u> (Exhibit P, #24), alluding to Fagan's misrepresentations, and other problematic actions; <u>viz</u>:

This is in response to your several recent e-mails.

In September 2004 you [Fagan] approached Harvey Grossman/Lions Group, and represented that Christofer Meili would be applying to have the balance of his settlement, $225,000, paid directly to him, and that it was being handled by Morse Geller. This money represented the fee you had sold, and assigned to Lions Group [in 1998]. You indicated then to Harvey that you had arrangement with Meili that these funds would be distributed to you and in turn, from these funds, you would reimburse the advance you were then seeking.

Based upon these representations Harvey arranged third-party financing to provide to you an advance of $17,000 -- with the understanding that repayment to the third-party funder was assured and would occur promptly.

Harvey was subsequently advised by Geller that Geller had been advised by the court not to make such an application, and further advised that if such an application were made not only would be denied, there could be additional adverse consequences.

As a result of this Harvey lost credibility with the funder which was prejudicial to the continuation of his financing business.
Nevertheless, in order to help you Harvey indicated to me a willingness to accommodate your continuing needs by cooperating with any other potential funders in the Kaprun litigation. In this connection Harvey and I both had extensive discussions with Steve Goldman and others who might be able to provide further funding.

Although you have recently disparaged his contribution, it was through Robert Hantman, who Harvey and I put you in contact with, and Harvey's willingness to accommodate the needs of the funder produced by Robert that additional financing of $100,000 was secured for Kaprun.

There have also been additional efforts by us to help you raise funds. However, any potential funder engages in its own diligence and demands to see as much information as possible. That includes issues of security positions, which raises

the potential impact of claims from Andy Dechter and Elizabeth, as well the lack of clarity as to the status of the [Kaprun] case, and uncertainty as to how close the matters are to resolution.  Most critically, any funders Harvey or I contact, including other clients of mine to whom I of course have a duty of full and candid disclosure.    This includes inquiries as to any problems Lions Group has encountered in the relationship, and the reviewing of the internal correspondence, not just the "Executive Summaries" and status memos.

Harvey is winding down his financing business. He has no additional funds available, and is limiting his financing  activities to supporting litigation which he is personally engaged  as a lawyer.

42.   <u>There Never was Any "Attorney-Client" or "Special Relationship" with Fagan</u>. None of the communications with Fagan involved any <u>legal</u> issue such as <u>subrogation</u>. Apart from the lack of any such relationship, what they reveal is what the world now already knows about Fagan's financial problems. All the messages related to Fagan's effort to enlist "Harvey & Mike" in raising money for him. Apparently Fagan finally got the message from my November 14, 2006 email that  "Harvey & Mike" were not interested, and ceased importuning us to find money for him. My only relationship with Fagan, prior to November 2007, was as either the business representative, or attorney for LGL, a major creditor of his, which byn 2006 already had an antagonistic relationship with him, and since early 2007 has clearly been his adversary.

43.   Plainly, neither I nor Mr. Grossman was ever an attorney in the <u>Kaprun</u> case, or an attorney for Fagan (or for Geier or Podovsovnik, who we have never met).[8]. It was in my role as LGL's <u>New Jersey</u> attorney that I first responded to Mr. Goldman's inquiry in 2006 as to whether LGL, a New Jersey company, would subrogate its lien on some basis so that another funder could be found to make a further investment in <u>Kaprun</u>. But it was only as LGL's <u>business</u> representative, and I assume in Fagan's mind, a possible independent source of "new money, beginning in August 2006 I also parried Fagan's <u>demands</u> that Mr. Grossman and I assist him in

---

[8] The only document which "Harvey & Mike" ever forwarded to any other party was the revised "Executive Summary," prepared by Mr. Hantman's office, which, to mollify Fagan, was sent to one potential funder per <u>Fagan's</u> <u>express</u> request of on September 15. While Fagan also requested that "Harvey & Mike" forward various "status reports," we never did so because the tone of same was so embarrassingly self-congratulatory, and the assertions so outlandishly bullish, that they lacked any credibility, as noted in my November 14, 2006 email.

finding another funder on the basis it would be in LGL's self-interest to do so.

44.  Fagan's email messages to "Harvey & Mike" were not communications from a "client," or among counsel in the <u>Kaprun</u> case, or even "legal" in nature. Any copies of emails sent to others had obviously lost whatever privileged or "confidential" character before we received them since they indicated on their face they had previously been copied to various non-lawyer/non-client third-parties, including other potential funders, money "finders and Fagan's ex-wife. Parenthetically, all that the emails reveal is not any "strategy" in <u>Kaprun</u> but rather the acuity of Judge Scheindlin's later assessment of Fagan's financial desperation.

45.  Neither I, nor Mr. Grossman nor LGL (nor Mr. Lowy) ever had any obligation to support Fagan's children or ex-wife. We certainly had no duty to throw more good money after bad, or to induce others to invest in <u>Kaprun</u>. Any business judgement not to devote more time and resources to Fagan or his projects was completely reasonable in light of his history of misrepresentations and broken promises to LGL, his then-likely, or possibly already filed bankruptcy, his abuse of Mr. Hantman, his inability to get along with other lawyers I also knew and respected such as Mr. Rice, his lack of resources, his personal problems, his abusive and threatening tone, his history of sanctions and constant disputes with co-counsel often winding up in litigation, his string of recent dismissals, and finally recent information indicating both he was in bankruptcy it was likely he might be disbarred before Kaprun ended (Exhibit A, 10 n. 29).

46.  <u>My Retention by Mr. Lowy.</u> It was at the end of November 2006, after my concluding communication to Fagan of November 14, that I <u>first</u> was contacted by, and then met with Mr. Lowy. The topic was a matter totally unrelated to either <u>Kaprun</u> or Fagan. Mr. Lowy retained me in December 2006.

47.  <u>The Formal Adversary Relationship Between LGL and Fagan.</u> I appeared for LGL in an involuntary bankruptcy filed in New Jersey in late 2006 by several creditors against Fagan. In the New Jersey bankruptcy Fagan failed to list LGL as a "secured creditor." However, before LGL could challenge this the New Jersey petition was superseded by Fagan's <u>voluntary</u> filing in

Florida, in about late February, early March 2007. Apparently by then Fagan was living in Florida as a tenant of Mr. Low (more or less rent-free as it turns out), and essentially being supported by Mr. Lowy.

48. In his voluntary Florida bankruptcy petition, Fagan initially listed "Harvey Grossman" as a disputed unsecured creditor. This prompted Mr. Grossman to appear on behalf of LGL in Fagan's Florida bankruptcy. Fagan also listed Mr. Lowy as a creditor (with a claim on the Kaprun fees). Since it appeared Fagan was poised to dispute LGL's secured position on the Kaprun fees, this raised a potential conflict between LGL and Mr, Lowy on the basis that they could wind-up competing as Fagan creditors for a priority position on any fees Fagan became entitled to receive from Kaprun. However, this incipient conflict soon became moot when the claims of the foreign plaintiffs in the Kaprun case were dismissed in June 2007, followed soon thereafter by Fagan withdrawing his voluntary bankruptcy. Subsequently, both Mr. Grossman, individually, and on behalf of LGL, and Mr. Lowy waived any conflicts regarding my continued representation of either Mr. Lowy or LGL/Grossman, including all matters relating to Fagan.

49. The only "relationship" I have ever had with Fagan in 2006, or at any other time, has been arms-length. It was based on his errant debtor relationship with my clients LGL and Mr. Grossman. It was at least potentially "adversarial" from my initial contact with Fagan in 2001 forward. My final response to his unsolicited contact in 2006 was intended to disabuse him of the fantasy we would provide "nominal funding for The Kaprun Cases" (Exhibit B, ¶ 20, n. 2).

50. Evidence of Fagan's Vexatious Intent and Recent Egregiously Un-Ethical Conduct,. Any doubt that the Second Case (as well as the First Case) was filed in bad faith, for the purpose of harassing and further vexing Mr. Lowy, and interfering with my ability to represent him in the First Case, as well as interfering with the exercise of jurisdiction by the Southern District in the First Case, is immediately dispelled by the communications from Fagan which preceded, accompanied, and have followed his apparent filing of the Second Case. Alkow v. Pearlman, 07 Civ 2285(GBD) is a case originated by Mr. Lowy involving a $250 million fraud.

The case was originally filed in Florida by Mr. Lowy in early 2007. Thereafter, Fagan induced Mr. Lowy to re-file the case in the Southern District of New York, on the basis Fagan would serve as local counsel and would move Mr. Lowy's admission pro hac vice.

51.  However, by October 2007, Fagan began a campaign to take over the Alkow case himself. At that time he not only reneged on the promise to move Mr. Lowy's pro hac admission, he was actively opposed it in a motion under seal in Alkow (Lowy Exhibit 6). Simultaneously, Fagan also undertook to derail Lowy's pending New York bar admission by submitting, unsolicited, a series of scurrilous and deliberately false accusations of unethical conduct to the First Department Character and Fitness Committee, and simultaneously filing a frivolous ethics grievance in Florida (Lowy Exhibits 1 and 2). I represent Mr. Lowy before the First Department.

52.  On November 6, 2007, I appeared in before Judge Daniels in the Alkow case. At that time Fagan learned  I would be both representing Mr. Lowy in the First Case (filed October 29, 2007), and also moving Mr. Lowy's admission pro hac vice in Alkow. This prompted Fagan to send an email to Mr. Lowy threatening to take unspecified measures to prevent me from either representing Mr. Lowy in the First Case or moving Lowy's admission pro hac vice in Alkow (Lowy Exhibit 7). Mr. Lowy was admitted pro hace in Alkow. On November 7, 2007 Fagan also communicated in a fax to Mr. Grossman, and his wife a threat that if it turned out that they, on behalf of LGL, had "consented to, and waived the conflicts ...related to Mr. Perle's representation of Mr. Lowy and Mr. Hantman...," Fagan  would  to "take any steps that I deem necessary to deal with this situation..."(Exhibit L). On November 9, 2007, Fagan sent an message to me and Mr. Grossman warning that he intended to sue me for "accept[ing] Lowy's request to appear in the Alkow case [Alkow v. Pearlman, 07CV2285 (GBD)]...," and that he was

> **putting you [Perle?], Grossman and LGL on notice that, to the extent Grossman and LGL believe that – prior to Nov 6, 2007 – Grossman and LGL believe they have any valid claims or liens or security interest against my revenues and/or future fees, I now have further objections to any such claims. [Exhibit M] [Emphasis added.]**

53.  In a fax of November 9, 2007 from Fagan to me, with copies to Mr. Grossman, Mr.

Lowy and Fagan's ex-wife, Fagan implied that for some totally inexplicable reason I had a conflict with Fagan's ex-wife – who had been LGL's direct adversary in the 2001-2002 divorce proceeding (Exhibit O). Thereafter, Fagan transmitted other similar emails threatening that unless I withdrew from representing Mr. Lowy, both LGL and I would be sued by him, and further, that he would challenge LGL's first lien position, as he already had initially done in his abortive Florida bankruptcy filing earlier in 2007.

54.  Notably, <u>before attempting to provide me or Mr. Lowy</u> with a copy of the complaint in the Second Case, Fagan faxed a "courtesy copy" to Mr. Grossman and LGL (Exhibit N) on December 14, 2007, with the ominous message:

> I urge you [Mr. Grossman] to consult with Mr. Perle and demand that he stop interfering in the Kaprun Cases, and my representation of people in the Transcontinental cases [<u>Alkow v. Pearlman</u>, i.e., by appearing as Lowy's local counsel] and my business in general.

55.   Most pointedly revealing Fagan's malice and true intent, as noted above, are his actions following-up the filing of both the <u>Fagan v. Nagel Rice</u> action and the complaint in the Second Case: Without serving the complaints in either case, he sent faxes to the lawyers for the American  defendants, i.e., the defendants in <u>Fagan v. Nagel Rice</u> on December 24, 2007 and to me on December 17, 2007 (Exhibit D, 1), in both instances demanding to know whether each of us had notified our respective malpractice carriers, and further demanding information as to the identity of our respective carriers. Like Fagan's actions in the transmission of "courtesy copies" of the complaint in the Second Case to my clients, the request for "malpractice carrier" information, based on an unserved complaint in which no attorney-relationship is, or could even be alleged, makes crystal clear that his only purposes in filing the wholly duplicative Second Case were improper -- i.e., to cause cleavage in my relationship with Mr. Lowy, and/or to cause Mr. Grossman/LGL to pressure me to withdraw from representing  Mr. Lowy.

56.  The sole basis Fagan claims in the Second Case for the existence of some" Special Relationship" with him is that allegedly, in 2006 I "...was in a unique position to assist Plaintiff

Fagan with nominal funding [of $55,000 a month?] for the Kaprun Cases...." However, I had no more "duty" to do so than Warren Buffett, for whom $55,000 a month might actually be "nominal." Except in the legal universe inhabited only by Fagan, "Perle's position as counsel for Grossman and LGL," i.e., <u>in dealing with Fagan as their adversary</u> could create no duty <u>to Fagan</u> (Exhibit Complaint, ¶ 21), it is not only black letter law, but kindergarten logic, that my only "duty" in all of these involuntary dealings with Fagan in 2006 was to Mr. Grossman and LGL. That duty by definition precluded any simultaneous attorney-client, or other "special [i.e., fiduciary] relationship" with Fagan. I have never had any confidentiality agreement, or other contractual relationship with him. The assertion is ludicrous that I "owed certain [never identified] contractual or professional obligations to...[Fagan], Geier, Podovsovnik, and their clients and other victims, survivors representatives involved in The Kaprun Cases....Appeals."

57. <u>Fagan's Conduct in this Matter Warrants Further Sanctions</u>. It is difficult to conceive of (i) any actions other than the foregoing recent conduct of Fagan that could be any more transparently animated by an "...improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation." <u>F.R.CIV.P.</u> 11(b)(1) or (ii) any claims other than those in the Second Case more plainly based upon "legal contentions...[A] [not] warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; <u>F.R.CIV.P.</u> 11(b)(2), or (B) more clearly grounded on "allegations and other factual contentions lacking].....evidentiary support [or likelihood that any further support will be found]...after a reasonable opportunity for further investigation or discovery." <u>F.R.CIV.P. 11</u>(b)(3).

58. Fagan's extortionate threats to me and my clients, coupled with these obvious <u>Rule</u> 11 violations, plainly warrant further sanctions, and the referral of Fagan <u>once again</u> to the Court's Disciplinary Committee. But more critically, they underscore the absolute necessity for the prophylactic relief sought herein, namely the invocation of the <u>Martin-Trigona</u> doctrine, the payment by Fagan of all outstanding sanctions and fee awards, the imposition of a bond

requirement in the First Case, an injunction against the Second Case proceeding, and restraints upon any further communication by Fagan with either the First Department Character and Fitness Committee, the Florida Bar, or Mr. Grossman, LGL, or any other clients of mine.

59. <u>Rule 65(b) Statement; Irreparable Injury; Need for Limited Emergent Relief Without Notice.</u> On this application very limited temporary restraints are being sought without notice first as to serving, or otherwise prosecuting the complaint in the Second Case, and Fagan attempting to contact my malpractice carrier.  Although I am being sued for "malpractice" in the Second Case, there is no allegation I ever appeared in Kaprun or that I ever had an  attorney-client relationship with Fagan, Podovsovnik or Geier, or that I even know who Podovsovnik and Geier. Thus, I submit that there is no likelihood  such a claim can succeed against me (Exhibit D, 1), and the possibility it was asserted for other than strategic reasons, i.e., to create a conflict between myself and my client, Mr. Lowy, as well as to engage my malpractice carrier, is nil. Any doubt that Fagan was driven by bad faith, an intention to engage my malpractice coverage, and to create tension and conflict between me and Mr. Lowy, my client in the First Case which is pending before this Court, is dispelled by Fagan's initial communications to me and Mr. Lowy regarding the complaint in the Second Case, and similar communications to the attorney defendants in <u>Fagan v. Nagel, et al.</u> All were virtually identical; e.g., "Kindly confirm by return fax that you have turned this matter over to/placed your malpractice carrier on notice..."

60.  The immediate effect as to me if the complaint in the Second Case is allowed to served, will be to impose a reporting obligation on me because it asserts a claim for "malpractice" – even no attorney-client relationship is alleged, even if on the return date the matter is stayed. At a minimum this will raise my malpractice rates – which have previously never been affected by a single claim in over 35 years of practice.  Beyond, it could well put in jeopardy my ability to secure coverage when the policy comes up for renewal. If the complaint in the Second Case is served. These no doubt are all effects which Fagan intended to cause me, but I submit, he has no legitimate interest in having them occur.

61. A restraint is also sought as to any further unsolicited communication by Fagan to the First Department Character and Fitness Committee regarding Mr. Lowy's pending application for admission. To a certain extent the damage has been done, and will be dealt with. However, with any new communication from Fagan, the matter will be pushed back further on the Committee's docket, and an additional response will be required. As a result of Fagan's gratuitous intrusion into the matter, consideration of the pending admission has already been pushed back three months, represents time to practice and opportunities irretrievably lost.

62. In contacting the Character and Fitness Committee, Fagan clearly was not driven by any sense of "duty" but rather a strategic purpose -- to disable Mr. Lowy's ability to resist Fagan's attempt to takeover the <u>Alkow</u> case. Fagan is an interloper in the bar admission matter. Clearly, his only real interest is to disable Mr. Lowy's ability to hold clients in <u>Alkow.</u> That is not an interest which should be protected, or given any weight by the Court. Likewise, there is absolutely no conceivable "hardship" for Fagan in being restrained until the return date from either serving the complaint in the Second Case, or attempting to contact my malpractice carrier. Fagan has not served the complaint in the Second Case despite the fact it apparently was filed over two months ago.[9] He obviously sees no "emergency."

63. On the other hand, simply giving Fagan notice of the requested temporary relief is likely to spur him to serve the complaint in the Second Case, to attempt to contact my malpractice carrier, or to make a further unsolicited submission to the Character and Fitness, knowing it will push-back consideration of Mr. Lowy's admission ffor another several months, all eviscerating key parts of the <u>pendente lite</u> relief being sought.

Dated:   January 16, 2008

MICHAEL R. PERLE
1265 Paterson Plank Road
Secaucus, New Jersey 07094
201-864-0200

---

[9]   In <u>Fagan v. Nagel Rice</u>, defendants have not been served with a complaint although the action was filed on September 24, 2007.

*Fagan v. Lowy, 07Civ10293 (SAS), M. Perle Decl. in Support of OSC, 1/15/08, p. 32*

**EXHIBIT A**



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

IN RE: SKI TRAIN FIRE IN KAPRUN          :    MDL # 1428 (SAS)
AUSTRIA ON NOVEMBER 11, 2000              :

This document relates to the following actions:    :

-------------------------------------------------------------- X

JOHANN BLAIMAUER, et al.,                 :
                                          :
                Plaintiffs,               :    OPINION & ORDER
                                          :
        - against -                       :
                                          :
OMNIGLOW CORPORATION, et al.,             :
                                          :
                Defendants.               :
-------------------------------------------------------------- X

HERMAN GEIER, et al.,                     :
                                          :    03-CV-8960 (SAS)
                Plaintiffs,               :
                                          :
        - against -                       :
                                          :
OMNIGLOW CORPORATION, et al.,             :
                                          :
                Defendants.               :
-------------------------------------------------------------- X

NANAE MITSUMOTO, et al.,                  :
                                          :    03-CV-8961 (SAS)
                Plaintiffs,               :
                                          :
        - against -                       :
                                          :
THE REPUBLIC OF AUSTRIA, et al.,          :
                                          :    06-CV-2811 (SAS)
                Defendants.               :
-------------------------------------------------------------- X

1

NANAE MITSUMOTO, et al.,                  :
                                          :    07-CV-935 (SAS)
                Plaintiffs,               :
                                          :
        - against -                       :
                                          :
ROBERT BOSCH                              :
CORPORATION, et al.,                      :
                                          :
                Defendants.               :
-------------------------------------------------------------- X

JOOP H. STADMAN, et al.,                  :
                                          :    07-CV-3881 (SAS)
                Plaintiffs,               :
                                          :
        - against -                       :
                                          :
AUSTRIAN NATIONAL TOURIST                 :
OFFICE INC., et al.,                      :
                                          :
                Defendants.               :
-------------------------------------------------------------- X

RASTKO and DRAGICA FERK, et al.,          :
                                          :    07-CV-4104 (SAS)
                Plaintiffs,               :
                                          :
        - against -                       :
                                          :
OMNIGLOW CORPORATION, et al.,             :
                                          :
                Defendants.               :
-------------------------------------------------------------- X

SHIRA A. SCHEINDLIN, U.S.D.J.:

        These cases arise from a disaster that occurred on November 11, 2000,

in which a ski train in Kaprun, Austria caught fire, killing 155 people. American

2

and foreign survivors and/or relatives of those who died in the fire brought a number of lawsuits in federal court against numerous defendants alleging, *inter alia*, negligence and strict liability. The Judicial Panel on Multidistrict Litigation assigned these actions to this Court for coordinated or consolidated pretrial proceedings. The actions within this multidistrict litigation ("MDL") fall easily into two groups – those filed on behalf of American plaintiffs,[1] and those filed on behalf of foreign plaintiffs. There are five actions falling in the latter category, all of which are being prosecuted by Edward D. Fagan, James F. Lowy, and Robert J. Hantman.[2]

Defendants now jointly move to disqualify Fagan as counsel in these proceedings on several grounds, including the filing of a personal bankruptcy petition giving rise to a conflict of interest with his clients in violation of ethical rules.[3] In addition, defendants jointly move, pursuant to section 1927 of title 28 of

---

[1] See, e.g., *Hubblet v. Omni-Glow Corp.*, Nos. 01 MDL 1428, 02 Civ. 2492 (filed April 1, 2002); *Hubblet v. Siemens AG*, Nos. 01 MDL 1428, 01 Civ. 6554 (filed July 19, 2001).

[2] The underlying facts related to the instant matters are summarized in Part III below. For a more thorough discussion of the procedural history of this MDL, see *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, Nos. 01 MDL 1428, 01 Civ. 6554, 01 Civ. 7242, 04 Civ. 1402, 2005 WL 1523508, at *1-2 (S.D.N.Y. June 27, 2005); *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F. Supp. 2d 403, 404 (S.D.N.Y. 2002).

[3] By letter to the Court dated May 23, 2007, the American plaintiffs joined in defendants' motion to disqualify Fagan. *See* 5/23/07 Letter from Jay I. Rice,

3

---

the United States Code, for an order imposing sanctions against all three foreign plaintiffs' counsel for alleged misrepresentations made by them concerning the testimony of two so-called "whistleblower" witnesses who were deposed by defense counsel in Germany in April 2007.[4] For the reasons stated below, defendants' motion is granted in part with respect to Fagan; it is denied with respect to Hantman and Lowy.

II.    DISQUALIFICATION OF COUNSEL.

A.    Applicable Law

"The power of federal courts to disqualify attorneys in litigation pending before them has long been assumed without discussion."[5] Whether to disqualify an attorney lies within the court's discretion.[6] Disqualification is only warranted, however, in the rare circumstance where an attorney's conduct "might

---

counsel for American plaintiffs, to the Court ("5/23/07 Rice Letter").

[4] To avoid duplicative briefing, only two defendants, Siemens Transportations Systems, Inc. and Bosch Rexroth Corporation, filed briefs in support of defendants' motion for disqualification and sanctions.

[5] 1 M. Silberberg, *Civil Practice in the Southern District of New York* § 4.17 at 4-21 (quoting *Board of Educ. of City of N.Y. v. Nyquist*, 590 F.2d 1241, 1245-46 (2d Cir. 1979)).

[6] See *Cheng v. GAF Corp.*, 631 F.2d 1052, 1055 (2d Cir. 1980), *vacated on other grounds*, 450 U.S. 903 (1981).

4

taint the case."[7] For even where a motion to disqualify opposing counsel is "made in the best of faith," courts must be mindful that such motions, when granted, invariably cause delay and have the immediate adverse effect of separating parties from their chosen representative.[8] "In general, then, a district judge should disqualify the offending counsel [only] when the integrity of the adversarial process is at stake."[9]

Thus, in this Circuit, "disqualification has been ordered only in essentially two kinds of cases," the more relevant of which is "where an attorney's conflict of interests in violation of Canon 5 . . . of [The American Bar Association] Code of Professional Responsibility undermines the court's confidence in the vigor of the attorney's representation of his client."[10] The American Bar Association Code of Professional Responsibility ("Code"), as adopted by the New York courts,

---

[7] Papanicolaou v. Chase Manhattan, N.A., 720 F. Supp. 1080, 1083 (S.D.N.Y. 1989) (citing Nyquist, 590 F.2d at 1246).

[8] Nyquist, 590 F.2d at 1246.

[9] Papanicolaou, 720 F. Supp. at 1083 (citing Nyquist, 590 F.2d at 1246).

[10] Nyquist, 590 F.2d at 1246 (citations omitted). Canon 5 of the New York Code of Professional Responsibility is entitled "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client." The other basis for disqualification is where an attorney is in a position to potentially use or misuse privileged information, in violation of Canons 4 and 9 of the Code of Professional Responsibility. See Nyquist, 590 F.2d at 1246.

sets forth the appropriate guidelines for attorneys' professional conduct in the United States District Courts in this state.[11] The Code consists of three separate but interrelated parts, including Canons, which are "statements of axiomatic norms,"[12] Within each Canon are corresponding Ethical Considerations and Disciplinary Rules. The Ethical Considerations are "aspirational in character and represent the objectives toward which every member of the profession should strive"[13] The Disciplinary Rules, however, are "mandatory in character," they "state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action."[14] Applications of the Code to resolve disqualification motions necessarily require a fact-specific analysis.[16]

---

[11] See NCK Organization Ltd. v. Bregman, 542 F.2d 128, 129 n.2 (2d Cir. 1976); King v. Fox, No. 97 Civ. 4134, 2005 WL 741760, at *2-3 (S.D.N.Y. Mar. 31, 2005); Arifi v. de Transport du Cocher, Inc., 290 F. Supp. 2d 344, 348 (E.D.N.Y. 2003).

[12] New York Code of Prof. Resp., Preliminary Statement, reprinted in N.Y. Jud. Law App.

[13] Id.

[14] Id.

[15] King v. Kornstein, 230 F.3d 531, 538 n.3 (2d Cir. 2000).

[16] See Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp., 518 F.2d 751, 753 (2d Cir. 1975) ("When dealing with ethical principles, it is apparent that we cannot paint with broad strokes. The lines are fine and must be so marked. Guideposts can be established when virgin ground is being explored, and the conclusion in a particular case can be reached only after painstaking analysis of the facts and

For the purposes of this motion, the most critical rules are those embodied in Canon 5 of the Code and its related Ethical Considerations and Disciplinary Rules.[17] Specifically, Disciplinary Rule 5-101 provides:

A lawyer shall not . . . continue employment if the exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests, unless a disinterested lawyer would believe that the representation of the client will not be adversely affected thereby and the client consents to the representation after full disclosure of the implications of the lawyer's interest.[18]

Ethical Consideration 5-1 is also relevant and states that: "[t]he professional judgment of a lawyer should be exercised . . . solely for the benefit of the client and free of compromising influences and loyalties . . . . [T]he lawyer's personal interests . . . should [not] be permitted to dilute the lawyer's loyalty to the client."[19]

**B.    Fagan's Personal Bankruptcy[20]**

On June 1, 2006, Fagan's creditors filed an involuntary Chapter 7 bankruptcy petition against him in the United States Bankruptcy Court for the District of New Jersey.[21] On February 14, 2007, the date on which the bankruptcy proceedings against Fagan were to begin, Fagan superseded the proceedings by filing a *pro se* Chapter 11 Bankruptcy Petition in the Middle District of Florida.[22] According to Fagan's Chapter 11 filings, he has accumulated $13.6 million in outstanding debts.[23] Notably, among Fagan's creditors are two of foreign plaintiffs' expert witnesses in this case: Dr. Carl Abraham (a purported scientific expert), to whom Fagan owes $75,000 in "professional fees," and Norbert

---

[17] precise application of precedent.'" (quoting *United States v. Standard Oil Co.*, 136 F. Supp. 345, 367 (S.D.N.Y. 1955)).

[18] *See Nyquist*, 590 F.2d at 1246 (emphasizing that trial judges in this Circuit utilize their power to disqualify counsel only "where necessary to preserve the integrity of the adversary process," such as where an attorney's conflict of interest violates Canon 5 of the Code).

[18] DR 5-101, 22 N.Y. Comp. Codes R. & Regs. § 1200.20. Additionally, Disciplinary Rule 5-103 provides that "[a] lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation he or she is conducting for a client . . . ." DR 5-103, 22 N.Y. Comp. Codes R. & Regs. § 1200.22(a). Although "reasonable" contingent fees in civil cases are one exception to this rule, *id.* § 1200.22(a)(2), the fact that Fagan's financial survival depends on the size of his share of any settlement proceeds in these cases renders Fagan's contingent fee arrangement unreasonable under the circumstances. *See Landsman v. Moss*, 579 N.Y.S.2d 450, 453 (2d Dep't 1992) (contingent fee agreement unreasonable where it created a genuine risk that a conflict of interest could arise which might affect attorney's ability to zealously represent client's interests).

[19] EC 5-1, N.Y. Code of Prof. Responsibility.

[20] Unless otherwise stated, all facts cited herein are taken from the parties' submissions and are undisputed.

[21] Case No. 06-14863-NLW.

[22] Case No. 8:07-bk-1109-PMG ("*In re Fagan*").

[23] *See In re Fagan*, Chapter 11 Case Management Summary filed March 30, 2007 ("Chapter 11 Summary"), Exhibit ("Ex.") 11 to Declaration of Paul P. Rooney, counsel for defendant Bosch Rexroth Corporation ("Rooney Decl."), at 2.

Gschwend (a purported marketing expert), to whom Fagan owes $3,000,000 in "loans".[24]

Most importantly, Fagan has admitted that his *single most significant* source of funding for his Chapter 11 reorganization plan is a hoped-for settlement of the Kaprun-related litigation pending before this Court.[25] Indeed, Fagan's Chapter 11 Summary gives a brief outline of the facts underlying this litigation and then pointedly states: "Fagan represents approximately 100 victims in that case. Upon reason and belief, there was a $16,000,000.00 offer for a global settlement and it is expected that this litigation will result in a substantial recovery which will also fund the Plan of Reorganization."[26] The Summary is silent as to what portion of this settlement will go to his clients and how much he will recover in fees.

During a May 7, 2007 deposition related to his bankruptcy, Fagan also revealed that until April 23, 2007, he failed to file his federal income tax returns

---

24  *In re Fagan*, List of Creditors Holding 20 Largest Claims filed March 30, 2007, Ex. 12 to Rooney Decl. at 1-2. Fagan also owes, *inter alia*, $100,000 in personal loans to his co-counsel Lowy, $3,000,000 in alimony and child support to his former wife, and four separate default judgments which collectively total over $4,000,000. *See id.*

25  *See* Chapter 11 Summary at 1; Transcript of 341 Meeting of Creditors held March 14, 2007 ("3/14/07 341 Mtg. Tr."), Ex. 17 to Rooney Decl., at 83 ("[T]he only way that I'm going to be able to fund this thing is if I can settle the Kaprun case and some of the others . . . ." (Fagan)).

26  Chapter 11 Summary at 1.

for the seven years from 2000 through 2006.[27] Fagan also admitted that he had not filed his state or local tax returns for that same seven-year period.[28]

C.    Disqualification Is Required

In recent years, Fagan has engaged in a pattern of unethical behavior. Indeed, this is not the first court to find Fagan's conduct worthy of reproach and sanctions.[29] Fagan's continued participation in the cases at bar presents one of the rare situations in which an attorney's violations of ethical rules warrant his

---

27  *See In re Fagan*, Unofficial Transcript of the Deposition of Edward D. Fagan taken by the U.S. Trustee on May 7, 2007 ("5/7/07 Fagan Tr."), Ex. 18 to Rooney Decl., at 7-8. The willful failure to file federal tax returns is a felony punishable by up to five years in prison. *See* 26 U.S.C. § 7203.

28  *See* 5/7/07 Fagan Tr. at 86.

29  Fagan's misconduct is not limited to his misrepresentations to this Court regarding foreign plaintiffs' so-called "whistleblower" witnesses. As further discussed below, Fagan was sanctioned by Judge Shirley Wohl Kram of this Court in August 2005, and by Magistrate Judge Viktor Pohorelsky of the United States District Court for the Eastern District of New York in February of this year. *See infra* Part III. Additionally, the New Jersey Office of Attorney Ethics has charged Fagan with misappropriating approximately $400,000 from the trust accounts of two Holocaust survivors whom Fagan represented in lawsuits filed against Swiss banks; these charges could lead to disbarment. *See Credit-Counseling Provision No Bar to Involuntary Bankruptcy Petition*, 185 N.J. Law J. 659, 660 (2006); *Holocaust Lawyer Disputes Ethics Charges: Disciplinary Case Against Fagan Proceeds Slowly*, Newark Star-Ledger, Mar. 23, 2006, at 50; *Holocaust Lawyer Fights His Own Court Battle/Victims' Attorney Mounts Defense in Ethics Hearing*, Newark Star-Ledger, Nov. 17, 2005, at 14.

disqualification.[30] Although an attorney's personal bankruptcy does not in itself constitute adequate grounds for disqualification, Fagan's Chapter 11 case gives rise to an impermissible conflict of interest between himself and his clients, and illustrates a degree of financial irresponsibility which severely undermines this Court's confidence in his ability to adequately represent foreign plaintiffs in this MDL.

A review of Fagan's Chapter 11 submissions makes plain that he has no means to represent his clients. He lacks any staff and has no business or trust accounts. Nor does Fagan have any malpractice insurance, which is particularly troubling given that he currently has two judgments entered against him for malpractice.[31] Experts and court reporters he has retained in this case have not been paid. Moreover, several of the cases in this MDL were only recently filed by Fagan and are likely to impose heavy costs.[32] If they are ever to make it through

---

[30] A "district court bears the responsibility for the supervision of the members of its bar." *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975) (also noting that the court's "discharge of this duty is discretionary in nature" and "will be upset only upon a showing that an abuse of discretion has taken place").

[31] *See In re Fagan*, Transcript of Proceedings held April 23, 2007 ("4/23/07 Bankr. Tr."), Ex. 19 to Rooney Decl., at 7.

[32] *See Stadman v. Austrian Nat'l Tourist Office Inc.*, No. 07 Civ. 3881 (filed May 17, 2007); *Ferk v. Omniglow Corp.*, No. 07 Civ. 4104 (filed May 25, 2007). *See also* 6/27/07 Letter from Fagan to the Court (arguing that this Court's June 19, 2007 ruling dismissing foreign plaintiffs' actions on the ground of *forum non conveniens*, is inapplicable to *Ferk* because *Ferk* is predicated on different legal

rounds of discovery – let alone trial – they will require hundreds of thousands of dollars to cover depositions, document productions, and other litigation costs.

Against this backdrop, Fagan's lack of financial resources and his personal history of financial irresponsibility render him incompetent to continue prosecuting these actions.

As counsel for the American plaintiffs observes, Fagan's inadequate finances violate several disciplinary rules, especially those embodied in Canon 5 of the Code.[33] There can be little doubt that Fagan's professional judgment in these cases has been and will continue to be seriously affected by his personal interests in this litigation.[34] Fagan has staked his financial future on the outcome of this

---

theories, including fraudulent conveyance).

[33] *See* 5/23/07 Rice Letter at 2 (citing DR 6-101, 22 N.Y. Comp. Codes R. & Regs. § 1200.38, which provides, in pertinent part, that a lawyer shall not "[h]andle a legal matter without preparation adequate to the circumstances").

[34] Apart from this violation of Canon 5 of the Code, the extent to which Fagan is personally and financially invested in the outcome of this litigation violates "the broad admonition of Canon 9 of the Code that an attorney . . . avoid even the appearance of impropriety." *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 567 F.2d 225, 232 (2d Cir. 1977) (emphasis added) (citing DR 9-101). *See also id.* (finding that the district court erroneously "glossed over the teaching of Canon 9 that even an appearance of impropriety requires prompt remedial action"); *Silver Chrysler Plymouth*, 518 F.2d at 757 (recognizing that Canon 9's requirement that attorneys avoid even the appearance of professional impropriety "dictates that doubts should be resolved in favor of disqualification" (citing *Hull*, 513 F.2d at 571)). Because it is clear that Fagan must be disqualified under Canon 5, I do not reach the issue of whether Fagan's violations of Canon 9, or any other Canon of the Code, would alone support disqualification. *See Fund of Funds*, 567 F.2d at

litigation; he himself told the Florida Bankruptcy Court that the linchpin of his Chapter 11 plan is the attorney's fees he hopes to recover if and when a global settlement is reached in the Kapnun cases. The fact that Fagan is relying on this case to cover such substantial personal debts seriously undermines this Court's confidence in his ability to devise a prudent litigation strategy for his clients, to assess whether any proposed settlement offer is fair to his clients, or to otherwise conduct himself as a fiduciary of his clients' interests.[35]

Additionally, there is no indication in the record that Fagan's clients are aware they have entrusted their claims to someone who (a) has no means to properly prosecute them and (b) is relying on earning a large fee in order to cover substantial personal debts, in the absence of detailed, explicit consent waivers from each of his purported clients, Fagan's blatant conflict of interest cannot be countenanced.[36]

234.

---

35. "In New York, as elsewhere, it is beyond doubt that a lawyer is bound to conduct himself as a fiduciary or trustee of his or her client's interests, and that he or she must exercise the utmost good faith, honesty, integrity and fidelity." *Fund of Funds*, 567 F.2d at 234 (invoking Canon 5 in disqualifying an attorney from further participating in litigation) (citations omitted).

36. It remains unclear whether Fagan possesses powers of attorney for each of his purported clients. By Order dated May 18, 2007, the Court directed counsel to provide the Court with sworn affidavits from each foreign plaintiff affirming his or her respective fee agreement. Counsel has yet to fully comply with this Order. I thus harbor doubts as to whether Fagan's clients are fully aware of the current

It is also obvious that the reason Fagan finally filed his federal income tax returns in April 2007 was to prevent the dismissal or conversion of his Chapter 11 proceeding.[37] Defendants argue that Fagan's delay in filing this federal taxes is, in itself, grounds for immediate disbarment from this Court.[38] But the issue of

---

procedural posture of their claims, let alone the extent to which Fagan has a personal financial interest in their claims.

37. Under federal bankruptcy law, a party-in-interest to a Chapter 11 proceeding may move to have the case dismissed or converted into a Chapter 7 proceeding upon showing that the debtor failed to timely file his tax returns. See 11 U.S.C. § 1112(b)(4). *Accord Matter of Santiago Vela*, 87 B.R. 229, 232 (D.P.R. Bankr. 1988) (failure to file tax returns is unreasonable delay allowing for conversion of Chapter 11 case into a Chapter 7). At the hearing before the bankruptcy court in Florida concerning the U.S. Trustee's motion to dismiss Fagan's Chapter 11 case for cause, the U.S. Trustee stated that immediately prior to the hearing, Fagan's attorney handed her what appeared to be originals of tax returns for the years 2000 through 2006. The trustee further commented "frankly, I have never seen anything quite like them. For instance, for the year -- I'll just pick one here. Oh, there's no tax liability for any year. Not one single year is there a tax liability." 4/23/07 Bankr. Tr. at 7.

38. See Defendant Bosch Rexroth Corporation's Memorandum of Law in Support of Motion for Sanctions Under 28 U.S.C. § 1927 and to Disqualify Edward D. Fagan, Esq. as Plaintiffs' Counsel ("Def. Mem.") at 19. Geoffrey C. Hazard, a well-recognized expert on attorney ethics, has described the connection between being an honest tax payer and an ethical lawyer this way: "Criminal violations of the tax laws are almost always related to fitness to practice law, even if the offense arises in the lawyer's private rather than professional life. Lawyers who engage in intentional tax fraud ought to be punished professionally ... because [they have] taken advantage of a system that relies upon self-discipline and self-reporting. ... Those who wish to challenge their tax liability are given ample opportunity to do so through legal procedures; tax cheats are thus violating the very concept of the rule of law, and this is intolerable in a lawyer." 2 Geoffrey C. Hazard, Jr., *The Law of Lawyering* § 65.4 at 65-69 (2007).

disbarment is properly dealt with by institutional disciplinary mechanisms, not by this Court.[39] For disqualification purposes, the lesson to be drawn from Fagan's egregious delay in filing his federal taxes is that his extreme lack of financial responsibility and accountability seriously calls into question his ability to prosecute these actions.

Specifically, Fagan's tax-related conduct demonstrates an unequivocal inability to handle finances.[40] While this is not typically grounds for disqualification, it does gives rise to a conflict of interest here, because plaintiffs' counsel is currently prosecuting these cases (and continuing to file new ones) solely on a contingency-fee basis. Additionally, as noted below in Part II.B., Fagan has engaged in bad faith litigation tactics which themselves warrant sanctions and fines. Fagan thus perpetuates a cycle whereby his personal

---

[39]   The Court is referring this matter to this Court's Disciplinary Committee.

[40]   It bears emphasis that whether an attorney's personal bankruptcy or failure to pay taxes displays financial irresponsibility warranting court intervention is a very fact-specific inquiry that turns on the particulars of the attorney and the underlying litigation being prosecuted or defended. Here, the fact that Fagan has pointedly admitted that his Kaprun-related attorneys' fees will be the single most significant source of financing for his Chapter 11 reorganization is critical to my finding that this financial irresponsibility will negatively affect the outcome of this litigation. Cf. In re van Riper, 808 N.Y.S.2d 815 (3d Dep't 2006) (disbarring attorney after conviction of one-count of tax fraud); In re Anonymous, 74 N.Y.2d 938, 939 (1989) (noting that in evaluating a bar applicant's moral character, "[a] determination of unfitness must rest not on the fact of bankruptcy but on conduct reasonably viewed as incompatible with a lawyer's duties and responsibilities as a member of the Bar").

indebtedness continues to grow – in significant part as result of expenses related to this litigation – and he thereby becomes increasingly dependent on obtaining a settlement sufficiently sizeable to fund his Chapter 11 plan.

It is worth noting that another conflict of interest exists between Fagan and foreign plaintiffs' two retained experts, to whom Fagan is personally indebted. Because Fagan cannot confirm his Chapter 11 plan absent a positive result for the foreign plaintiffs in these cases, Fagan's debts to Dr. Abraham (who is owed $75,000) and Geshwend (who is owed $3,000,000) will remain unpaid until Fagan is able to obtain a favorable settlement or verdict in this litigation. Dr. Abraham and Mr. Geshwend are thus in a position whereby their compensation as expert witnesses is contingent on the outcome of these cases. Under these circumstances, Fagan's retention of them violates Disciplinary Rule 7-109 of the Code, which provides that "[a] lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the outcome of his or her testimony or the outcome of the case."[41] This violation of the Code not only constitutes an impermissible conflict of interest, but also underscores the overall appearance of professional impropriety that Fagan brings to this litigation.

---

[41]   DR 7-109, 22 N.Y. Comp. Codes R. & Regs. § 1200.40(e) (emphasis added).

Moreover, Fagan has already been sanctioned by this Court for having a remarkably similar conflict of interest with respect to litigation he prosecuted on behalf of victims of the Nazi Holocaust.[42] The court in that litigation determined that, in reality, Fagan was "seeking damages on behalf of a fictitious entity" and dismissed the action for lack of subject matter jurisdiction.[43] The court also held that "most seriously, however, Fagan [was] proceeding in direct violation of New York's Champerty Statute and Applicable Disciplinary Rules. Champerty is defined as 'maintaining a suit in return for financial interest in the outcome.'"[44] Apparently, Fagan had purchased interests in stolen artwork for the sole purpose of bringing actions involving that artwork. Citing various provisions of New York law, including Disciplinary Rule 5-103, the court held that Fagan's proprietary interest in the litigation ran afoul of legal and ethical rules.[45] As a result of this interest and additional misconduct – including Fagan's various "deceptions" – the court imposed sanctions on Fagan, ordering him to pay his adversary's litigation

---

[42] See Association of Holocaust Victims for Restitution of Artwork & Masterpieces v. Bank Austria Creditanstalt AG ("Association of Holocaust Victims I"), No. 04 Civ. 3600, 2005 WL 2001888, at *5 (S.D.N.Y. Aug. 19, 2005).

[43] Id.

[44] Id. (quoting In re Primus, 436 U.S. 412, 425 n.15 (1978)).

[45] See id. (citations omitted).

costs and fees, and fining him $5,000.[46] The court also noted with dismay that Fagan's litigation tactics "appear[ed] to be part of a pervasive and disturbing [personal] trend."[47]

This past February, Fagan was again formally sanctioned, this time by the Eastern District of New York.[48] By way of background, Fagan had been terminated as co-counsel for plaintiffs in well-publicized litigation involving the now abolished South African apartheid regime. In response to his termination, Fagan "hastily instituted" a related action in the same district and, in "full view of the international and national media," personally served a subpoena on his former co-counsel.[49] The court quashed the subpoena on the ground that it was purely

---

[46] Fagan moved for reconsideration of and a stay of these rulings, which the court denied. See Association of Holocaust Victims for Restitution of Artwork & Masterpieces v. Bank Austria Creditanstalt AG ("Association of Holocaust Victims II"), No. 04 Civ. 3600, 2005 WL 3099592 (S.D.N.Y. Nov. 17, 2005). The court further held that Fagan owed a total of $345,520.64 in litigation costs and expenses, and ordered him to immediately either pay a $5,000 fine or post a supersedeas bond. See id. at *8.

[47] Association of Holocaust Victims I, 2005 WL 20001888, at *5 (listing related actions being prosecuted by Fagan).

[48] See Moleff v. The Oppenheimer Trust, No. 03 Civ. 5361, 2007 WL 538547, at *2-4 (E.D.N.Y. Feb. 15, 2007).

[49] Id. at *1.

"retaliatory" and "patently frivolous" and awarded Fagan's former co-counsel nearly $15,000 in attorneys' fees and costs.[50]

These prior sanctions bolster my finding that his disqualification in the instant cases is required. Although Fagan's personal stake in this MDL differs from that which he had in the Holocaust litigation discussed above, it is just as unprofessional and deserving of rebuke. In resolving this motion in favor of plaintiffs' interest in being represented by counsel of their choice, and the need to maintain high ethical standards within the profession.[51] By Fagan's own admissions, he has been forced into bankruptcy due to massive debts totaling millions of dollars, and the main source of funding for his Chapter 11 plan are proceeds from a hypothetical global settlement of Kaprun-related litigation. With such a flagrant personal interest in the outcome of these cases, Fagan simply cannot be allowed to continue participating as counsel.[52]

50    Id. at *8.

51    See Fund of Funds, 567 F.2d at 236-37 ("[A]bove all else, we must maintain public trust in the integrity of the Bar.").

52    In opposition to the motion for his disqualification, Fagan submitted a memorandum of law which cites to relevant case law, but neglects to apply the law to these facts. See Consolidated Submissions in Opposition to Motion for Sanctions Against Edward Fagan, Robert Hantman and James Lowy Related to Whistleblower Depositions and to Disqualify Edward Fagan ("Pl. Mem.") at 9-14. Rather, Fagan's memorandum is rife with unsupported and conclusory statements,

19

III.    SANCTIONS

A.    Applicable Law

A district court has the "inherent authority to sanction parties appearing before it for acting in bad faith, vexatiously, wantonly, or for oppressive reasons."[53] This authority "stems from the very nature of the courts and their need to be able to manage their own affairs so as to achieve the orderly and expeditious disposition of cases."[54]

In addition to this inherent power, section 1927 of title 28 of the United States Code allows a court to impose sanctions when an attorney,"[so]

such as: "There is abundant evidence that the Motion to Disqualify is a litigation tactic designed to prejudice the Kaprun victims and survivor claims." Id. at 14. Fagan also attaches declarations of "independent ethics counsel" who opine that Fagan's continued participation in these cases raises no improper conflict of interests. See, e.g., Declaration of Ethics Expert Richard Grayson. Upon review, these declarations are useless. They cite no case law, contain only vague summaries of the law (e.g., "There is no per se rule that prohibits a lawyer from continuing to represent clients when the lawyer has filed a bankruptcy petition."), and unsupported assertions of fact (e.g., "The cooperating lawyers, together with their clients, want Fagan to continue representing them."). Id. at 2. Nowhere do these declarations address the conflict raised by Fagan's bankruptcy or otherwise allude to Fagan's substantial debts, or his important admission that his Chapter 11 plan presumes he will receive a large fee from a settlement of this litigation, or the fact that he owes millions of dollars to two of foreign plaintiffs' expert witnesses.

53    Association of Holocaust Victims I, 2007 WL 2001888, at *3 (citing Sassower v. Abrams, 833 F. Supp. 253, 272 (S.D.N.Y. 1993)).

54    Id. (citation omitted).

20

multiplies the proceedings in any case unreasonably and vexatiously."[55] Thus, the statute "imposes an obligation upon attorneys throughout the entire litigation to avoid dilatory tactics."[56] Where an attorney fails to meet this obligation, courts may order him "to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."[57]

An award of sanctions under either the court's inherent authority or section 1927 requires a finding of bad faith on the part of the offending attorney.[58] Bad faith may be inferred when counsel's actions are "so completely without merit so as to require the conclusion that they must have been undertaken for some improper purposes such as delay."[59]

55. *Schlaifer Nance & Co., Inc. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999) (quoting 28 U.S.C. § 1927)).

56. *MacDraw, Inc. v. CIT Group Equip. Fin., Inc.*, 73 F.3d 1253, 1261 (2d Cir. 1996).

57. 28 U.S.C. § 1927.

58. *See United States v. International Bd. of Teamsters*, 948 F.2d 1338, 1345 (2d Cir. 1991) ("Bad faith is the touchstone of an award under [section 1927]"); *Association of Holocaust Victims I*, 2007 WL 200188, at *4 (citing *Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 96 (2d Cir. 1997)).

59. *Vacco v. Operation Rescue Nat'l*, 80 F.3d 64, 72 (2d Cir. 1996) (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986)). *Accord Keller v. Mobil Corp.*, 55 F.3d 94, 99 (2d Cir. 1995) (listing acts which could justify sanctions under the "bad faith" test, including "making several insupportable bias recusal motions and repeated motions to reargue . . . [and] continually engaging in obfuscation of the issues, hyperbolism and groundless presumptions in addition to

21

## B. Whistleblower Testimony

On April 12 and 13, 2007, foreign plaintiffs' counsel and a majority of defendants' counsel traveled to Germany to depose foreign plaintiffs' so-called "whistleblower" witnesses. Although Fagan refused to disclose the identities of these witnesses, they were eventually revealed to be Maria Steiner and Georg Schwarz, both of whom had testified at the already-concluded Austrian criminal proceedings related to the Kaprun ski train disaster.

Defendants assert that they were forced to depose Ms. Steiner and Mr. Schwarz in Germany at great expense only to learn that these individuals were not, in fact, "secret," "nor were they whistleblowers, and that they lacked the knowledge Fagan said they had. Specifically, defendants point to representations made by Fagan during a conference before this Court on December 28, 2006.[60] Defendants illustrate this point with a side-by-side comparison chart – one column quotes Fagan's representations regarding the whistleblowers' purported knowledge; the other column quotes their actual deposition testimony.[61] The evidence is clear and overwhelming: Fagan drastically misrepresented the knowledge of these witnesses

insinuating the court [is] biased'" (quoting *Hudson Motors P'ship v. Crest Leasing Enters.*, 845 F. Supp. 969, 978 (E.D.N.Y. 1994))).

60. *See* 12/18/06 Conference Transcript ("12/18/06 Conf. Tr.") at 40-43.

61. *See* Def. Mem. at 2-6.

22

— indeed, they had practically no relevant information whatsoever. For instance, Fagan told the Court that one of his whistleblowers — later identified as Georg Schwarz — "is a person who has technical knowledge of the train operations . . . has technical knowledge about the products, parts and systems that were put on the train and in the tunnel . . . has knowledge about the dangerous products that were put on the train or were allowed to be put on the train . . . ."[62] But at his deposition, Mr. Schwarz — who had once been employed as a ski lift operator at the Kaprun ski resort — candidly admitted that he lacked any such knowledge.[63] The same is true with respect to Fagan's representations regarding the other purported whistleblower, Maria Steiner.[64] In short, while some of Fagan's representations as to his so-called whistleblowers could generously be construed as mere exaggeration, others were quite patently false.

C.    **Fagan's Conduct in this Litigation Warrants Sanctions**

"Mr. Fagan's actions in [these cases] go beyond (but certainly include) a lack of preparation and lack of professionalism. In addition to glaringly

---

62    12/18/06 Conf. Tr. at 41-42.

63    See April 12 and 13, 2007 Deposition of Georg Schwarz Transcript, Ex. 2 to Rooney Decl. ("Schwarz Tr."), at 44-45.

64    See Def. Mem. at 4-6 (comparing Fagan's representations about Ms. Steiner to Ms. Steiner's actual testimony).

23

---

inadequate filings, [and] utter disregard for [ethical standards of conduct] . . . it is obvious that Mr. Fagan has misrepresented critical facts" relating to his so-called whistleblower witnesses.[65]

Not only did Fagan misrepresent the knowledge of his so-called whistleblowers, he also misrepresented the status of Ms. Steiner and Mr. Schwarz as secret witnesses whose identity needed to remain confidential for the sake of their safety. On several occasions, in Court and in sworn affidavits, Fagan characterized Ms. Steiner and Mr. Schwarz as "whistleblowers" who were fearful and afraid of intimidating tactics by defendants and their counsel.[66] Under this pretext, Fagan obtained an order of confidentiality from this Court. It is now clear, however, that Fagan's representations were patently false and served absolutely no purpose save to instill a melodramatic air of menace to these proceedings.[67]

In his January 10, 2007 Declaration, under the boldfaced heading "FEAR FOR HIS FAMILY'S SAFETY AND WELL-BEING," Fagan wrote the following about Mr. Schwarz:

It was common knowledge that other [employees of defendant Gletscherbahnen Kaprun Aktiengesellschaft ("GBK"), which

---

65    *Association of Holocaust Victims I*, 2005 WL 2001888, at *4.

66    See, e.g., 12/18/07 Conf. Tr. at 41-42, 4/25/07 Conf. Tr. at 29-32.

67    Def. Mem. at 8.

24

owns the ski resort] (such as engineer [Walter] Steiner[69]) after coming forward, were ostracized, alienated, and subjected to ridicule and economic and social isolation in Kaprun. According to the witness, after [Walter] Steiner came forward, he, his wife and his family were "dead" in Kaprun. He is very concerned that certain [ski resort] lawyers, such as Dr. Thomas Fried and his firm, not be given access to this information as he is fearful of retribution and retaliation. He is fearful for his and his families' safety and welfare in Austria.[68]

Mr. Schwarz's deposition testimony completely contradicts Fagan's assertions. Several times during his deposition, Mr. Schwarz was asked, point-blank, whether he was ever threatened or intimidated because of anything he might have said or might know in connection with the ski train disaster, each time, Mr. Schwarz gave a resounding "No."[70]

---

[68] Walter Steiner, the husband of Maria Steiner, worked as an engineer and conductor at the Kaprun ski resort for twenty-five years. He died in February 2007. See April 13, 2007 Deposition Transcript of Maria Steiner, Ex. 7 to Rooney Decl. ("Steiner Tr."), at 8-9.

[69] See "Fagan Jan. 10, 2007 Declaration Related to "Whistleblower" dated January 16, 2007, Ex. 3 to Rooney Decl., ¶ 33. I also note that in practically all of Fagan's submissions to the Court, various words and phrases are capitalized, boldfaced, italicized and/or underlined. Whether this is stylistic or for emphasis or simply random is unclear. Numerous sentences are also incomplete and lack punctuation. This is not only peculiar, but also incomprehensible given that Fagan has been previously reprimanded in this Court for filing such hap-hazardly drafted papers. See Association of Holocaust Victims I, 2005 WL 2001888, at *4 n.7.

[70] See Schwarz Tr. at 52.

25

Nor was Ms. Steiner a stealth witness with reason to fear for her safety upon a disclosure of her identity. Indeed, Ms. Steiner was already well-known to all parties because she was mentioned *by name* in the written opinion of the judge in the Austrian criminal case arising out of the ski train disaster which took place in 2002. In that decision, the Austrian judge wrote:

The statements made by Maria Steiner were not convincing to the Court at all. The witness left a psychologically striking impression upon the Court, hid behind rumors, and gave no specific comments. The information provided by the witness could not be used at all in establishing the truth, and the identification and naming of the witness on the part of the private parties *is not viable*.[71]

Nevertheless, Fagan noticed Ms. Steiner's deposition and insisted that her identity remain confidential. Fagan further claimed, in submissions to this Court, that Ms. Steiner would testify to, among other things, that her husband was an employee at the ski resort and that she has firsthand knowledge relevant to defendant GBK's liability and spoliation of evidence.[72] Not surprisingly, however, Ms. Steiner's deposition, taken in April 2007, provided no such evidence.[73]

---

[71] Def. Mem. at 7 (quoting the report of the Austrian criminal court) (emphasis added).

[72] See Foreign Plaintiffs' "Summary of 2nd Whistleblower," Ex. 6 to Rooney Decl.

[73] See Steiner Tr. at 85-86, 93-94.

26

In sum, Fagan made false representations concerning the so-called whistleblowers and he obtained an order of confidentiality from this Court under false pretenses. Aside from being highly unprofessional, such tactics suggest utter disregard for the Court. In light of the proceeding, this Court finds that Fagan's claims regarding his witnesses were made in bad faith. This finding is bolstered by the fact that Fagan had been previously warned and sanctioned by Judge Kram of this Court for working similar deceptions that wasted judicial resources. As a result, pursuant to this Court's inherent power and section 1927, Edward D. Fagan is hereby fined $5,000 and is ordered to reimburse defendants for litigation costs and expenses relating to the depositions of Ms. Steiner and Mr. Schwarz

D. Messrs. Hantman and Lowy

Defendants' request for sanctions against Hantman and Lowy, in addition to Fagan, are not unfounded. Either of their own volition or at the prompting of Fagan, Hantman and Lowy have written inflammatory letters to parties and the Court accusing defendants and non-parties of plotting to intimidate and threaten plaintiffs' witnesses.[74] Apparently, prior to Mr. Schwarz's deposition,

---

[74]    See 4/12/07 Email from Hantman to all parties, Ex. 8 to Rooney Decl. ("As one of the lawyers for the plaintiffs, I was advised that one of the plaintiffs witnesses – a whistle blower – received a very disturbing and intimidating phone call over the weekend. Fagan has the details."); 4/13/07 Letter from Lowy to the Court, Ex. 10 to Rooney Decl. (claiming that prior to the depositions in Germany, "one or more of defendants or GBK" violated the Court's orders and engaged in "witness tampering").

he received at least one telephone call from Dr. Johannes Stiefdorf – an Austrian attorney who is currently prosecuting civil cases in Austria on behalf of victims of the ski train disaster – who attempted to discourage Mr. Schwarz from participating in the U.S. litigation.[75] Based on this telephone call, Fagan, Hantman and Lowy sent a flurry of communications to the Court about a scandal involving a conspiracy amongst certain defendants to bribe and intimidate witnesses and to "leak" information about the U.S. litigation to Dr. Stiefdorf, who plaintiffs' counsel persistently characterize as an agent of GBK, despite the fact that he represents *plaintiffs* in the Austrian litigation.[76] This brief summary does not do justice to the urgency and sensationalism of Fagan and this co-counsel's communications to the Court.[77]

Additionally, both before and after the depositions in Germany, Hantman and Lowy repeatedly stated in correspondence to the Court that they represent the foreign plaintiffs together with Fagan. And as recently as this past June, Fagan also requested that all correspondence for this litigation be sent to him

---

[75]    See 4/25/07 Conf. Tr. at 29-32.

[76]    See id. at 32.

[77]    In response to Fagan's conspiracy theory this Court was driven to inquire whether he was hallucinating. See 4/25/07 Conf. Tr. at 29-32.

care of Hantman's office.[78] Nevertheless, because the overwhelming majority of misrepresentations concerning the whistleblowers were made solely by Fagan, and because there is little evidence in the record supporting an inference of bad faith on behalf of Hantman and Lowy, who hardly ever broke their courtroom silence, I decline to sanction them.[79]

_____

[78] See 6/6/07 Conf. Tr. at 44.

[79] Indeed, when Hantman and Lowy attended conferences in these actions, they sat silently next to Fagan at plaintiffs' table; the Court cannot recall a single instance where they interjected or otherwise addressed the Court, either to agree, supplement, or disagree with Fagan's representations. See also Declaration of Robert J. Hantman dated June 14, 2007 (Docket No. 164; Case No. 03 Civ. 8960) ¶ 7 ("[D]efendants [sic] counsel seeks to impute certain knowledge to me as a result of my standing next to Fagan, when he addressed the Court."); id. ¶ 12 ("... I find it incredulous that any of the defendants seriously relied upon my representations in attending the depositions when I made none and I have no authority or decision making power to do so as all defense counsel are aware."); id. ¶¶ 15-16 ("As to my e-mail, I do believe it is not proper to discourage a witness from testifying regardless of who discourages that person while I did not know [sic] who called the witnesses at the time this information was conveyed to me by Mr. Fagan. I submit that my e-mail was neither threatening nor improper under the circumstances and, if those who received it had no participation [sic], it is hard to believe that it would have had any impact on anyone.").

## IV.    CONCLUSION

For the reasons stated above, defendants' motion – in which the American plaintiffs join – to disqualify Edward D. Fagan from further participating in these proceedings is granted.[80] It is further ordered that

1. Fagan is fined $5,000.00, which is due immediately and should be remitted to the Clerk of the Court, United States District Court, Southern District of New York, 500 Pearl Street, New York, New York 10007.

2. Defendants are directed to submit to the Court, within thirty (30) days of receipt of this Order, statements of reasonable litigation costs and fees in connection with the depositions of Maria Steiner and Georg Schwarz that took place in Germany on April 12 and 13, 2007.

3. If Hantman and Lowy are retained to represent any foreign plaintiffs, they shall enter appearances within thirty (30) days of the date of this Order, together with copies of all retainer agreements.

4. If no counsel has entered an appearance on behalf of any foreign plaintiff within thirty (30) days from the filing of

_____

[80] Foreign plaintiffs have also filed a motion for sanctions against certain defendants and non-parties, as well as a motion for the disqualification of Gordon E. Haesloop and his firm, Bartlett McDonough, Bastone & Monaghan, LLP, counsel for defendant Ormiglow Corporation. See Motion to Disqualify Haesloop & Firm (filed March 23, 2007) and Motion for Sanctions against Ormiglow, Cyalume, Haesloop & Firm and St. Paul / Travelers based on Spoliation of Evidence (filed March 26, 2007). Both of these motions, as well as their accompanying affidavits and declarations, are rife with incomplete sentences, conclusory and illogical legal arguments, and unsupported factual allegations. What is clear from foreign plaintiffs' moving papers, however, is that their motions are predicated on disputed issues of material fact – i.e., GBK's alleged spoliation of evidence. Accordingly, foreign plaintiffs' motions are denied at this time.

this Order, that plaintiff must notify the Court of his or her intention to proceed *pro se*. If no such notice is received within sixty (60) days of this Order, the Clerk of Court shall enter a Judgment dismissing these actions.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
August 16, 2007

31

- Appearances -

*For Foreign Plaintiffs:*

Edward D. Fagan, Esq.
Five Penn Plaza, 23rd Floor
New York, New York 10001
(646) 378-2225

James F. Lowy, Esq.
International Law Group, LLC
3907 Henderson Boulevard, Suite 200
Tampa, Florida 33629
(813) 288-9525

Robert J. Hantman, Esq.
Hantman & Associates
1313 Avenue of the Americas, Suite 406
New York, New York 10019
(212) 684-3933

*For American Plaintiffs:*

Jay I. Rice, Esq.
Nagel Rice, LLP
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 618-0400

Robert Swift, Esq.
Kohn, Swift & Graf, P.C.
One South Broad Street, Suite 2100
Philadelphia, Pennsylvania 19107
(215) 238-1700

Kenneth P. Nolan, Esq.
Speiser Krause Nolan & Granito
140 East 45th Street, 34th Floor
New York, New York 10017
(212) 661-0011

32

*For Defendant Bosch Rexroth Corporation and as Liaison Counsel for all Defendants:*

Paul P. Rooney, Esq.
Reed Smith LLP
599 Lexington Avenue, 28th Floor
New York, New York 10022
(212) 521-5435

*For Defendant Siemens Transportation Systems, Inc.:*

Brant W. Bishop, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000

Ryan M. Moretini, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
(212) 446-4800

Robert W. Littleton, Esq.
Littleton Joyce Ughetta & Park LLP
39 Broadway, 34th Floor
New York, New York 10006
(212) 404-5777

*For Defendant Robert Bosch Corp.:*

Arnd N. von Waldow, Esq.
Paul P. Rooney, Esq.
Reed Smith LLP
599 Lexington Avenue, 28th Floor
New York, New York 10022
(212) 521-5435

*For Defendant Wika Instrument Corp.:*

33

Eileen T. McCabe, Esq.
Stephen Roberts, Esq.
William Lalor, Esq.
Mendes & Mount LLP
750 Seventh Avenue
New York, New York 10019
(212) 261-8000

*For Defendant Hydac Technology Corp.:*

Nancy Ledy-Gurren, Esq.
Ledy-Gurren, Bass & Siff LLP
475 Park Avenue South
New York, New York 10016
(212) 447-1111

*For Defendants American Cyanamid Inc. and Omniglow Corp.:*

E. Gordon Haesloop, Esq.
Bartlett McDonough, Bastone & Monaghan LLP
300 Old Country Road
Mineola, New York 11501
(516) 877-2900

*For Defendant Exxon Mobil:*

John F. Tully, Esq.
Robert Owen, Esq.
Fulbright & Jaworski LLP
666 Fifth Avenue
New York, New York 10103
(212) 318-3000

34

**EXHIBIT B**

LAW OFFICES
HARVEY S. GROSSMAN

80 MAIN STREET, WEST ORANGE, NEW JERSEY 07052
(973) 736-5858
FAX: (973) 325-2589

FAX:  (973)  325-2589

DATE:

TRANSMITTED TO: 12/17/07

FAX NUMBER: 1-201-864-0200
1-201-617-5500

RE: Fagan

We are transmitting _____ pages, including this cover page.
Kindly call the undersigned at (973) 736-5858 if there is a problem
with the transmission.

MESSAGE: I received this from
Fagan on Friday.

will call you this PM

# EDWARD D. FAGAN ESQ.

Five Penn Plaza, 23rd Floor, New York, NY 10001
Tel. (646) 378-2225, New Fax # (646) 304-6446 *(as of 30 Nov. 2007)*
Email: ed.fagan@global-litigation-partners.com

# *FAX TRANSMISSION*

**TO:** _Harvey Grossman    (973) 325-2589_
_The Lions Group_

**Cc:** _____

_____

**FROM:** Ed Fagan

**RE:** _Fagan et al v Lowy et al - 07-115473_

**DATE:** _Dec. 14, 2007_                    **TOTAL # PAGES:** _20_

With this fax I am sending you a courtesy
copy of the above complaint and the factual
allegations that relate to you, your firm and
Michael Perle. I urge you to consult with Mr. Perle
and demand that he stop interfering in the
Kaprun Cases, and my representation of people
in the Transcontinental cases and my business in general

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CONFIDENTIALITY WARNING & NOTICE

The information in this facsimile message and attachments is legally privileged and confidential information intended only for
the us of the individual or entity named above. If the reader or recipient is not the intended recipient, you are hereby notified
that any dissemination, distribution, or copy of this facsimile is strictly prohibited. If you have received this facsimile in error,
please notify the send immediately by calling us at (646) 378-2225 and thereafter please DESTROY the facsimile message.

NEW YORK
COUNTY CLERK'S OFFICE

NOV. 19 2007

NOT COMPARED
WITH COPY FILE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X
Edward D. Fagan Esq,                           :
Dr. Bernd Geier,                               :
Dr. Gerhard Podovsovnik,                       :
                                  Plaintiffs   :
                                               :
     - vs -                                    :
                                               :
James F. Lowy Esq.                             :
International Law Group LLC,                    :
Florida Law Group LLC,                          :
Michael R. Perle Esq., and                     :
Michael R. Perle P.C.                          :
                                  Defendants.  :
------------------------------------------------------------X

INDEX #

*07-115473*

Date Filed:
*Nov. 19, 2007*

COMPLAINT
WITH JURY TRIAL DEMANDED

## INTRODUCTION

This case is based upon negligence and malpractice, including unauthorized disclosures of confidential and privileged materials, with reckless disregard to the consequences and the damages caused to clients, former clients and persons to whom Defendants owed duties of care.

## PARTIES

1) Plaintiff Edward D. Fagan (hereinafter "Fagan") is a lawyer licensed to practice in New York State who maintains offices at 5 Penn Plaza, 23rd Floor, New York, NY 10001.

2) Plaintiff Dr. Bernd Geier (hereinafter "Geier") is citizen of the Federal Republic of Germany, who lives in Munich, and who is the personal representative of and holder of a Valid Power of Attorney for his father who was a victim of a ski train and tunnel fire that occurred on Nov. 11, 2000 in Kaprun Austria (hereinafter "The Kaprun Disaster").

3) Plaintiff Dr. Gerhard Podovsovnik (hereinafter "Podovsovnik") is citizen of the Republic of Austria, who lives in Vienna, Austria, and who is an attorney and a legal representative of and holder of Valid Powers of Attorney for victims and survivors of The Kaprun Disaster.

4) Defendant James F. Lowy Esq. ("Lowy") is a Florida lawyer who applied for admission to the New York Bar.

5) Defendant Florida Law Group LLC ("FLG") is a Florida law firm through which Defendant Lowy solicits and/or solicited clients and/or conducts legal business in New York.

6) Defendant International Law Group LLC ("ILG") is a Florida based law firm through which Defendant Lowy solicits and/or solicited clients and/or conducts business in and maintains an Annex Office in New York.

7) Defendant Michael R. Perle Esq. ("Perle") is a lawyer licensed to practice law in the State of New York.

8) Defendant Michael R. Perle P.C. ("Perle PC") is New Jersey law firm through which Defendant Perle conducts business in NY.

## JURISDICTION & VENUE

9) The Court has jurisdiction, and venue is proper in New York County, over Defendants Lowy, FLG and ILG, pursuant to CPLR §§ 301 and 302 by virtue of Defendants Lowy & ILG maintenance of an office at 5 Penn Plaza, 23rd Floor, New York, NY 10001, telephone number in New York City (646) 378-2225 and over Defendant FLG by virtue of its systematic continuous and ongoing conducting and/or solicitation of business, including but not limited to appearing in lawsuits and providing legal advise to persons, in New York.

10) The Court has jurisdiction over Defendant Perle and Perle PC pursuant to CPLR § 301 by virtue of Defendant Perle's residence in New York at 50 West 96th Street, New York, NY 10050 Defendant Perle's alleged maintenance of offices in NY[1] and by virtue of Defendant

---

[1] Plaintiffs have searched for any actual office in NY for Defendant Perle and have found nothing despite Defendant Perle's contentions to the contrary. There is no listing in NY phone directories for such an office. The Office of Court Administration has no listing of an office in NY office. Plaintiffs have repeatedly requested disclosure by Defendants of an office, phone and fax number in NY but have yet to receive such information.

Perle's ongoing conduct of business in new York and representation in matters in and before

New York State and Federal Court.

11) Venue is proper in this Court by virtue of Defendants acts and efforts to interfere with

Plaintiffs business in New York.

## FACTS RELEVANT TO CAUSES OF ACTION

12) In November 2000 Plaintiff Fagan started to work for victims of The Kaprun Disaster.

13) Starting in January 2001, Plaintiff Fagan was working for victims, survivors and/or family

representatives of The Kaprun Disaster by filing and prosecuting negligence, product liability

and cases in the United States (hereinafter "The Kaprun Cases").

14) Plaintiff Geier is the son of Hermann Geier a survivor of The Kaprun Disaster and a Plaintiff

in The Kaprun Cases.

15) Plaintiff Podovsovnik is an Austrian lawyer who has been working with Plaintiff Fagan in

The Kaprun Cases for years.

16) In early 2006, Defendants Lowy and FLG entered into an agreement with Plaintiff Fagan

through which he was to provide legal work and funding and help to organize future

additional funding for The Kaprun Cases.

17) From early 2006 forward, Defendants Lowy and FLG gained access to confidential,

privileged and proprietary information related to The Kaprun Cases.

18) Defendants Lowy and FLG did not do the legal work that he and his firm was required to

perform for The Kaprun Cases.

19) Defendants Lowy and FLG did not provide the funding and did not help to organize

additional funding for The Kaprun Cases.

20) In early spring 2006, Plaintiff Fagan approached Defendant Perle and his principal client
    Harvey Grossman ("Grossman") of Lions Group Ltd ("LGL")[2] to assist him with the further
    prosecution of The Kaprun Cases.

21) By virtue of Defendant Perle's position as counsel for Grossman and LGL, Defendant Perle
    had a special relationship and/or owed a duty to Plaintiff Fagan to:

    a)  assist and/or not interfere with Plaintiff Fagan's business;

    b)  assist and/or not interfere with Plaintiff Fagan's relationship with creditors including
        Grossman and LGL;

    c)  assist and/or not interfere with Plaintiff Fagan's ability to prosecute The Kaprun Cases;
        and

    d)  refrain from interfering in or taking actions that could prejudice Plaintiff Fagan's interests
        in The Kaprun Cases.

22) By virtue of Defendant Perle's position as counsel for Grossman and LGL and special
    relationship with Plaintiff Fagan, Defendant Perle gained access to confidential, privileged
    and proprietary information about Plaintiff Fagan and The Kaprun Cases.

23) Defendant Perle was in a unique position to assist Plaintiff Fagan with nominal funding for
    The Kaprun Cases, and to support Plaintiff Fagan's prosecution of The Kaprun Cases.

24) Instead of helping, in the spring of 2006 Defendant Perle refused to help with prosecution or
    with nominal funding for Plaintiff Fagan's prosecution of The Kaprun Cases.

---

[2] Grossman and LGL were funders of various of Plaintiff Fagan's cases since 1999. Grossman and LGL were paid
back the entire principal borrowed. Grossman and LGL are attempting to collect what amounts to usurious interest,
which issue has already been raised in the context of a proceeding in which Plaintiff Fagan, Grossman and LGL
were/are adversaries and Defendant Perle is counsel for Grossman and LGL. Plaintiff Fagan recently learned that
Grossman and LGL have purported to file security statements in different jurisdictions without Plaintiff Fagan's
prior knowledge or consent. These issues will either be handled in separate proceedings or Grossman and LGL will
be added as a future Defendant in this case for his interference with Plaintiff Fagan's business directly and through
his agent Defendant Perle.

25) From early spring 2006 forward, Defendants Lowy and FLG gained access to confidential, privileged and proprietary information related to The Kaprun Cases.

26) During this time, Defendants Lowy and FLG brought Lowy's other entity ILG into the relationship with Plaintiff Fagan.

27) From early spring 2006 forward, Defendant ILG gained access to confidential, privileged and proprietary information related to The Kaprun Cases.

28) Plaintiff Fagan introduced Defendants Lowy, FLG and ILG to Plaintiffs Geier and Podovsovnik so that they could all work together on The Kaprun Cases.

29) From spring 2006 forward, Defendants Lowy, FLG and ILG began to enter appearances/were identified as counsel for victims, survivors and family representatives in The Kaprun Cases.

30) Through Plaintiff Fagan, Defendants Lowy, FLG and ILG entered into an attorney client relationship with victims, survivors and/or family representatives in The Kaprun Cases.

31) Defendants Lowy, FLG and ILG had an obligation to assist Plaintiff Fagan with the prosecution of The Kaprun Cases.

32) Defendants Lowy, FLG and ILG had an obligation to use the Confidential Information[3] they learned through the attorney client relationship for the benefit of victims, survivors and/or family representatives in The Kaprun Cases.

33) As co-counsel to Plaintiff Fagan in The Kaprun Cases, Defendants Lowy, FLG and ILG had an obligation to refrain from disclosing and preserving Confidential Information learned through the attorney client relationship related to The Kaprun Cases for the benefit of victims, survivors and/or family representatives in The Kaprun Cases.

---

[3] Confidential Information includes attorney client, work product, personal data related to clients, survivors and/or family representatives, agreements with counsel, consultants and researchers activities, emails, letters, settlement strategies, litigation strategies, appellate strategies, target Defendants, theories of liability, areas of strengths and weaknesses in claims, identity of witnesses, experts opinions and theories of liability, strategies related to presentations to court, errors and omissions, interaction between parties, counsel and Defendants.

34) Defendants Lowy, FLG and ILG entered into commitments and/or obligated themselves to pay expenses including but not limited to expenses for Court Reporters, investigators, experts, consultants and researchers in The Kaprun Cases.

35) Defendants Lowy, FLG and ILG failed and/or refused to pay expenses for Court Reporters, investigators, experts, consultants and researchers in The Kaprun Cases.

36) Not only did Defendants Lowy, FLG and ILG fail and/or refuse to pay expenses for which they committed themselves, but they attempted to shift the blame and/or failure to pay the bills[4] to Plaintiff Fagan.

37) Defendants Lowy, FLG and ILG failed and/or refused to do work on filed motions or to assist in discovery related to The Kaprun Cases.

38) By way of example only:

   a) Defendant Lowy did not appear on time for meetings or depositions;

   b) Defendant Lowy failed to assist with certain depositions related to the claims of victims, survivors and their family representatives in The Kaprun Cases; and

   c) Defendant Lowy failed and/or refused to provide an Affidavit related to his first hand knowledge of threats and intimidation of witnesses in The Kaprun Cases and which information was important to The Kaprun Cases and to Plaintiff Fagan.

39) Defendants Lowy, FLG and ILG failed and/or refused to provide Affidavits related to the evidence and/or facts which they knew existed and which they knew were necessary to Plaintiffs ability to prosecute The Kaprun Cases.

---

[4] Some of the bills that Defendants Lowy, FLG and ILG failed to pay were bills related to expert Dr. Carl Abraham, Investigator Ken Torres and Court Reporter Candace Flowers.

40) After The Kaprun Cases were dismissed in June 2007, despite requests for assistance
    Defendants Lowy, FLG and ILG failed and/or refused to provide assistance and/or financial
    support necessary to Motions for Reconsideration and/or appeals.

41) After Plaintiff Fagan was disqualified in The Kaprun Cases, despite requests for assistance
    Defendants Lowy, FLG and ILG failed to timely assist with The Kaprun Appeals.

42) From early 2006 to present, Defendants Lowy, FLG and ILG were privy to Confidential
    Information being generated and/or exchanged by and/or between Plaintiff Fagan, Plaintiff
    Geier, Plaintiff Podovsovnik and other lawyers and/or victims involved with them in The
    Kaprun Cases and The Kaprun Appeals.

43) From June 2007 forward, Defendants Lowy, FLG and ILG became privy to confidential and
    proprietary information being generated and/or exchanged by and/or between Plaintiff Fagan,
    Plaintiff Geier, Plaintiff Podovsovnik and other lawyers and/or victims involved with them in
    The Kaprun Cases and specifically related to the Motions for Reconsideration, Motions for
    Recusal, Motions to Supplement the Record, The Kaprun Appeals and other strategies.

44) After Plaintiff Fagan was disqualified and when Defendants Lowy, FLG and ILG knew or
    should have known that the disqualification was based on errors of fact and law, Defendants
    Lowy, FLG and ILG did little or nothing to help The Kaprun Cases or The Kaprun Appeals.

45) After Plaintiff Fagan was disqualified, Plaintiff Geier, Plaintiff Podovsovnik and other
    victims, survivors and/or representatives and Cooperating Counsel gave Defendants Lowy,
    FLG and ILG verbal and/or written instructions about what he could and could not do.

46) After Plaintiff Fagan was disqualified, Defendants Lowy and FLG failed and/or refused to
    follow the instructions and/or directions of Plaintiff Geier, Plaintiff Podovsovnik and other
    victims, survivors and/or representatives and Cooperating Counsel.

40) After The Kaprun Cases were dismissed in June 2007, despite requests for assistance Defendants Lowy, FLG and ILG failed and/or refused to provide assistance and/or financial support necessary to Motions for Reconsideration and/or appeals.

41) After Plaintiff Fagan was disqualified in The Kaprun Cases, despite requests for assistance Defendants Lowy, FLG and ILG failed to timely assist with The Kaprun Appeals.

42) From early 2006 to present, Defendants Lowy, FLG and ILG were privy to Confidential Information being generated and/or exchanged by and/or between Plaintiff Fagan, Plaintiff Geier, Plaintiff Podovsovnik and other lawyers and/or victims involved with them in The Kaprun Cases and The Kaprun Appeals.

43) From June 2007 forward, Defendants Lowy, FLG and ILG became privy to confidential and proprietary information being generated and/or exchanged by and/or between Plaintiff Fagan, Plaintiff Geier, Plaintiff Podovsovnik and other lawyers and/or victims involved with them in The Kaprun Cases and specifically related to the Motions for Reconsideration, Motions for Recusal, Motions to Supplement the Record, The Kaprun Appeals and other strategies.

44) After Plaintiff Fagan was disqualified and when Defendants Lowy, FLG and ILG knew or should have known that the disqualification was based on errors of fact and law, Defendants Lowy, FLG and ILG did little or nothing to help The Kaprun Cases or The Kaprun Appeals.

45) After Plaintiff Fagan was disqualified, Plaintiff Geier, Plaintiff Podovsovnik and other victims, survivors and/or representatives and Cooperating Counsel gave Defendants Lowy, FLG and ILG verbal and/or written instructions about what he could and could not do.

46) After Plaintiff Fagan was disqualified, Defendants Lowy and FLG failed and/or refused to follow the instructions and/or directions of Plaintiff Geier, Plaintiff Podovsovnik and other victims, survivors and/or representatives and Cooperating Counsel.

47) In September 2007, without prior consultation with Plaintiff Fagan and without Plaintiff Fagan being copied on communications, Defendants Lowy and FLG attempted to solicit Plaintiff Geier, Plaintiff Podovsovnik and other victims, survivors and/or representatives and Cooperating Counsel to retain them.

48) Defendants Lowy, FLG and ILG are not competent to handle The Kaprun Cases alone.

49) During the period from early 2006 to June 2007, Defendants Lowy and FLG failed to learn the claims, the legal theories upon which the claims were based, the involvement of each Defendant, the facts and expert evidence upon which the claims against the Defendants were based or any other aspect of the case so that they could provide meaningful assistance or assume legal responsibility for any aspect of The Kaprun Cases or The Kaprun Appeals.

50) After The Kaprun Cases were dismissed, Defendants Lowy and FLG failed to learn the legal theories, facts or evidence upon which the Motions for Reconsideration were based.

51) After The Kaprun Cases were dismissed, Defendants Lowy and FLG failed to learn the legal theories, facts or evidence upon which The Kaprun Appeals were based.

52) Defendant Lowy started to use Defendant ILG through which he intended to act in The Kaprun Cases and The Kaprun Appeals.

53) Defendants Lowy, FLG and ILG tried to solicit Plaintiff Fagan's clients in The Kaprun Cases and The Kaprun Appeals without consultation and/or knowledge of Plaintiff Fagan.

54) At the time Defendants Lowy, FLG and ILG tried to solicit Plaintiff Fagan's clients in The Kaprun Cases and The Kaprun Appeals, Defendant Lowy, FLG and ILG were not competent to represent the clients and intended to take the clients just to try to settle claims cheaply so they Defendants Lowy, FLG and ILG could try to recover some of the expenses they paid toward the prosecution of the case but without regard to the true value of the case.

---

*Fagan et al v. Lowy et al – November 2007 – Complaint – Page 8*

55) On September 14, 2007, The Kaprun Appeal was filed and docketed by Plaintiff Fagan, on behalf of Plaintiffs Geier and Podovsovnik, and the victims, survivors and/or family representatives in The Kaprun Cases on whose behalf Plaintiffs Geier and Podovsovnik worked and from whom they had Valid Powers of Attorney.

56) On September 20, 2007, The Kaprun Appeal was amended to include additional Orders from which appeals were being taken.

57) From September 18 – 21, 2007, Defendant Lowy claimed that the Court was "pressuring" him to take action related to The Kaprun Cases or The Kaprun Appeals.

58) During the period from September 20 to 25, 2007, Plaintiffs Fagan, Geier and Podovsovnik (through Plaintiff Fagan) suggested to Defendant Lowy that (i) he should do nothing to prejudice The Kaprun Appeals, (ii) if the Court wanted him to appear he should appear and inform the Court that he had no authority to act and that he had no Retainers, and (iii) he should make no representation that he was competent or prepared to assume or resume or make decisions with regard to the prosecution of The Kaprun Cases, the Motion for Reconsideration or The Kaprun Appeals.

59) Contrary to the suggestions, instructions and/or warnings, on September 24, 2007, Defendant Lowy wrote the Court and stated:

   a)  "the foreign Plaintiffs have previously retained me, along with Mr. Fagan" ; and

   b)  "I have confirmation that at least some of the clients would continue to have me represent them".

60) Defendant Lowy's statements were untrue and misleading.

61) From September 25 – 28, 2007, again with notification of, consultation with and/or consent of Plaintiff Fagan, Defendants Lowy, FLG and ILG wrote multiple emails in which they

sought to get Plaintiff Fagan's clients, including but not limited to Plaintiff Geier and

Plaintiff Podovsovnik's clients, to enter into Retainer Agreements with Defendants Lowy,

FLG and ILG.

62) During this time, Defendants Lowy, FLG and ILG wanted to sever their relationship with

Plaintiff Fagan and try to settle The Kaprun Cases and The Kaprun Appeals on their own.

63) To accomplish this, during this period of time, Defendants Lowy, FLG and ILG sought to

create and/of cause anxiety, confusion and/or fear of Plaintiff Fagan's clients, including but

not limited to Plaintiff Geier and Plaintiff Podovsovnik's, so that they would enter into

Retainer Agreements with Defendants Lowy, FLG and ILG.

64) During this period, The Kaprun Appeals were pending and there were sensitive strategy and

issues being discussed in emails related to The Kaprun Appeals and The Kaprun Cases.

65) During this period, Defendants Lowy, FLG and ILG were apparently also communicating

electronically and/or by telephone with the District Court Judge in The Kaprun Cases.

66) When Plaintiffs discovered what Defendants Lowy, FLG and ILG were doing, they tried to

stop them and attempted to explain the potential serious problems that could they cause for

the overall claims and legal strategies related to The Kaprun Cases and The Kaprun Appeal.

67) Plaintiffs Fagan, Plaintiff Geier and Plaintiff Podovsovnik again gave Defendants Lowy,

FLG and ILG specific instructions to take no action and to do nothing to prejudice The

Kaprun Appeals or The Kaprun Cases.

68) Defendants Lowy, FLG and ILG informed Plaintiffs that the Court scheduled and he was

going to take part in a telephone Conference on September 28, 2007.

69) Plaintiffs again instructed Defendants Lowy, FLG and ILG that he should inform the District

Court Judge that he had no retainer agreements and as such he had not authority from

victims, survivors and/or family representatives, including Plaintiffs, to participate in the

scheduled telephone Conference.

70) Defendants Lowy, FLG and ILG withheld from Plaintiffs what the agenda was for and why

the District Court Judge or defendants requested the scheduled telephone Conference.

71) Defendants Lowy, FLG and ILG misled Plaintiffs about what the agenda was for and what

occurred at the scheduled telephone Conference.

72) Plaintiffs obtained a copy of the transcript of the September 28, 2007 telephone conference

and discovered the extent of Defendants Lowy, FLG and ILG misrepresentations to the

District Court, defendants in The Kaprun Cases and The Kaprun Appeals, became known as

well as how these actions adversely impacted The Kaprun Cases and The Kaprun Appeals.

73) Defendants Lowy, FLG and ILG misled Plaintiffs about what occurred and what they did

during the September 28, 2007 Telephone Conference.

74) Plaintiffs discovered that, among other things, during the September 28, 2007 Telephone

Conference Defendant Lowy, FLG and ILG:

   a) Misrepresented their retention;

   b) Misrepresented their authority and/or Plaintiffs intentions/wishes;

   c) Made additional improper and unauthorized statements;

   d) Disclosured Confidential and/or Privileged Information;

   e) Took unauthorized actions; and

   f) Committed to do things for which they had no authority.

75) After the wrongful and unauthorized acts were discovered, Plaintiffs Fagan, Geier and

Podovsovnik again demanded that Defendants Lowy, FLG and ILG do nothing further, make

no statements and preserve the work product and confidential litigation and appellate
strategies and Confidential Information.

76) In response, instead of honoring the instructions, Defendants Lowy, FLG and ILG continued
to engage in actions that interfered with The Kaprun Cases and The Kaprun Appeals.

77) From mid-October 2007, the wrongful acts of Defendant Lowy, FLG and ILG increased.

78) From mid-October 2007, Plaintiffs tried in vain to get Defendant Lowy, FLG and ILG to
cease and desist and to keep the confidential information that belonged to Plaintiffs and
which was learned from The Kaprun Cases from being disclosed to third parties.

79) In or about the end of October or beginning of November, 2007, Defendants Lowy, FLG and
ILG retained Defendants Perle and Perle PC to protect their interest in their disagreements
with Plaintiff Fagan related to The Kaprun Cases and The Kaprun Appeals.

80) At that time, because of their special relationship with Plaintiff Fagan, Defendant Perle and
Perle PC had a duty to refrain from representing Defendants Lowy, FLG and ILG against
Plaintiff Fagan's interests as they related to The Kaprun Cases and The Kaprun Appeals.

81) Defendants Lowy, FLG and ILG hired Defendant Perle and Perle PC because of Confidential
Information they knew and which they agreed and/or intended to use against Plaintiff Fagan.

82) Defendant Perle's or Perle PC's purpose in agreeing to represent Defendants Lowy, FLG and
ILG was motivated by their intention to interfere with Plaintiff Fagan's interests in The
Kaprun Cases for benefit of Defendant Perle's or Perle PC's client Grossman and LGL.

83) In an attempt to gain unfair leverage over Plaintiff Fagan, Defendants Lowy, FLG, ILG,
Perle and Perle PC planned to disclose and/or make public Confidential Information related
to The Kaprun Cases and The Kaprun Appeals.

84) The attempt to gain unfair leverage over Plaintiff Fagan, Defendants Lowy, FLG, ILG, Perle
    and Perle PC through the unauthorized disclosure or making public Confidential Information
    related to The Kaprun Cases and The Kaprun Appeals, was improper, unlawful and/or in
    violation of their duties as lawyers to former clients and/or lawyers toward adversaries.

85) Defendants Lowy, FLG, ILG, Perle and Perle PC believed that the disclosure and/or making
    public Confidential Information related to The Kaprun Cases and The Kaprun Appeals,
    would cause Plaintiff Fagan to drop his claims against Defendants Lowy, FLG and ILG
    Defendant Perle's client Grossman and LGL.

86) Defendants Lowy, FLG, ILG, Perle and Perle PC were willing to disclose and/or make public
    the Confidential Information related to The Kaprun Cases despite the fact that to do so would
    prejudice The Kaprun Cases and The Kaprun Appeals and/or otherwise injure Plaintiff Geier
    and Plaintiff Podovsovnik's clients.

87) On Friday November 16, 2007, Plaintiff Fagan discovered that Defendants Lowy, FLG, ILG,
    Perle and Perle PC started publishing Confidential Information related to The Kaprun Cases
    and The Kaprun Appeals.

88) Plaintiff Fagan on behalf of Plaintiffs Geier, Podovsovnik and other victims and/or survivors
    involved with The Kaprun Cases, wrote Defendants Lowy, FLG, ILG, Perle and Perle PC
    have sought to stop Defendants unauthorized disclosure, publication and filing of
    Confidential Information in Court documents related to a dispute between Fagan and Lowy.

89) Defendants Lowy, FLG, ILG, Perle and Perle PC failed to take the necessary steps to cease
    the disclosure or publication of Confidential Information related to The Kaprun Cases and
    The Kaprun Appeals.

no statements and preserve the work product and confidential litigation and appellate

strategies and Confidential Information.

76) In response, instead of honoring the instructions, Defendants Lowy, FLG and ILG continued

to engage in actions that interfered with The Kaprun Cases and The Kaprun Appeals.

77) From mid-October 2007, the wrongful acts of Defendant Lowy, FLG and ILG increased.

78) From mid-October 2007, Plaintiffs tried in vain to get Defendant Lowy, FLG and ILG to

cease and desist and to keep the confidential information that belonged to Plaintiffs and

which was learned from The Kaprun Cases from being disclosed to third parties.

79) In or about the end of October or beginning of November, 2007, Defendants Lowy, FLG and

ILG retained Defendants Perle and Perle PC to protect their interest in their disagreements

with Plaintiff Fagan related to The Kaprun Cases and The Kaprun Appeals.

80) At that time, because of their special relationship with Plaintiff Fagan, Defendant Perle and

Perle PC had a duty to refrain from representing Defendants Lowy, FLG and ILG against

Plaintiff Fagan's interests as they related to The Kaprun Cases and The Kaprun Appeals.

81) Defendants Lowy, FLG and ILG hired Defendant Perle and Perle PC because of Confidential

Information they knew and which they agreed and/or intended to use against Plaintiff Fagan.

82) Defendant Perle's or Perle PC's purpose in agreeing to represent Defendants Lowy, FLG and

ILG was motivated by their intention to interfere with Plaintiff Fagan's interests in The

Kaprun Cases for benefit of Defendant Perle's or Perle PC's client Grossman and LGL.

83) In an attempt to gain unfair leverage over Plaintiff Fagan, Defendants Lowy, FLG, ILG,

Perle and Perle PC planned to disclose and/or make public Confidential Information related

to The Kaprun Cases and The Kaprun Appeals.

84) The attempt to gain unfair leverage over Plaintiff Fagan, Defendants Lowy, FLG, ILG, Perle and Perle PC through the unauthorized disclosure or making public Confidential Information related to The Kaprun Cases and The Kaprun Appeals, was improper, unlawful and/or in violation of their duties as lawyers to former clients and/or lawyers toward adversaries.

85) Defendants Lowy, FLG, ILG, Perle and Perle PC believed that the disclosure and/or making public Confidential Information related to The Kaprun Cases and The Kaprun Appeals, would cause Plaintiff Fagan to drop his claims against Defendants Lowy, FLG and ILG Defendant Perle's client Grossman and LGL.

86) Defendants Lowy, FLG, ILG, Perle and Perle PC were willing to disclose and/or make public the Confidential Information related to The Kaprun Cases despite the fact that to do so would prejudice The Kaprun Cases and The Kaprun Appeals and/or otherwise injure Plaintiff Geier and Plaintiff Podovsovnik's clients.

87) On Friday November 16, 2007, Plaintiff Fagan discovered that Defendants Lowy, FLG, ILG, Perle and Perle PC started publishing Confidential Information related to The Kaprun Cases and The Kaprun Appeals.

88) Plaintiff Fagan on behalf of Plaintiffs Geier, Podovsovnik and other victims and/or survivors involved with The Kaprun Cases, wrote Defendants Lowy, FLG, ILG, Perle and Perle PC have sought to stop Defendants unauthorized disclosure, publication and filing of Confidential Information in Court documents related to a dispute between Fagan and Lowy.

89) Defendants Lowy, FLG, ILG, Perle and Perle PC failed to take the necessary steps to cease the disclosure or publication of Confidential Information related to The Kaprun Cases and The Kaprun Appeals.

90) The disclosure and/or publication of Confidential Information related to The Kaprun Cases was not protected by any privilege because it was done with malice and/or with intention to cause damage to Plaintiff Fagan's business, Plaintiff Podovsovnik's business and to claims of Plaintiff Geier's father and the claims of Plaintiffs Fagan and Podovsovnik's clients in The Kaprun Cases or The Kaprun Appeals.

91) The disclosure and/or publication of Confidential Information related to The Kaprun Cases was of sensitive information related to The Kaprun Cases and the appeal adversely affects and prejudices Plaintiff Fagan's business, Plaintiff Podovsovnik's business and to the claim of Plaintiff Geier's father and to claims of Plaintiffs Fagan and Podovsovnik's clients in The Kaprun Cases or The Kaprun Appeals.

92) The disclosure and/or publication of Confidential Information related to The Kaprun Cases was of sensitive information related to The Kaprun Cases and The Kaprun Appeal adversely affects and prejudices Plaintiff Fagan's business, Plaintiff Podovsovnik's business and to the claim of Plaintiff Geier's father and the claims of Plaintiffs Fagan and Podovsovnik's clients in The Kaprun Cases or The Kaprun Appeals during a time when they are in the midst of ongoing Settlement discussions related to entities in Austria, the last meeting being November 6, 2007 in Vienna Austria.

93) Defendants Lowy, FLG, ILG, Perle and Perle PC disclosure or publication of Confidential Information related to The Kaprun Cases is the latest in a series of wrongful acts being taken by these Defendants against Plaintiff Fagan and his interests in The Kaprun Cases.

94) Defendants Lowy, FLG, ILG, Perle and Perle PC are in possession of additional Confidential Information related to The Kaprun Cases and The Kaprun Appeal which they threaten to

90) The disclosure and/or publication of Confidential Information related to The Kaprun Cases was not protected by any privilege because it was done with malice and/or with intention to cause damage to Plaintiff Fagan's business, Plaintiff Podovsovnik's business and to claims of Plaintiff Geier's father and the claims of Plaintiffs Fagan and Podovsovnik's clients in The Kaprun Cases or The Kaprun Appeals.

91) The disclosure and/or publication of Confidential Information related to The Kaprun Cases was of sensitive information related to The Kaprun Cases and the appeal adversely affects and prejudices Plaintiff Fagan's business, Plaintiff Podovsovnik's business and to the claim of Plaintiff Geier's father and to claims of Plaintiffs Fagan and Podovsovnik's clients in The Kaprun Cases or The Kaprun Appeals.

92) The disclosure and/or publication of Confidential Information related to The Kaprun Cases was of sensitive information related to The Kaprun Cases and The Kaprun Appeal adversely affects and prejudices Plaintiff Fagan's business, Plaintiff Podovsovnik's business and to the claim of Plaintiff Geier's father and the claims of Plaintiffs Fagan and Podovsovnik's clients in The Kaprun Cases or The Kaprun Appeals during a time when they are in the midst of ongoing Settlement discussions related to entities in Austria, the last meeting being November 6, 2007 in Vienna Austria.

93) Defendants Lowy, FLG, ILG, Perle and Perle PC disclosure or publication of Confidential Information related to The Kaprun Cases is the latest in a series of wrongful acts being taken by these Defendants against Plaintiff Fagan and his interests in The Kaprun Cases.

94) Defendants Lowy, FLG, ILG, Perle and Perle PC are in possession of additional Confidential Information related to The Kaprun Cases and The Kaprun Appeal which they threaten to

continue to disclose and/or publish in an effort to gain an advantage over Plaintiff Fagan's interests in The Kaprun Cases.

95) The aforesaid acts of Defendants Lowy, FLG, ILG, Perle and Perle PC are/were negligent, wrongful, tortious and/or improper.

96) The aforesaid acts of Defendants Lowy, FLG, ILG, Perle and Perle PC are/were intended to cause damage to Plaintiffs' business, rights, property and claims.

97) Defendants Lowy, FLG, ILG, Perle and Perle PC acts are/were taken so as to put their personal and/or professional interests ahead of the interests of Plaintiffs or other victims, survivors and/or representatives involved in The Kaprun Cases and The Kaprun Appeals.

98) Defendants Lowy, FLG, ILG, Perle and Perle PC owed certain contractual and/or professional obligations to Plaintiffs Fagan, Geier, Todovsovnik and their clients and other victims, survivors representatives involved in The Kaprun Cases and The Kaprun Appeals.

99) As a direct and proximate result of Defendants Lowy, FLG, ILG, Perle and Perle PC wrongful acts, Plaintiffs suffered monetary and other damages.

## COUNT I - NEGLIGENCE

100)    Plaintiffs repeat and reallege the allegations of ¶¶ 12 to 99 above as if the same were set forth fully and at length herein.

101)    Defendants Lowy, FLG, ILG, Perle and Perle PC had a duty and obligations to refrain from careless, reckless, negligent, tortious or improper acts that were designed to or could adversely affect Plaintiffs' business, contracts, claims and/or rights.

102)    As a direct and proximate result of Defendants Lowy, FLG, ILG, Perle and Perle PC's aforesaid careless, reckless, negligent, tortious and/or improper acts, Plaintiffs suffered monetary and other damages.

-----------------

continue to disclose and/or publish in an effort to gain an advantage over Plaintiff Fagan's interests in The Kaprun Cases.

95) The aforesaid acts of Defendants Lowy, FLG, ILG, Perle and Perle PC are/were negligent, wrongful, tortious and/or improper.

96) The aforesaid acts of Defendants Lowy, FLG, ILG, Perle and Perle PC are/were intended to cause damage to Plaintiffs' business, rights, property and claims.

97) Defendants Lowy, FLG, ILG, Perle and Perle PC acts are/were taken so as to put their personal and/or professional interests ahead of the interests of Plaintiffs or other victims, survivors and/or representatives involved in The Kaprun Cases and The Kaprun Appeals.

98) Defendants Lowy, FLG, ILG, Perle and Perle PC owed certain contractual and/or professional obligations to Plaintiffs Fagan, Geier, Podovsovnik and their clients and other victims, survivors representatives involved in The Kaprun Cases and The Kaprun Appeals.

99) As a direct and proximate result of Defendants Lowy, FLG, ILG, Perle and Perle PC wrongful acts, Plaintiffs suffered monetary and other damages.

## COUNT 1 - NEGLIGENCE

100)    Plaintiffs repeat and reallege the allegations of ¶¶.12 to 99 above as if the same were set forth fully and at length herein.

101)    Defendants Lowy, FLG, ILG, Perle and Perle PC had a duty and obligations to refrain from careless, reckless, negligent, tortious or improper acts that were designed to or could adversely affect Plaintiffs' business, contracts, claims and/or rights.

102)    As a direct and proximate result of Defendants Lowy, FLG, ILG, Perle and Perle PC's aforesaid careless, reckless, negligent, tortious and/or improper acts, Plaintiffs suffered monetary and other damages.

## COUNT III – MALPRACTICE

108)   Plaintiffs repeat and reallege the allegations of ¶¶ 12 to 99 above as if the same were

set forth fully and at length herein.

109)   Defendants Lowy, FLG, ILG, Perle and Perle PC owed a duty to The Kaprun Cases and

to Plaintiffs to perform their legal services in accordance with the applicable standards of

care and practice for legal professionals in NY.

110)   Defendants Lowy, FLG, ILG, Perle and Perle PC's aforesaid acts were a violation of

their duty to The Kaprun Cases and to Plaintiffs and were not in accordance with the

applicable standards of care and practice for legal professionals in NY.

111)   As a direct and proximate result of Defendants Lowy, FLG, ILG, Perle and Perle PC

aforesaid acts, Plaintiffs suffered monetary and other damages.

WHEREFORE, Plaintiffs demand judgment against Defendants Lowy, FLG, ILG, Perle

and Perle PC jointly severally and/or in the alternative for (i) compensatory damages of five

million dollars; (ii) exemplary, special and/or punitive damages of ten million dollars; and (iii)

attorneys fees, interests and costs of suit.

## COUNT IV – INJUNCTIVE RELIEF

112)   Plaintiffs repeat and reallege the allegations of ¶¶ 12 to 99 above as if the same were set

forth fully and at length herein.

113)   Disclosure and/or publication of Confidential Information related to The Kaprun Cases

causes damage to Plaintiff Fagan's business, Plaintiff Podovsovnik's business and to the

claims of Plaintiff Geier's father, and Plaintiffs Fagan and Podovsovnik's clients.

114)   Disclosure and/or publication of Confidential Information adversely affects and

prejudices The Kaprun Cases and The Kaprun Appeals adversely affects and prejudices

Plaintiffs rights and interests.

115)   The aforesaid acts of Defendants Lowy, FLG, ILG, Perle and Perle PC are intended to

cause damage to The Kaprun Cases and The Kaprun Appeals.

116)   Defendants aforesaid acts caused injuries and threaten to cause more injuries to The

Kaprun Cases and the claims of Plaintiff Geier's father and of Plaintiff Fagan's and Plaintiff

Podovsovnik's clients for which there is no adequate remedy at law.

117)   As a direct and proximate result of Defendant wrongful acts, The Kaprun Cases have

suffered and will continue to suffer damages for which there is no adequate remedy at law.

        **WHEREFORE,** Plaintiffs demands judgment against Defendants Lowy, FLG, ILG,

Perle and Perle PC jointly severally and/or in the alternative for (i) injunctive relief to prevent

disclosure of Confidential Information, Work Product and/or Attorney Client Privileged

Documents including but not limited to personal data related to clients, survivors and/or family

representatives, agreements with counsel, consultants and researchers activities, emails, letters,

settlement strategies, litigation strategies, appellate strategies, target Defendants, theories of

liability, areas of strengths and weaknesses in claims, identity of witnesses, experts opinions and

theories of liability, strategies related to presentations to court, errors and omissions, interaction

between parties, counsel and Defendants and and (iii) attorneys fees, interests and costs of suit.

Dated:   November 19, 2007        By: _____
         New York, NY                 Edward D. Fagan
                                      5 Penn Plaza, 23rd Floor, New York, NY 10001
                                      Tel. (646) 378-2225 / Fax (646) 417-5558
                                      Email: ed.fagan@global-litigation-partners.com

**WHEREFORE,** Plaintiffs demand judgment against Defendants Lowy, FLG, ILG, Perle and Perle PC jointly severally and/or in the alternative for damages[5] as follows (i) compensatory damages of five million dollars; (ii) exemplary, special and/or punitive damages of ten million dollars; and (iii) attorneys fees, interest and costs of suit.

## COUNT 1I – BREACH OF CONTRACT OR FIDUCIARY DUTY

103)    Plaintiffs repeat and reallege the allegations of ¶¶ 12 to 99 above as if the same were set forth fully and at length herein.

104)    Defendants Lowy, FLG, ILG, Perle and Perle PC entered into oral and/or written contracts with Plaintiffs and/or had fiduciary duties to Plaintiffs.

105)    The oral, written/implied contracts or fiduciary duties required Defendants Lowy, FLG, ILG, Perle and Perle PC to use their best efforts and skills to cooperate and not interfere with The Kaprun Cases or Plaintiff business, claims and rights and not to cheat them.

106)    Defendants Lowy, FLG, ILG, Perle and Perle PC violated the terms of the oral, written or implied contracts and/or fiduciary duties by failing to cooperate and by interfering with The Kaprun Cases and Plaintiff's business, claims and rights.

107)    As a direct and proximate result of Defendants Lowy, FLG, ILG, Perle and Perle PC's aforesaid breach of the terms of the oral, written and/or implied contracts and fiduciary duties, Plaintiffs suffered monetary and other damages.

**WHEREFORE,** Plaintiffs demand judgment against Defendants Lowy, FLG, ILG, Perle and Perle PC jointly severally and/or in the alternative for (i) compensatory damages of five million dollars; (ii) exemplary, special and/or punitive damages of ten million dollars; and (iii) attorneys fees, interests and costs of suit.

---

[5] Damages are based on number of Plaintiffs' clients on whose behalf disclosures adversely affects and/or prejudices. These amounts will be increased as additional individual Plaintiffs claims are joined.

## COUNT III – MALPRACTICE

108) Plaintiffs repeat and reallege the allegations of ¶¶ 12 to 99 above as if the same were set forth fully and at length herein.

109) Defendants Lowy, FLG, ILG, Perle and Perle PC owed a duty to The Kaprun Cases and to Plaintiffs to perform their legal services in accordance with the applicable standards of care and practice for legal professionals in NY.

110) Defendants Lowy, FLG, ILG, Perle and Perle PC's aforesaid acts were a violation of their duty to The Kaprun Cases and to Plaintiffs and were not in accordance with the applicable standards of care and practice for legal professionals in NY.

111) As a direct and proximate result of Defendants Lowy, FLG, ILG, Perle and Perle PC aforesaid acts, Plaintiffs suffered monetary and other damages.

WHEREFORE, Plaintiffs demand judgment against Defendants Lowy, FLG, ILG, Perle and Perle PC jointly severally and/or in the alternative for (i) compensatory damages of five million dollars; (ii) exemplary, special and/or punitive damages of ten million dollars; and (iii) attorneys fees, interests and costs of suit.

## COUNT IV – INJUNCTIVE RELIEF

112) Plaintiffs repeat and reallege the allegations of ¶¶ 12 to 99 above as if the same were set forth fully and at length herein.

113) Disclosure and/or publication of Confidential Information related to The Kaprun Cases causes damage to Plaintiff Fagan's business, Plaintiff Podovsovnik's business and to the claims of Plaintiff Geier's father, and Plaintiffs Fagan and Podovsovnik's clients.

*K grudive*
*goldmm grudur mod. 7*

# EXHIBIT 2

# EXHIBIT   3

**EXHIBIT C**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CHAMBERS OF JUDGE SHIRA A. SCHEINDLIN
NEW YORK, NEW YORK 10007
Telephone (212) 805-0246
Telefax (212) 805-7920

## FACSIMILE COVER SHEET

The information contained in this facsimile message is intended only for the use of
the individual or entity named below. If the reader of this message is not the
intended recipient, or the employee or agent responsible to deliver it to the
intended recipient, you are hereby notified that any dissemination, distribution or
copying of this communication is strictly prohibited. If you have received this
communication in error, please immediately notify us by telephone, and return the
original message to us at the above address via the U.S. Postal Service.

ADDRESSEE: *James F. Lowy, Esq.*

ADDRESSEE FACSIMILE TELEPHONE NUMBER: *(813) 283-0384*

NAME OF COMPANY: *International Law Group, LLC*

COMPANY TELEPHONE NUMBER: _____

CITY AND STATE: *Tampa, Fl.*

DATE TRANSMITTED: *1/4/08*      TIME TRANSMITTED: _____

SENDER/NAME: JUDGE SHIRA A. SCHEINDLIN

OPERATOR: *Connie Daughtry*

CASE NAME: *Blaimauer, et al v. Daviglow*

DOCKET NUMBER: *MDL 1428*

NUMBER OF PAGES Including Cover Sheet: *7*

## IMPORTANT!

MESSAGE: **PLEASE DELIVER IMMEDIATELY!**

_____ Original will NOT follow        _____ Original WILL follow

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

IN RE: SKI TRAIN FIRE IN KAPRUN :
AUSTRIA ON NOVEMBER 11, 2000 :
-----------------------------------------------------------X
This document relates to the following actions:
-----------------------------------------------------------X

JOHANN BLAIMAUER, et al.,                :

        Plaintiffs,                        :

     - against -                              :

OMNIGLOW CORPORATION, et al.,     :

        Defendants.                       :
-----------------------------------------------------------X
-----------------------------------------------------------X

HERMAN GEIER, et al.,                    :

        Plaintiffs,                        :

     - against -                              :

OMNIGLOW CORPORATION, et al.,     :

        Defendants.                       :
-----------------------------------------------------------X
-----------------------------------------------------------X

NANAE MITSUMOTO, et al.,                 :

        Plaintiffs,                        :

     - against -                              :

THE REPUBLIC OF AUSTRIA, et al.,  :

        Defendants.                       :
-----------------------------------------------------------X

MDL # 1428 (SAS)

ORDER

03-CV-8960 (SAS)

03-CV-8961 (SAS)

06-CV-2811 (SAS)

1

```
------------------------------------X
NANAE MITSUMOTO, et al.,            :
                                    :
              Plaintiffs,           :
                                    :        07–CV–935 (SAS)
       - against -                  :
                                    :
ROBERT BOSCH                        :
CORPORATION, et al.,                :
                                    :
              Defendants.           :
------------------------------------X
------------------------------------X
JOOP H. STADMAN, et al.,            :
                                    :
              Plaintiffs,           :
                                    :        07–CV–3881 (SAS)
       - against -                  :
                                    :
AUSTRIAN NATIONAL TOURIST           :
OFFICE INC., et al.,                :
                                    :
              Defendants.           :
------------------------------------X
------------------------------------X
RASTKO and DRAGICA FERK, et al.,    :
                                    :
              Plaintiffs,           :
                                    :        07–CV–4104 (SAS)
       - against -                  :
                                    :
OMNIGLOW CORPORATION, et al.,       :
                                    :
              Defendants.           :
------------------------------------X
```

SHIRA A. SCHEINDLIN, U.S.D.J.:

By Order dated December 26, 2007 (the "December 26 Order"), this Court recused itself sua sponte with respect to any future proceedings in the action

2

captioned *Edward D. Fagan, Dr. Bernd Geier, and Dr. Gerhard Podovsovnik v. James F. Lowy, International Law Group, LLC, Robert J. Hantman, and Hantman & Associates*, 07 Civ. 10293, pursuant to 28 U.S.C. § 455(a). Because the Court had previously disqualified Edward D. Fagan from appearing as counsel in the *In re Ski Train Fire in Kaprun Austria on November 11, 2000* ("Ski Train") cases and sanctioned him for his pattern of unethical conduct,[1] the Court found it appropriate to recuse itself from the suit in which Mr. Fagan himself is a *party*. The December 26 Order, however, takes no action with respect to the *Ski Train* cases, in which Mr. Fagan no longer appears as counsel on behalf of any party. To the extent Mr. Fagan's letter to the Court, dated January 2, 2008, renews his motion to recuse this Court in the *Ski Train* cases, that motion is again denied for all of the reasons previously stated.[2]

Additionally, in violation of section I.B. of the Court's Individual Rules and Procedures, Mr. Fagan has routinely transmitted lengthy correspondence to the Court without obtaining prior approval.[3] Because Mr. Fagan no longer appears before the Court in any action either as a party or as

---

[1]     *See In re Ski Train Fire in Kaprun Austria on November 11, 2000,* Nos. 01 MDL 1428, 03 Civ. 8960, 03 Civ. 8961, 06 Civ. 2811, 07 Civ. 935, 07 Civ. 3881, 07 Civ. 4104, 2007 WL 2398697, at *3 (S.D.N.Y. Aug. 16, 2007).

[2]     *See* 8/28/07 Order. *See also* 12/20/07 Order.

[3]     *See* 10/31/05 Individual Rules and Procedures of Judge Shira A. Scheindlin, § I.B.

counsel, he is not to make any further motions or direct any further correspondence to this Court. Mr. Fagan has repeatedly moved to recuse this Court in the *Ski Train* cases. He has also repeatedly moved for reconsideration of this Court's previous Orders in the *Ski Train* cases. Each time, his motions have been denied. Any further motions seeking the same relief will be frivolous. Mr. Fagan's remedy, if any, lies with the Court of Appeals. A violation of this Order may warrant the imposition of sanctions.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated: New York, New York
January 3, 2008

4

01/04/2008  13:32   8132888384        FLORIDA LAW GROUP        PAGE  06/07
Case 1:07-cv-10293-LAK    Document 15    Filed 01/25/2008    Page 86 of 91   P. 06/07

JAN-04-2008  12:36

## ~ Appearances ~

Edward D. Fagan, Esq.
Five Penn Plaza, 23rd Floor
New York, NY 10001
(646) 378-2225

James F. Lowy, Esq.
International Law Group, LLC
3907 Henderson Blvd., Ste. 200
Tampa, FL 33629
(813) 282-0384

*For Defendant Bosch Rexroth Corp., Robert Bosch Corp.:*

Neil Rosolinsky, Esq.
Reed Smith LLP
599 Lexington Avenue, 28th Floor
New York, NY 10022
(212) 549-0391

*For Defendant Siemens Transportation Systems, Inc. and as Liaison Counsel for
all Defendants:*

Brant W. Bishop, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
(202) 879-5000

Ryan M. Morettini, Esq.
Kirkland & Ellis LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022
(212) 446-4800

Robert W. Littleton, Esq.
Littleton Joyce Ughetta & Park LLP

01/04/2008 13:32 8132920384 Case 1:07-cv-10293-LAK Document 13 FLORIDA LAW GROUP Filed 01/25/2008 Page 87 of 97 PAGE 07/07

JAN-04-2008 12:36 P.07/07

39 Broadway, 34th Floor
New York, NY 10006
(212) 404-5777

*For Defendant Wika Instrument Corp.:*

Eileen T. McCabe, Esq.
Stephen Roberts, Esq.
William Lalor, Esq.
Mendes & Mount LLP
750 Seventh Avenue
New York, NY 10019
(212) 261-8000

*For Defendant Hydac Technology Corp.:*

Nancy Ledy-Gurren, Esq.
Ledy-Gurren, Bass & Siff LLP
475 Park Avenue South
New York, NY 10016
(212) 447-1111

*For Defendants American Cyanamid Inc. and Omniglow Corp.:*

E. Gordon Haesloop, Esq.
Bartlett McDonough, Bastone & Monaghan LLP
300 Old Country Road
Mineola, NY 11501
(516) 877-2900

*For Defendant Exxon Mobil:*

John F. Tully, Esq.
Robert Owen, Esq.
Fulbright & Jaworski LLP
666 Fifth Avenue
New York, NY 10103
(212) 318-3000

**EXHIBIT D**

# EDWARD D. FAGAN ESQ.

Five Penn Plaza, 23rd Floor, New York, NY 10001
Tel. (646) 378-2225, New Fax # (646) 304-6446 (as of 30 Nov. 2007)
Email: ed.fagan@global-litigation-partners.com

# FAX TRANSMISSION

TO: _Jay Rice   - (973) 618-9154_
_Robert Swift - (215) 238-1968_

Cc: _Ken Nolan  - (212) 953-6483_
_Michael Witti - 011-49-89-419-66-779_
_Johannes Strieldorf - 011-43-1-587-62 14  16_
_office @ strieldorf.at_

FROM:   Ed Fagan

RE: _Fagan v Nagel Rice etal - 07-112f92_

DATE: _Dec. 29, 2007_              TOTAL # PAGES: _2_

_Gentlemen:_

_With this fax I am sending you a copy of the Summons with Notice Filed against you in New York Supreme Court. Copies are out for service of Process._

_Kindly confirm by return fax that you have turned this matter over to / placed your respective malpractice carriers on notice. Thank you._

*****************************************************************

## CONFIDENTIALITY WARNING & NOTICE

The information in this facsimile message and attachments is legally privileged and confidential information intended only for the us of the individual or entity named above. If the reader or recipient is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this facsimile is strictly prohibited. If you have received this facsimile in error, please notify the send immediately by calling us at (646) 378-2225 and thereafter please DESTROY the facsimile message.

, 24 Dec 2007 10:40                                                              P.2

SUPREME COURT FOR STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------X
EDWARD D. FAGAN;                                       :       INDEX #
                                      PLAINTIFFS,      :       07-112592
              v.                                       :
                                                       :
NAGEL RICE LLC;                                        :       Date Purchased:
JAY RICE ESQ.;                    NEW YORK             :       Sept. 24, 2007
SPEIER KRAUSE LLC;             COUNTY CLERK'S OFFICE   :
KEN NOLAN ESQ.;                    SEP 24 2007         :
KOHN SWIFT & GRAF LLC;          NOT COMPARED           :
ROBERT A. SWIFT ESQ.;          WITH COPY FILED         :
MICHAEL WITTI; and                                     :       SUMMONS
JOHANNES STIELDORF.                                    :       WITH NOTICE
                                      DEFENDANTS.      :
-----------------------------------------------------------------X

TO THE FOLLOWING DEFENDANTS:
NAGEL RICE LLC 525 Madison Avenue, New York, NY.
JAY J. RICE ESQ 103 Eagle Rock Avenue, Roseland, New Jersey
SPEISER KRAUSE Two Grand Central Tower, 140 East 45th St, 34th Fl, NY, NY 10017-3144.
KEN NOLAN ESQ. Two Grand Central Tower, 140 East 45th St, 34th Fl, NY, NY 10017-3144.
KOHN SWIFT & GRAF One South Broad Street Suite 2100, Philadelphia, PA 19107
ROBERT SWIFT ESQ. One South Broad Street Suite 2100, Philadelphia, PA 19107
MICHAEL WITTI 9 Possartstrasse, Munich, Germany
JOHAHHES STIELDORF A-1010 Wien, Nibelungengasse 1-3, Vienna Austria

      YOU ARE HEREBY SUMMONED to serve a Notice of Appearance on Plaintiff within
twenty days of service of this Summons, exclusive of the date of service (or thirty days if this
Summons is not served upon you personally in the State of New York) and in case you fail to
appear, judgment will be taken against you for the relief demanded in the Notice below.

DATED: -September 24, 2007           By: /s/
         New York, NY                     Edward D. Fagan (EF-4125)
                                          5 Penn Plaza, 23rd Floor
                                          New York, NY 10001
                                          Tel (646) 378-2225
                                          Fax (646) 417-5558
                                          Email: ed.fagan@global-litigation-partners.com

NOTICE: The nature of this action is for (i) negligence, (ii) breach of actual, implied and/or
oral contract, (iii) breach of fiduciary duties, (iv) malpractice, (v) tortious and negligent
interference in business relations and (vi) tortious and negligent infliction of emotional
distress. The damages sought jointly, severally and/or in the alternative against Defendants
are fifteen million ($15,000,000.00) for each of the six causes of action. Plaintiff also seeks
injunctive relief. It should also be noted that additional plaintiffs will be included in the
Complaint and causes of action for which relief is sought and the damages for each such after
named plaintiff will also be fifteen million dollars ($15,000,000.00) for each cause of action.
Venue in New York County is proper because this is where Plaintiff and Defendants maintain
offices, or do business and where many of the acts occurred upon which the claims are made.

**EXHIBIT E**

**EXHIBIT E**

Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
Dorothy MOLEFI, et al., Plaintiffs,
v.
The OPPENHEIMER TRUST, et al., Defendants.
**No. 03 CV 5631(FB)(VVP).**

Feb. 15, 2007.

**Edward D. Fagan**, Short Hills, NJ, for Plaintiffs.


### *OPINION AND ORDER*
POHORELSKY, Magistrate Judge.
**\*1** Judge Block has referred this matter to me, *see*28 U.S.C § 636(b)(1)(A), to determine whether sanctions, in the form of attorneys' fees and costs, pursuant to Rule 45 of the Federal Rules of Civil Procedure, should be imposed upon **Edward Fagan**, plaintiffs' counsel, for improperly issuing a subpoena to Dumisa Ntsebeza, a non-party to this action. The subpoena was quashed by an earlier ruling of this court.[FN1]

> FN1. After ruling on the motion to quash and by order of the

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 2001888 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

**H**Association of Holocaust Victims for Restitution of
Artwork and Masterpieces v. Bank Austria Creditanstalt
Ag
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
ASSOCIATION OF HOLOCAUST VICTIMS FOR
RESTITUTION OF ARTWORK AND
MASTERPIECES, a/k/a "Ahvram," et al., Plaintiff
v.
BANK AUSTRIA CREDITANSTALT AG, et al.
Defendants.
No. 04 CV 3600(SWK).

Aug. 19, 2005.

*OPINION & ORDER*
KRAM, J.
*1 Bank Austria Creditanstalt AG ("Bank Austria"),
pursuant to Federal Rules of Civil Procedure ("Fed. R.
Civ.P.") 12(b)(1) and 12(b)(6), moves to dismiss
Plaintiff's First Amended Complaint ("Complaint").
Plaintiff opposes the motion to dismiss and "cross moves"
for jurisdiction discovery, preservation of evidence,
depositions *debene esse*, limited production of documents,
and other relief [sic]. Additionally, Defendant moves for
sanctions pursuant to Fed.R.Civ.P. 11.

BACKGROUND

Beginning in 1998, several individual and class actions
were filed against certain Austrian banks, including Bank
Austria and Creditanstalt, in both the Southern and Eastern
Districts of New York, alleging that "the defendant banks
had committed various torts and violations of international
law arising out of the activities of the Nazis during and
after World War II."*In re Austrian and German Bank*

*Holocaust Litig., 80 F.Supp.2d 164 (S.D.N.Y.2000).* All
of the actions were then consolidated into a single class
action ("Class Action.") [FN1]

> FN1. One of the cases consolidated was *Watman
> v. Deutsche Bank,* 98 Civ. 3938(SWK) (the
> "*Watman* Action"), a class action for equitable
> and monetary relief stemming from the alleged
> unlawful receipt and conversion of stolen and/or
> looted assets and personal property, including
> "cash, securities, precious metals, jewelry, art
> treasures and family heirlooms, gold jewelry and
> gold coins" alleged to have been "deposited ...
> into numbered or secret accounts and safe
> deposit boxes of the defendant German and
> Austrian banks."*Watman,* Am. Compl. ¶¶
> 36-37.The Plaintiff Class included, *interalia,* all
> victims of Nazi persecution and their heirs who,
> between 1933 and 1945 ... had personal property
> looted from them or Aryanized by the Nazis or
> their co-conspirators and transferred to the
> defendant banks." *Id.* ¶ 15.Lead Counsel for
> plaintiffs in *Watman* was **Edward D. Fagan.**
> Mr. Fagan is also Plaintiffs' counsel and claims
> to be a member of the purported association,
> AHVRAM, that has brought the instant action.

Four years ago, this Court approved a Class Action
Settlement. *In re Austrian and German Bank Litig., 80
F.Supp.2d 164* (the "Bank Austria Settlement" or
"Settlement"). The decision was affirmed by the Court of
Appeals. *D'Amato v. Deutsche Bank, 236 F.3d 78 (2d
Cir.2001).* The $40 million settlement paid by Bank
Austria was deposited into the Court's designated
settlement fund and has been used to pay Holocaust
survivors and their heirs.

I. This Case Is Dismissed For Lack Of Subject Matter
Jurisdiction

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 63046 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 1

**H**Window Headquarters, Inc. v. Mat Basic Four, Inc.
S.D.N.Y.,1996.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
WINDOW HEADQUARTERS, INC., Plaintiff,
v.
MAI BASIC FOUR, INC., a/k/a Mai Systems
Corporation, Ventech Systems, Inc., Mark Smith,
Vance Diggins, John Diggins, John Doe #1 and John
Doe #2, Midlantic National Bank and Ford Motor
Credit Corp., Defendants.
FORD MOTOR CREDIT COMPANY, Plaintiff,
v.
WINDOW HEADQUARTERS, INC., David Malek,
Daniel Malek and Michael Verstandig, Defendants.
MIDLANTIC NATIONAL BANK, Third-Party
Plaintiff,
v.
COLONIAL FUNDING CORP. and Tucker Leasing-
Capital Corp., Third-Party Defendants.
MIDLANTIC NATIONAL BANK, Plaintiff,
v.
WINDOW HEADQUARTERS, INC., David Malek,
Daniel Malek and Michael Verstandig, Defendants.
WINDOW HEADQUARTERS, INC., David Malek,
Daniel Malek and Michael Verstandig, Third-Party
Plaintiffs,
v.
COLONIAL FUNDING CORP. and Tucker Leasing-
Capital Corp., Third-Party Defendants.
**No. 91 Civ. 1816 (MBM), 93 Civ. 4135 (MBM), 92
Civ. 5283 (MBM).**

Feb. 9, 1996.

Edward D. Fagan, Fagan & Associates, New York
City, for Window Headquarters, David Malek, Daniel
Malek and Michael Verstandig.
Joseph W. Lawyer, Messerli & Kramer P.A.,
Minneapolis, Minnesota, for Ventech Systems, Inc.,
Vance Diggins, and John Diggins.
Lawrence D. Katz, Marcus & Katz, Garden City, NY,
for Colonial Funding Corp.

MEMORANDUM AND ORDER
MUKASEY, District Judge.
*1 This opinion treats the two outstanding motions in
this case.

I.

Prior opinions herein, reported at 1993 WL 312899
(S.D.N.Y. Aug. 12, 1993) and 1994 WL 673519
(S.D.N.Y. Dec. 1, 1994), familiarity with which is
assumed for current purposes, determined that neither
Midlantic National Bank nor Ford Motor Credit
Corporation is liable to Window Headquarters, Inc.
under any theory. Colonial Funding Corporation,
alleged in the third-party complaint in 92 Civ. 5283
to have been acting as agent of Midlantic, has moved
for summary judgment based on the holdings in those
prior opinions. The only response by Window
Headquarters has been to assert in a letter dated June
29, 1995 that Colonial in fact was acting as agent for
Window Headquarters, and therefore remains
potentially liable. Because this improvisational and
late-blooming assertion conflicts directly with what
had been set forth in the third-party complaint, and
because assertions in briefs and letters are not
evidence, Re-Alco Inds., Inc. v. National Ctr. for
Health Educ., Inc., 812 F. Supp. 387, 394 (S.D.N.Y.
1993), the motion is granted, except as to those
limited claims arising from alleged unauthorized
release of funds by Colonial to the vendor, MAI
Basic Four, Inc. As to such claims, the motion is
denied.

II.

In June 1994, **Edward** D. **Fagan**, Esq., counsel for
plaintiff Window Headquarters in 91 Civ. 1816
moved pursuant to Fed. R. Civ. P. 37(d) for a default
judgment and other radical relief against defendant
Ventech Systems, Inc. and two individual defendants
since dismissed, as well as for production of certain
documents. The motion was filed without the
required certification that the movant had conferred
in good faith with his adversary, as apparently he had
not. Ventech cross-moved for sanctions in the
amount of $750 to defray the cost of responding to
the meritless motion. Because the motion was
without basis and was filed by **Fagan** without
consulting his adversary, **Fagan** will pay to counsel
for Ventech a sanction in the amount of $200, that
being the minimum reasonable cost of responding to
this meritless motion.

SO ORDERED:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 673519 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 1

Plaintiff Ford has moved also for the court to sanction defendants' lawyer, **Edward D. Fagan**, under Fed.R.Civ.P. 11 for bringing counterclaims that not only lacked any factual basis, but also repeated earlier arguments dismissed by this court in this litigation. Rule 11 "explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading before it is signed." *Knipe v. Skinner,* 19 F.3d 72 (2d Cir.1994) (quotation omitted). Sanctions are appropriate when a party asserts a claim which to the best of his "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances" was not "warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law." Fed.R.Civ.P. 11.

*\*20* The policy behind Rule 11 is to "discourag[e] dilatory and abusive litigation tactics and eliminat[e] frivolous claims and defenses, thereby speeding up and reducing the costs of the litigation process." *McMahon v. Shearson/American Express, Inc.,* 896 F.2d 17, 21 (2d Cir.1990). In determining whether the lawyer "has crossed the line between zealous advocacy and plain pettifoggery, the court applies an objective standard of reasonableness." *United States v. International Brotherhood of Teamsters,* 948 F.2d 1338, 1344 (2d Cir.1991). If the pleadings "meet the test of reasonableness and are not interposed for ... improper purposes.... sanctions are not warranted." *McMahon,* 896 F.2d at 22.

A review of the Window Headquarters defendants' papers shows that Rule 11 sanctions are appropriate. This court stated in its August 12, 1993 opinion dismissing defendants' First Amended Complaint that defendants had "failed to plead the existence of a contract between the parties, or the terms of such a contract [and] failed to plead any facts to show that ... Ford owed a fiduciary duty to plaintiff." *Window Headquarters,* 1993 WL 312899, at *4-5. Defendants' counterclaims repeat the same insufficient allegations, Counterclaim ¶¶ 1-34, while failing to supply either a contract, or facts to show a fiduciary duty. Defendants' first counterclaim was frivolous in light of the clear and unambiguous terms of the various contracts; the eighth counterclaim, with even cursory research, would have shown itself frivolous, and the remaining counterclaims, in various forms, were dismissed by this court on August 12, 1993. Finally, the "newly discovered

evidence" proved to have no significant relationship to this litigation.

Under these circumstances, plaintiff Ford's motion is granted. Defendants' counsel, **Edward D. Fagan**, is hereby ordered to pay to Ford $500, plus Ford's attorneys' fees and costs incurred in connection with opposing Window Headquarters' motion for reinstatement of its direct causes of action, and litigation of the counterclaims asserted by defendants in this action. Ford will establish such fees and costs with an affidavit supported by contemporaneous time and expense records. In *Window Headquarters v. MAI Basic Four, Inc.,* 91 Civ. 1816, plaintiff's first claim, fourth and fifth claims with respect to the computer hardware, seventh through ninth claims, and thirteenth through fifteenth claims are all dismissed. Plaintiff Ford's motion for summary judgment is granted in *Ford Motor Credit Co. v. Window Headquarters, Inc.,* 93 Civ. 4135. Finally, plaintiff Midlantic's motion for summary judgment is granted in *Midlantic Nat'l Bank v. Window Headquarters, Inc.,* 92 Civ. 5283. Settle judgment and order on 10 days' notice.

SO ORDERED.

> FN1. The Leases relating to the Midlantic action contain identical terms. (Corrigan Aff. Exhs. A, G)

> FN2. Identical Acknowledgment forms appear in the Midlantic action. (Corrigan Aff. Exhs. E, I)

> FN3. Guarantees employing identical language are found in the Midlantic action. (Corrigan Aff. Exhs. B, H)

> FN4. The assignments, employing similar language, in the Midlantic action can be found in Corrigan Aff. Exhs. C, J.

> FN5. Midlantic informed Window Headquarters of its defaults as well. (Corrigan Aff. Exhs. F, L)

> FN6. The defense of fraudulent inducement is discussed in the section dealing with defendants' first counterclaim.

S.D.N.Y.,1994.
Window Headquarters, Inc. v. MAI Basic Four, Inc.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 673519 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Not Reported in F.Supp., 1994 WL 673519
(S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT F**

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 2001888 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

**H**Association of Holocaust Victims for Restitution of
Artwork and Masterpieces v. Bank Austria Creditanstalt
Ag
S.D.N.Y.,2005.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
ASSOCIATION OF HOLOCAUST VICTIMS FOR
RESTITUTION OF ARTWORK AND
MASTERPIECES, a/k/a "Ahvram," et al., Plaintiff
v.
BANK AUSTRIA CREDITANSTALT AG, et al.
Defendants.
No. 04 CV 3600(SWK).

Aug. 19, 2005.

*OPINION & ORDER*
KRAM, J.
**\*1** Bank Austria Creditanstalt AG ("Bank Austria"),
pursuant to Federal Rules of Civil Procedure ("Fed. R.
Civ.P.") 12(b)(1) and 12(b)(6), moves to dismiss
Plaintiff's First Amended Complaint ("Complaint").
Plaintiff opposes the motion to dismiss and "cross moves"
for jurisdiction discovery, preservation of evidence,
depositions *debene esse*, limited production of documents,
and other relief [sic]. Additionally, Defendant moves for
sanctions pursuant to Fed.R.Civ.P. 11.

BACKGROUND

Beginning in 1998, several individual and class actions
were filed against certain Austrian banks, including Bank
Austria and Creditanstalt, in both the Southern and Eastern
Districts of New York, alleging that "the defendant banks
had committed various torts and violations of international
law arising out of the activities of the Nazis during and
after World War II."*In re Austrian and German Bank*

*Holocaust Litig.*, 80 F.Supp.2d 164 (S.D .N.Y.2000). All
of the actions were then consolidated into a single class
action ("Class Action.") FN1

> FN1. One of the cases consolidated was *Watman
> v. Deutsche Bank*, 98 Civ. 3938(SWK) (the
> "*Watman* Action"), a class action for equitable
> and monetary relief stemming from the alleged
> unlawful receipt and conversion of stolen and/or
> looted assets and personal property, including
> "cash, securities, precious metals, jewelry, art
> treasures and family heirlooms, gold jewelry and
> gold coins" alleged to have been "deposited ...
> into numbered or secret accounts and safe
> deposit boxes of the defendant German and
> Austrian banks."*Watman*, Am. Compl. ¶¶
> 36-37.The Plaintiff Class included, *interalia*, all
> victims of Nazi persecution and their heirs who,
> between 1933 and 1945 ... had personal property
> looted from them or Aryanized by the Nazis or
> their co-conspirators and transferred to the
> defendant banks." *Id.* ¶ 15.Lead Counsel for
> plaintiffs in *Watman* was **Edward** D. **Fagan**.
> Mr. **Fagan** is also Plaintiff's counsel and claims
> to be a member of the purported association,
> AHVRAM, that has brought the instant action.

Four years ago, this Court approved a Class Action
Settlement. *In re Austrian and German Bank Litig.*, 80
F.Supp.2d 164 (the "Bank Austria Settlement" or
"Settlement"). The decision was affirmed by the Court of
Appeals. *D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d
Cir.2001). The $40 million settlement paid by Bank
Austria was deposited into the Court's designated
settlement fund and has been used to pay Holocaust
survivors and their heirs.

I. This Case Is Dismissed For Lack Of Subject Matter
Jurisdiction

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2001888 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

After first circulating a draft of his Amended Complaint to journalists in Vienna, Austria, Mr. Fagan filed the instant action on May 11, 2004. *See* Memorandum of Law In Support of Defendant Bank Austria Creditanstalt AG's Motion To Dismiss The First Amended Complaint, dated November 8, 2004, at 8 n. 8. Because he failed to properly serve the Defendant, he was given additional time to file an amended pleading, which he did on October 15, 2004. Initially, however, there was some confusion regarding the amended filing because Mr. Fagan had captioned it incorrectly. Finally, the motion to dismiss was fully briefed on January 6, 2005.

Because the procedural defects in this case are dispositive, no factual background will be provided. Plaintiff relies upon two alleged bases for subject matter jurisdiction: (1) the "laws of the City and State of New York, as well as violations of laws of nations and treaties of the United States," (Am.Compl.¶ 49) and, "violations of International Law, including those as articulated and established by the International Court of Justice, the Law of Nations, *JusCogens* [sic], treaties entered into by the United States and/or to which the United States is a signatory and are and have been declared cognizable and actionable in the Second Circuit."(*Id.* ¶ 53); and (2) this case "in part-calls for the Court to enforce and/or act upon certain aspects of" the prior Settlement Agreement in *In Re Austrian and German Bank Holocaust Litig.*[FN2]

> FN2. Plaintiff (correctly) appears to have dropped its claim that diversity jurisdiction exists.

**\*2** By statute, "the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."*See*28 U.S.C. § 1331. It is axiomatic that jurisdiction exists only "when a federal question is presented on the face of the plaintiff's properly pleaded complaint."*Caterpillar Inc. v.*

*Williams,* 482 U.S. 386, 392 (1987). A well-pleaded complaint must establish "either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on a resolution of a substantial question of federal law."*Frazier v. Turning Stone Casino,* 254 F.Supp.2d 295, 302 (N.D.N.Y.2003).*Seealso Princz v. Fed. Rep. Of Germany,* 26 F.3d 1166, 1176 (D.C.Cir.1994) (complaint seeking Holocaust reparations for plaintiffs' concentration camp injuries sounded in tort and quasi contract, not federal law).

The Amended Complaint in this case does not assert any federal law claims, nor is any question of federal law, much less a substantial one, implicated by the common law claims the Amended Complaint seeks to plead.[FN3] Amazingly, apart from two passing references to international and treaty law, the Amended Complaint fails to make any specific reference to any federal law. Accordingly, Plaintiff's first proffered basis for jurisdiction is without merit.

> FN3. While Count 12 of the Amended Complaint seeks a declaratory judgment, the Declaratory Judgment Act, 28 U.S.C. § 2201, cannot, in the absence of a controversy involving a federal question, confer federal question jurisdiction. *Tasini v. New York Times Co.,* 184 F.Supp.2d 350, 358 n. 12 (S.D.N.Y.2002).

Plaintiff's second alleged ground for subject matter jurisdiction, namely that this case "in part-calls for the Court to enforce and/or act upon certain aspects of" the prior Settlement Agreement in *In Re Austrian and German Bank Holocaust Litig.,* is not only without legal basis, it is little more than an end run around the Bank Austria Settlement. While this Court, in its Final Order and Judgment in the Bank Austria settlement, did expressly retain "continuing jurisdiction over the Settlement and Settlement Agreement,"*see* Final Order and Judgment ¶ 5, that settlement cannot confer subject matter jurisdiction here because this is an entirely separate action requiring an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2001888 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

independent jurisdictional basis. *See, e.g., Peacock v. Thomas, 516 U.S. 349, 355 (1996)* ("In a subsequent lawsuit involving claims with no independent basis for jurisdiction, a federal court lacks the threshold jurisdictional power that exists when ancillary claims are asserted in the same proceeding as the claims conferring federal jurisdiction"). Indeed, Plaintiff spends the first fifteen pages of an entirely sloppy, misleading and unresponsive brief [FN4] trying to get out from the Settlement, only then to opportunistically invoke that same 1998 agreement in a vain effort to salvage jurisdiction. In any event, it is abundantly clear that there is no subject matter jurisdiction; accordingly, the case is dismissed.[FN5]

> FN4. Apparently conceding the point, Plaintiff's opposition papers completely ignore Defendant's challenges to subject matter jurisdiction.

> FN5. Because of the jurisdictional bar, the Court does not reach the issue of whether the 1998 Settlement Agreement precludes this action; Plaintiff's effort to circumvent that agreement is, however, discussed, *infra,* at 10-15.

II. Plaintiff's Cross-Motion Is Denied

Plaintiff moves for jurisdictional discovery, preservation of evidence, depositions *debeneesse* and limited production of documents. These requests are, in addition to being without basis in the law, mooted by the lack of subject matter jurisdiction. They are denied.

III. The Motion To Impose Sanctions Is Granted

**\*3** On February 10, 2005, Defendant, in a detailed and lengthy memorandum, moved, pursuant to Fed.R.Civ.P. 11(b) and 28 U.S.C. § 1927, to impose sanctions on Plaintiff and its principal counsel and co-Plaintiff,

**Edward D. Fagan**. Remarkably, as of the date of this writing, over six months after the sanctions motion was filed, Mr. Fagan has not responded.

A. Standard For Sanctions Under Rule 11 and 28 U.S.C. § 1927

Rule 11, which is designed to deter baseless filings and curb abusive litigation, imposes an affirmative duty to conduct a reasonable inquiry into the factual and legal viability of claims. *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 253 (2d Cir.1985). It requires an attorney to sign every pleading or other paper filed with the court. The signature "certifies to the court that the signer has read the document, has conducted a reasonable inquiry into the facts and the law and is satisfied that the document is well grounded in both, and is acting without any improper motive." *Business Guides, Inc. v. Chromatic Communications Enters.,* 498 U.S. 533, 542 (1991). Rule 11 is intended to ensure that an attorney will "stop, think and investigate" before filing "baseless papers." *Cooter & Gell v. Hartmax Corp.,* 496 U.S. 384, 398 (1990).

Under Rule 11, sanctions may be imposed on a person who signs a pleading, motion, or other paper for an improper purpose such as to delay or needlessly increase the cost of litigation, or does so without a belief, formed after reasonable inquiry, that the position espoused is factually supportable and is warranted by existing law or a nonfrivolous argument for the extension, modification, or reversal of existing law. *See Caisse Nationale de Credit Agricole-CNCA, New York Branch v. Valcorp.,* 28 F.3d 259, 264 (2d Cir.1994).

When a district court determines that Rule 11(b) has been violated, it may impose sanctions. Fed.R.Civ.P. 11(c). Both monetary and non-monetary sanctions are permitted. Fed.R.Civ.P. 11(c)(2). In fashioning a sanctions order, the Advisory Committee notes suggest the following considerations: (1) whether the improper conduct was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

willful or negligent; (2) whether it was part of a pattern of activity, or an isolated event; (3) whether it infected the entire pleading, or only one particular count or defense; (4) whether the person has engaged in similar conduct in other litigation; (5) whether it was intended to injure; (6) what effect it had on the litigation process in either time or expense; (7) whether the responsible person is trained in law; (8) what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; and (9) what amount is needed to deter similar activity by other litigants. *See* Rule 11(c) Advisory Comm. Notes (1993).

Separate from Rule 11, a district court has the inherent authority to sanction parties appearing before it for acting in bad faith, vexatiously, wantonly, or for oppressive reasons. *See* *Sassower v. Abrams*, 833 F.Supp. 253, 272 (S.D.N.Y.1993). The Court's inherent power to sanction stems from the very nature of the courts and their need to be able to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. *Id.*

*\*4* Additionally, 28 U.S.C. § 1927 provides that an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. "To impose sanctions under either authority, a court must find clear evidence that (1) the offending party's claims are entirely without color, and (2) the claims were brought in bad faith-that is, 'motivated by improper purposes such as harassment or delay.' " *Eisemann v. Greene, M.D.*, 204 F.3d 393, 396 (2d Cir.2000). There must be a showing of subjective bad faith on the part of the offending attorney. *Ted Lapidus, S.A. v. Vann*, 112 F.3d 91, 96 (2d Cir.1997). However, bad faith "can be inferred when the attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Vacco v. Operation Rescue Nat'l*, 80 F.3d 64, 72 (2d Cir.1996) (internal quotation marks omitted).

### B. Edward D. Fagan's Conduct In This Litigation Clearly Warrants Sanctions

Mr. Fagan's actions in this case go far beyond (but certainly include) a lack of preparation and lack of professionalism. In addition to glaringly inadequate filings, utter disregard for the court, its schedule, and the rules of procedure, it is obvious that Mr. Fagan has misrepresented critical facts.[FN6]

> FN6. While the jurisdictional bar prevents the Court from determining whether the instant lawsuit is legally barred by the Bank Austria Settlement, to address the Rule 11 and § 1927 applications, the Court must look at that Settlement.

In ¶ 271 of the Amended Complaint, Mr. Fagan asserts that the word "ARTWORK" [FN7] does not appear in the Settlement Agreement and Release because "the 1998 Claims related EXCLUSIVELY to bank accounts, monies or assets ..."*Id.* ¶ 275.This is totally false. The Settlement Agreement and Release defines "Released Claims" to include, *inter alia,* claims for "Looted and/or Aryanized Assets," (Settlement Agreement ¶ 1(B)), which specifically include "any and all personal ... property, including ... silver, gold, jewelry ... [and] art masterpieces."Class Action Compl. ¶ 17.[FN8]

> FN7. Numerous words and phrases in Mr. Fagan's papers are capitalized, italicized, boldfaced, or underlined. At times, this appears to be for emphasis; however, at other times, it appears entirely random. In any event, the Court refers herein to words and phrases as they appear in Mr. **Fagan's** submissions.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2001888 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

FN8. Further, Mr. **Fagan's** complaint in the Austrian and German case, *Watman*, alleged that "cash, securities, precious metals, jewelry, art treasures and family heirlooms, gold jewelry and gold coins" were "deposited ... into numbered or secret accounts and safe deposit boxes of the defendant German and Austrian banks."*See* 11/08/04 Moerdler Decl. Ex. 17, Watman Am Compl. ¶¶ 36-37.

In the instant case, Mr. Fagan also asserts that an alleged scheme to defraud occurring from "the 1950s to the present" falls outside the scope of the Settlement. Am. Compl. at 23 n. 3. Again, Mr. Fagan's claim is belied by the Settlement, which states that "actions, conducts, or omissions on or subsequent to January 1, 1947 that result from, arise out of or relate to the actions, conduct, or omissions of the Releasees prior to January 1, 1947" are explicitly covered by the Agreement. Settlement Agreement ¶ 7. Moreover, according to that same agreement, the parties specifically agreed that Bank Austria would be released from all claims "from the beginning of time to the date of this Agreement" relating to Holocaust-era conduct and the claims in the Consolidated Class Action Complaint, including those related to "looted and/or Aryanized Assets," which include "art masterpieces." In light of that release, it is, quite frankly, incomprehensible that Mr. Fagan would initiate the instant action.

**\*5** Mr. Fagan's deceptions are not limited to the above. Despite his representation that AHVRAM, the purported entity of which he claims to be a member and brings this suit on behalf of, "was formed," Am. Compl. at 1 n. 1, there is, according to the Defendant, no record of such an entity being formed in New York State as of the filing of the Amended Complaint.[FN9]*See* Memorandum In Support of Defendant Bank Austria Creditanstalt AG's Motion To Impose Sanctions, dated February 10, 2005, at 19-20. To that end, Mr. Fagan appears to be seeking damages on behalf of a fictitious entity.

FN9. As of this writing, Mr. Fagan has offered no evidence that AHVRAM does, or for that matter, has ever, existed.

Perhaps most seriously, however, Mr. Fagan is proceeding in direct violation of New York's Champerty Statute and Applicable Disciplinary Rules. Champerty is defined as "maintaining a suit in return for financial interest in the outcome."*In re Primus*, 436 U.S. 412, 425 n. 15 (1978).Section 488 of the New York Judiciary Law provides, in pertinent part, that:

An attorney or counselor shall not:
1. Directly or indirectly, buy, take an assignment of or be in any manner interested in buying or taking an assignment of a bond, promissory note, bill of exchange, book debt, or other thing in action, with the intent and for the purpose bringing an action thereon ...
3. An attorney or counselor who violates the provisions of this section is guilty of a misdemeanor.

N.Y. Jud. Law § 488 (McKinney 1983). Thus, under New York law, attorneys are prohibited from purchasing an interest in an action where the primary purpose is "to enable the attorney to commence a suit thereon."*Sprung v. Jaffe*, 3 N.Y.2d 539, 540 (1957).

In addition, New York Disciplinary Rule 5-103 states in pertinent part that:
A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation he or she is conducting for a client, except that the lawyer may: 1. Acquire a lien granted by law to secure the lawyer's fee or expenses. 2. Except as provided in DR 2-106 [1200.11](C)(2) or, 3. Contract with a client for a reasonable contingent fee in a civil case.

DR 5-1903.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2001888 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 6

In the Amended Complaint, Mr. Fagan claims to possess "interests in certain of The Stolen Artwork and/or Collections, including but not limited to portions of the Hatvany Collections" by virtue of "Plaintiffs Deutsch who sold and/or transferred to Fagan portions of interests acquired from Hatvany's Heirs in 1973." Am. Compl. ¶¶ 27-28. Accepting Mr. Fagan's allegations as true, it is clear that he acquired these "claims" for the sole purpose of bringing this action. Moreover, by acquiring this proprietary interest in the litigation, Fagan has, at the very least, run afoul of the disciplinary rules.

In light of the preceding, and in accordance with Rule 11, 28 U.S.C. § 1927 and the factors set forth in the Advisory Committee Notes, the Court finds that: (1) Mr. Fagan's claims in this matter are entirely without color; and (2) the claims were brought in bad faith. *See Eisemann, 204 F.3d at 396.* Though independently each of the following would be sufficient to find bad faith, certainly when aggregated, Mr. Fagan's scattershot pleadings, his disregard for the court and its rules, his flagrant misrepresentations in the Amended Complaint, his circumvention of the Bank Austria Settlement, and his attempt to profit by buying into the litigation constitute subjective bad faith. *Id.; Ted Lapidus, S.A., 112 F.3d at 96.* Such a finding is only bolstered by the fact that this case appears to be part of a pervasive and disturbing trend.[FN10] Additionally, as a graduate of Cardozo Law School with 25 years in practice, Mr. Fagan's conduct is simply inexcusable. Accordingly, pursuant to Rule 11, this Court's inherent power, and 28 U.S.C. § 1927, Edward D. Fagan is hereby formally sanctioned.

> FN10. At minimum, Mr. **Fagan**, through AHVRAM, is pursuing cases against Bank Austria, the Russian Federation, the Republic of Germany, the Republic of Hungary, the United States of America, and Sotheby's Holdings.

*6 In accordance with the formal sanctions, the Court also orders the following:

1. Mr. Fagan is to pay all of to Bank Austria's reasonable litigation costs and fees in connection with this action;[FN11]

> FN11. Bank Austria should, within 21 days of receipt of this Opinion & Order, submit its fees and costs to the Court.

2. Mr. Fagan is fined $5,000.00, which is due immediately, and should be remitted to the Clerk of the Court, United States District Court, Southern District of New York, 500 Pearl Street, New York, N.Y. 10007.[FN12]

> FN12. While the Court, at this time, declines to enjoin Mr. Fagan from filing any actions in federal court related to *In re Austrian and German Bank Holocaust Litigation* without first seeking permission, the Court may revisit this issue should Mr. Fagan (or any other "association" of which he is purportedly a member), continue to initiate harassment suits.

SO ORDERED.

S.D.N.Y.,2005.
Association of Holocaust Victims for Restitution of Artwork and Masterpieces v. Bank Austria Creditanstalt Ag
Not Reported in F.Supp.2d, 2005 WL 2001888 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT G**

1

79stskic                              Telephone Conference

1    UNITED STATES DISTRICT COURT
1    SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
2
3    IN RE:  SKI TRAIN FIRE
3    IN KAPRUN, AUSTRIA                     CASE NO.
                                           01 MDL 1428  (SAS)
4
4    ------------------------------x
5
5                                          New York, N.Y.
6                                          September 28, 2007
6                                          12:00 p.m.
7
7    Before:
8
8                    HON. SHIRA A. SCHEINDLIN,
9
9                                          District Judge
10
10                   APPEARANCES (Telephonic)
11
11   JAMES LOWY
12        Attorney for Foreign Plaintiffs
12
13   REED, SMITH, LLP
13        Attorneys for Defendant Bosch Rexroth Corporation
14   BY:  PAUL P. ROONEY
14        NEIL ROSOLINSKY
15
15   KIRKLAND & ELLIS, L.L.P.
16        Attorneys for Defendant Siemens Corporation
16   BY:  BRANT W. BISHOP
17
17
18
19
20
21
22
23
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

4

79stskic

1    represent anybody.
2         But after we cross that bridge, what is your position
3    on motion for reconsideration?  You don't have to go through
4    with it, Mr. Lowy.  If you're counsel, the only counsel left,
5    you're certainly permitted to withdraw it and proceed in the
6    Circuit.
7         On top of that we received a letter today from
8    Dr. Padovsovnik.  And it was a confusing letter, but it seems
9    that he, from what I can tell, wants to pursue the matter in
10   the Second Circuit not on reconsideration, but he also wants to
11   understand what it was that was extended to October 16th.  He
12   wrote, and I'm quoting, "We are informed that the Court has
13   modified the dates contained in the August 16 opinion and order
14   to extend the time until October 16th by which the Kaprun
15   victims are to inform the Court of their intentions to
16   prosecute the U.S. claims and with whom they wish and intend to
17   prosecute those claims after the Second Circuit has ruled on
18   the appeals."
19        Well, I don't know what he's talking about because
20   that's what I said in the order in the first place.  In the
21   disqualification order it says that counsel has to step in
22   within 30 days, but if any plaintiff wants to proceed pro se
23   they have 60 days.  So there's no modification, there's no need
24   for a new order, that's what I said.  So that's fine.  So I
25   don't really understand his letter too well.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

Telephone Conference

1    But in any event, putting his letter aside because I
2    don't really know who he is; he says counsel for certain German
3    victims and survivors.  He's not counsel in this Court, he's
4    not admitted to this Court, so he can't represent any of my
5    plaintiffs here.  But to the extent I understand his wishes,
6    there's nothing to do because that's what the October 16 order
7    says, that people can step in pro se as long as they let me
8    know by October 16, and counsel was supposed to do it within 30
9    days.
10        So let's start with you, Mr. Lowy.  Are you formally
11   representing the plaintiffs in -- the foreign plaintiffs in
12   this Kaprun case?
13        MR. LOWY:  Let me back up a little bit and try to
14   clarify my current position, which may or may not unconfuse
15   things.
16        The plaintiffs collectively decided that they wanted
17   to pursue the appellate route.  Mr. Fagan has sort of driven
18   this process to file notices of appeal and get the case ready
19   for appeal.  Because of that, we didn't believe that we had an
20   obligation or I didn't believe I had an obligation to inform
21   the Trial Court of who I represented or to let the Court know
22   who I represented because we thought it was going to the
23   Appellate Court.
24        THE COURT:  That's what I'm trying to understand.  You
25   see, there's all kinds of different decisions.  He was

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**EXHIBIT H**

# EDWARD D. FAGAN ESQ.

Five Penn Plaza, 23ʳᵈ Floor, New York, NY 10001
Tel (646) 378-2225, Fax (646) 417-5558 & Email: ed.fagan@global-litigation-partners.com

*Sunday 18 November 2007*

*Via Fax (201) 617-5500*
*Email: m.perle@earthlink.net*
Michael R. Perle Esq.
1265 Paterson Plank Road, # 3 A
Secaucus, NJ 07094

*Via Fax (813) 282-0384*
*Email: jameslowy@gmail.com*
*jameslowy@floridalawgroup.com*
James Lowy Esq/Florida Law Group
3907 Henderson Blvd., Suite 200
Tampa, FL 33728

*Via Fax (212) 212-755-1989*
*Email: hantmanrj@aol.com*
Robert Hantman Esq. / Hantman & Associates
1414 Avenue of the Americas, Suite 406
New York, NY 10019

Re:    *Fagan v. Lowy et al 07-114562 and Removed Docket # 07-cv-10293*

Dear Michael, Jim & Robert:

I am writing this letter to all of you on behalf of the Kaprun victims and survivors I represent and continue to represent in the pending Appeals.

Despite my repeated requests, I have not received a signed copy of the Notice of Removal. I did receive an electronic version of it and I await the document with signatures exactly as it was filed, as well as a copy of the Case Information Statement.

Your Notice of Removal is filled with and improperly discloses Confidential, Attorney Client, Work Product and/or Other Privileged communications, information and strategy. In the desire to try to defend actions commenced by me against Messrs. Lowy and Hantman, you have crossed the line between what is acceptable, as parties or counsel, and what is actionable.

Specifically, the references to and inclusion of Exhibits G & H in the Notice of Removal were impermissible, careless, negligent, reckless and improper. This disclosure, in addition to other acts to date, has prejudiced the Kaprun cases, the pending Appeals and me. On behalf of Kaprun victims and survivors, I DEMAND that you not upload the documents.

If I do not receive written Confirmation by return email before the end of the day Sunday, that you have agreed NOT to upload the Notice of Removal and you have redacted Exhibits G & H and you have redacted all references to Exhibits G & H, I will taken action against you without further notice for relief, including but not limited to an immediate injunction and damages.

Your anticipated cooperation is will be appreciated and is expected. Also, stop trying to communicate with my clients and my colleagues in The Kaprun Case.

Very truly yours,

Edward D. Fagan
EDF/left
*Attachments Unsigned Notice of Removal & Exhibits G & H (33 pages)*

**EXHIBIT I**

## Michael R Perle

**From:** Michael Perle [m.perle@earthlink.net]
**Sent:** Saturday, December 22, 2007 11:17 AM
**To:** m.perle@earthlink.net
**Subject:** Fagan email allleged privileged materials; FW: Fagan v. Lowy et al 07-114562 and Removed Case 07-cv-10293

---

**From:** Michael Perle [mailto:m.perle@earthlink.net]
**Sent:** Tuesday, November 20, 2007 9:13 AM
**To:** 'Edward D. Fagan'
**Cc:** 'James Lowy'; 'Robert J. Hantman'
**Subject:** RE: Fagan v. Lowy et al 07-114562 and Removed Case 07-cv-10293

Most repectfully, you, as a disqualified attorney, lack standing to raise claim attorney- client privilege with regard to a communication from post-disqualification, either regarding the meaning of the order of the district court which disqualified you, directing non-disqualified counsel as to what to do or not do before the district court. This was made quite clear in the telephone in Kaprun on 9/28/07. Even if the privilege applied, I believe that advising clients to disregard a court's order would clearly come with the crime-fraud exception.

Moreover, in camera review of the document is the established procedure for determining assertions of attorney-client privilege regarding a particular document. See Renner v Chase Manhattan Bk, 2001 WL 1819215 (S.D.N.Y.); Strougo v. Bea Associates, 199 F.R.D. 515, 522 (S.D.N.Y.2001); Calvin Klein Trademark Trust v. Wachner, 198 F.R.D. 53, 54 (S.D.N.Y.2000)

If attorney-client privilege is your claim, that should be addressed through in camera review of the document by Judge Scheindlin or whichever district court judge is assigned to the matter, not by threatening opposing counsel with reprisal.

By the way, Exhibit H is Judge Scheindlin's order of 10/24/07. What possible basis could have for claiming this is privileged?

---

**From:** Edward D. Fagan [mailto:ed.fagan@global-litigation-partners.com]
**Sent:** Monday, November 19, 2007 9:26 AM
**To:** m.perle@earthlink.net
**Cc:** 'James Lowy'; 'Robert J. Hantman'
**Subject:** Re: Fagan v. Lowy et al 07-114562 and Removed Case 07-cv-10293

Michael:

Thank you for saying that you faxed the signature page of the Notice of Removal. Now, please fax the signed Case Information Statement.

Thank you also for the representation that you have not yet uploaded the Notice of Removal. That solves one aspect of the problem. The rest still needs to be addressed

Exhibits G & H and all references to them should not have been in the Notice to Remove in the first place. The inclusion of them and the references to them were improper and create serious problems for

12/28/2007

**EXHIBIT J**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------X

Edward D. Fagan Esq,                    :           INDEX #
                            Plaintiff   :

        - vs -                          :

                                        :

James F. Lowy Esq., International Law Group LLC;:
Robert Hantman Esq. and Hantman & Associates;   :
And John Does/Jane Does 1 – 5           :
                            Defendant   :

-------------------------------------------------------------X

## DECLARATION OF DR. GERHARD PODOVSOVNIK

Dr. Gerhard Podovsovnik, hereby declares as follows:

1) I am an Austrian lawyer and I have worked together with Edward D. Fagan since 2003.

2) I am submitting this Affidavit because of the damage that is being caused to my clients' cases
   by James F. Lowy.

3) I have had a chance to review the Declaration by Edward D. Fagan and to the extent that the
   Declaration relates to The Kaprun Case, I confirm those statements to be true.

4) However, I am submitting this Declaration because my clients and I wish to impress upon the
   Court the importance of granting the immediate injunction requested by Mr. Fagan to help
   minimize the future damage that Mr. Lowy's actions can cause.

5) I am one of the lawyers who is working with Mr. Fagan on cases pending in the United
   States related to damages suffered by victims and survivors of the 2000 fire in a ski train
   tunnel in Kaprun, Austria hereinafter as "The Kaprun Case".

6) I represent Dutch and German victim and/or survivor families.

7) Together with other Austrian, European and Japanese lawyers, I am and have been working
   with Mr. Fagan on the claims pending in the United States District Court for the Southern
   District of New York and which claims are now on appeal to the 2nd Circuit.

---------------------
*Fagan v. Lowy et al – October 2007 – Podovsovnik Declaration – Page 1*

8) While I cannot go into detail that would violate attorney client, work product and/or other privileges, I can state unequivocally that Mr. Lowy has damaged and continues to threaten damage to our claims.

9) Mr. Lowy has refused to follow instructions from the team before but his recent actions have caused serious problems for our claims and us.

10) From mid-September 2007 to the present, Mr. Lowy caused confusion and direct damage to our claims.

11) Mr. Lowy wrote letters to the Court claiming that he was retained by clients (Kaprun clients – the ones to which he referred were and are my clients), when in fact that was not true.

12) Mr. Lowy misled the Court and defendants into believing he had authority and was competent to act on behalf of my clients, when in fact that was not true.

13) Mr. Lowy participated in a Conference and represented to the Court and defendants that he was acting on behalf of my clients and then Mr. Lowy proceeded to take actions which he expressly forbidden from taking.

14) Mr. Lowy disclosed litigation and appellate strategy to defendants without our authorization, without retainers and which disclosures caused my clients' damages.

15) Mr. Lowy made inappropriate and/or disparaging comments about Mr. Fagan that caused damages to my clients' claims and appeal.

16) Mr. Lowy has taken confidential information that was prepared by Mr. Fagan and is attempting to negotiate a settlement with defendants and others and he is doing so without authority.

17) Mr. Lowy has been communicating with adversaries and others whose interests are adverse to my clients and has attempted to work out a settlement for claims about which he has no knowledge or authority.

18) Mr. Lowy is a menace to our claims and he must be stopped.

19) Mr. Lowy's alleged theft of Mr. Fagan's mail is a matter of grave concern to my clients and me because at least in part the mail relates to the ongoing claims and appeal.

20) Mr. Lowy has attempted to solicit me to work with him, to get me to give him clients and to abandon my working relationship with Mr. Fagan.

21) My clients are considering filing damage claims against Mr. Lowy and his firm for the damage he caused to us.

22) The damage claims that we may be filing against Mr. Lowy in the future are not sufficient to protect against the ongoing damage that Mr. Lowy is causing.

23) The only way to protect my clients from Mr. Lowy's continuing damage is to grant the injunction requested by Mr. Fagan.

24) In view of the foregoing, I pray the Court grant Mr. Fagan's application in its entirety.

Dated:   29 October 2007            By: _Gerhard Podovsovnik (ass)_ _authorized/approved_
         Vienna, Austria                  Dr. Gerhard Podovsovnik    _as attached_

-----------------------------------------------------------------------------

## DECLARATION UNDER 28 USC § 1746

I declare, verify, certify and state under the penalty of perjury that the facts and statements contained above are true and accurate to the best of my knowledge information and belief.

Dated: 29 October 2007            _____

From: "Mag. Dr. Gerhard Podovsovnik" <Dr.Gerhard@podovsovnik.com>
Subject: n.s. Kaprun - Lowy (Declaration Dr. Podo)
Date: October 29, 2007 6:45:38 PM EDT
To: <ed.fagan@global-litigation-partners.com>
Cc: Romana Pflügler <Romana.Pfluegler@podovsovnik.com>
1 Attachment, 1.3 MB

Ed

Here is now the signed declaration as drafted. I am ok with it. I hope you can open the attachement, because it is blocked by my own outlook as a document that is not safe, because it is scanned by a new handscanner.

Gerhard

declarationn....EXE (1.3 MB)

23) The only way to protect my clients from Mr. Lowy's continuing damage is to grant the injunction requested by Mr. Fagan.

24) In view of the foregoing, I pray the Court grant my application in its entirety.

Dated:    29 October 2007                    By: _____
          Vienna, Austria                         Dr. Gerhard Podovsovnik

---

### DECLARATION UNDER 28 USC § 1746

I declare, verify, certify and state under the penalty of perjury that the facts and statements contained above are true and accurate to the best of my knowledge information and belief.

Dated: 29 October 2007

*October 2007 – Podovsovnik Declaration – Page 3*

**EXHIBIT K**



Nov 01 2007 1:13PM                                                                    p.10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-----------------------------------------------------X
Edward D. Fagan Esq,                              :
                                    Plaintiff     :
                                                  :        INDEX #
    - vs -                                        :
                                                  :        *07 - 114562*
James F. Lowy Esq., International Law Group LLC;:  :        *Affidavit*
Robert Hantman Esq. and Hantman & Associates;     :
And John Does/Jane Does 1 – 5                     :
                                    Defendants    :
-----------------------------------------------------X

### DECLARATION AND STATEMENT OF AUTHORITIES OF EDWARD D. FAGAN

Edward D. Fagan, ~~hereby declares as follows:~~ *being duly sworn upon my oath hereby deposes and says :*

### INTRODUCTION

1) I am the plaintiff in this matter. I make this application for an injunction to protect against the further irreparable harm and damages that are being caused by Defendants until the Complaint filed today against these Defendants is resolved by a jury trial. *(See Exhibit 1 – copy of complaint attached hereinafter referred to as "The Complaint").*

2) The damage is being caused because of Defendants interception of my mail, interception of electronic data, use of privileged, confidential and proprietary information and interference with my ability to discharge my duties as counsel in cases pending in NY Courts, which has caused damage to cases pending in NY Courts and/or which is being used to gain an unfair commercial advantage.

3) The interception of my mail was discovered on Friday October 26, 2007 and I have taken immediate action to report the interception to authorities. *See Exhibit 2 – copies of complaints to the US Postal Service in New York, with attachments.*

4) I have taken steps to resolve these issues with the landlord and will be entering into a separate agreement with the landlord to insure the future safety of my mail.

---

*Fagan v. Lowy et al – October 2007 – Fagan OSC Declaration – Page 1*

5) The discovery late on Friday about my mail, led to other discoveries where it can now be shown that Defendants have:

   a) taken and/or are attempting to use confidential and/or privileged and proprietary information, including documents, work product, data, photographs, legal analysis, confidential legal theories, experts reports, settlement models and positions, so as to gain a competitive advantage over me and interfere with my representation of clients claims;

   b) made disparaging, derogatory and inflammatory statements about me to clients or other lawyers with whom I work, in an attempt to alienate them from me and to interfere with my representation of clients' claims so that one or more of the Defendants can take over the claims and/or gain a commercial advantage over me.

6) As explained below, the interception of my mail has already caused damages (i) to the claims of plaintiffs for whom I am responsible in ongoing cases in New York State, Federal and Appellate Courts and (ii) to me personally and my ability to respond to Courts, adversaries, clients and others and/or matters related to my practice and my business.

7) Additional damages have been caused, by Defendant Lowy acting individually and/or with the guidance of Defendant Hantman or others, violated specific instructions by me and by my clients and in direct contravention to specific instructions proceeded to make false representations to judges and took other actions that caused damages to clients claims in NY. By way of examples of Defendant Lowy's damage to clients' claims and to appeals, I am attaching documents that show these wrongful acts regarding The Kaprun Case. *See Exhibit 3 - September 25, 2007 letter to Court - where Defendant Lowy misrepresents his retention and has authority to act for my clients, Exhibit 4 - Sept. 28, 2007 Hearing Transcript – where Defendant Lowy makes misrepresentations and informs Court that he is authorized to take*

*actions -- which he was never authorized to take, which caused confusion and damages to my*

*clients, Exhibit 5 – Defendant Lowy's October 4, 2007 letter where he attempts to fix he*

*already caused and confirms he was not retained and had no authority to act, and Exhibit 6 –*

*Notice and Amended Notices of Appeal filed by me as of Sept. 20, 2007 for Kaprun victims.*

8) If my request for temporary injunction is not granted, Defendants will continue to cause

damages to my innocent clients, as well as to my business, my family and to me.

9) There is reasonable probability that I will succeed on (i) my claims based upon Defendants'

interception of my mail, (ii) my claims based upon Defendant Lowy's interception of my

wire, oral and/or electronic communications, (iii) my other claims based upon Defendants'

other wrongful acts of using proprietary, confidential and/or other privileged information

belonging and/or related to me, my clients, lawyers who cooperate with me, my business and

my family, designed or intended to cause harm and/or obtain a commercial advantage over

me, (iv) interference with my obligations in cases for which I am counsel of record, and (v)

my claim for breach of contract, theft of services, theft by deception and specific

performance.

10) The facts are irrefutable and actual damage has already been caused. The only issues are the

extent of the damages that my business, clients, my colleagues, my family and I will suffer.

11) The injunctive relief is necessary because further damage can and is being done to pending

appeals, settlement negotiations and cases that are in the midst of motion practice.

12) Defendants must be stopped.

### Interception of My Mail

13) As explained in ¶¶ 22 to 29 of the Complaint, Defendants Lowy, ILG, Hautman and

Associates intercepted and/or took of my letters, packages, mail and other articles.

14) There is no defense or excuse for these acts. The mail did not go to addresses where I conduct my practice. The mail was not sent to my residence in New Jersey. Instead the mail was sent and came to be into the hand of persons who had no right to my mail, no authority to receive it and no right to open it.

15) The interception and retention of my mail has caused me to miss deadlines in matters pending in New York State and Federal Courts.

16) The interception and retention of my mail has prevented me from responding to Judges and adversaries.

17) The interception and retention of my mail has injured clients' claims and subjected me personally to potential sanctions.

18) The interception and retention of my mail has interfered with my ability to prosecute appeals in the 2nd Circuit.

19) The interception and retention of my mail occurred when mail attendants and other office personnel at The Regus Group (my landlord) to take mail from my mailbox at 5 Penn Plaza, 23rd Floor, New York, NY and divided and forwarded it to Defendants Lowy, ILG, Hantman and Associates offices. *(See Exhibit 7 – mailing labels as of Oct. 26, 2007 used by The Regus Group - my landlord).*

20) I have received complaints by adversaries, judges and others that they sent me materials to which they say I failed to respond. I did not know what was happening with my mail. The reason I did not receive mail is because my mail was sent to Defendants Lowy, ILG, Hantman and Associates who in turn have held some, lost or destroyed other mail and opened still other mail. Defendants had no authorization or permission to receive or open my mail.

---

*Fagan v. Lowy et al – October 2007 – Fagan OSC Declaration – Page 4*

28) I have worked for almost 7 years on The Kaprun Cases together with European and Japanese lawyers representing victims, survivors and family representatives from Austria, Germany, Japan, Slovenia, The Czech Republic and The Netherlands.

29) I personally represents all the foreigner victim family members and survivors whose claims were brought in the Southern District of New York and which are currently on appeal to the 2nd Circuit.

30) Defendants Lowy and ILG have no retained clients in any of these cases.

31) On June 19, 2007, claims which I was litigating for almost 7 years were dismissed and an appeal was taken and is pending in the 2nd Circuit.

32) On August 16, 2007, I was disqualified in the cases that had already been dismissed and for which an appeal had been taken.

33) From mid-September 2007 to present, during the pendancy of Appeals to the 2nd Circuit for which I am ultimately responsible, Defendants Lowy and ILG was given instructions from me, from cooperating lawyers and from clients in the cases on appeal as to what he should or should not do.

34) Contrary to specific instructions, Defendants Lowy and ILG made representations to the Court that he had retained clients – which was not true – and based on those false representations, Defendants Lowy and ILG took unauthorized actions that prejudiced the claims of my clients and me.

35) Those unauthorized actions by Defendants Lowy and ILG resulted in procedural problems in the District Court and procedural problems with the Appeal.

---

*Fagan v. Lowy et al – October 2007 – Fagan OSC Declaration – Page 6*

36) Those unauthorized actions by Defendants Lowy and ILG resulted in prejudice to my clients who are in the midst of settlement negotiations regarding certain aspects of their claims, while they pursue other claims and the Appeals in the 2nd Circuit.

37) The Declaration of Dr. Gerhard Podovsovnik is attached as is the email Confirmation that he signed it. Additional Declarations will be submitted when they are received showing how Defendants Lowy and ILG has caused damage to clients' claims, caused damage to ongoing settlement negotiations and have caused Dr. Podovsovnik, me and my/our clients to expend substantial funds in an effort to try to fix the damages caused by Defendants Lowy and ILG.

*Alkow et al v. Pearlman et al 07-cv-2285(GBD) ("The Alkow Case") USDC/SDNY*

38) Defendants Lowy and ILG solicited and entered into Retainer Agreements with New Yorkers and other persons and on whose behalf I was hired to be counsel in New York.

39) I was hired to file and prosecute The Alkow Case and any and all related individual claims that could be brought in the Southern District of New York some of which are already pending and others of which are/were in the process of being filed as separate actions (hereinafter "The Alkow Case and related individual claims").

40) Despite repeated requests, Defendants Lowy and ILG delayed providing me with a signed contract for my services and copies of the Retainer Agreements ("Lowy Retainers") that Defendants Lowy and ILG entered into in Florida with clients for the cases, especially cases in New York, on which I was to do work . *See Exhibit 8 – Lowy Retainers.*

41) In the last few weeks, I have discovered why Defendant Lowy and ILG were refusing to provide the documentation. Based on the facts as they have now unfolded, it appears clear that Defendants Lowy and ILG (i) wanted to try to cheat my team and me out of fees for services rendered and reimbursement of expenses as the case continued and when the case

was successful, or in the alternative (ii) wanted to set me up as the person on whom they could assign blame if the cases failed in New York.

42) Defendants Lowy and ILG are in breach of their obligations to under the Lowy Retainers. In particular, Defendants Lowy and ILG have breached the requirements under ¶¶ 4 and 5 of the Statement of Client rights that require me to be an additional signatory on the Lowy Retainers and that clients be advised, acknowledge and consent to the fees for my services. *See Exhibit 9 – attachment to Lowy Retainer.*

43) After I recently discovered these problems, I insisted that Defendants Lowy and ILG (and even the clients themselves) honor their obligations under the Lowy Retainers.

44) In response, Defendants Lowy and ILG refused to honor their obligations, refused to provide me with the necessary contracts and interfered with clients' attempts to comply with the requirements under the Lowy Retainer.

45) In addition to these problems, Defendants Lowy and ILG have:

    a)  refused to perform their obligations under the Lowy Retainers and the direct agreement with me to support me and the team[1] that came to work on cases for Defendants Lowy and ILG and for clients who retained them; and

    b)  failed to provide documents and support necessary for the prosecution of the case.

46) Then I discovered that Defendants Lowy and ILG intercepted, retained and opened my mail related to all of my personal and business matters and intercepted and/or are using confidential, proprietary and/or privileged electronic data, client lists, settlement models and work product.

---

[1] All references to The Team relate to office support staff, investigators and researchers who agreed to work, in exchange for the agreements made by and with Defendants Lowy and ILG, on the cases which Defendants Lowy and ILG wished Plaintiff Fagan to pursue or in which Defendants Lowy and ILG wished to participate and work with Plaintiff Fagan.

*Fagan v. Lowy et al – October 2007 – Fagan OSC Declaration – Page 8*

47) Among other things, Defendants Lowy and ILG acts in The Alkow Case and related individual claims threaten (i) my ability to effectively represent clients named in that case on whose behalf my team and I have spent over 1,000 hours since March 2007, (ii) my ability to advise clients for whom I am counsel of record as the best way to proceed with their claims, (iii) my ability to re-align the claims so that the individual plaintiffs' claims can be effectively prosecuted, (iv) my ability to dismiss defendants who Defendants Lowy and ILG wanted to be included in the action but as to which Defendants Lowy and ILG provided no evidence to support further litigation against such defendants, (v) my ability to respond to pending Motions, (vi) my ability to provide adversaries with documents they have requested, and (vi) my ability to discharge my duties to the Court.

48) Defendants Lowy, ILG, Hantman and Associates acts are causing prejudice to Plaintiffs claims and to me in The Alkow Case and related individual claims.

**_Kupfer v. Republic of Germany et al 07-cv-8589 (PAC) ("The Kupfer Case") – USDC/SDNY_**

49) Defendants Lowy and ILG wanted to be involved in and to benefit from The Kupfer Case.[2]

50) Because of the problems with Defendants Lowy and ILG in The Kaprun Cases and The Alkow Case and related individual claims, Defendants Lowy and ILG were not going to be included in The Kupfer Case.

51) Defendants Lowy and ILG interception, retention and reading of mail and other wrongful acts have interfered with The Kupfer Case.

---

[2] I first met Defendant Lowy because his partner in another law firm in Florida sought my assistance in representing other clients with German bonds. In or about January/February 2006, Defendant Lowy's partner and client sought to force me out of further involvement with claims they were prosecuting. There were problems with those bonds and with those claims. However, I had another client on whose behalf I intended to prosecute similar claims. I have reason to believe that Defendant Lowy and ILG or his partner in the other Florida law firm, or the clients on whose behalf they continue to prosecute claims for German Bonds, have been intercepting, retaining and reading my mail and interfering with my business dating back to December 2006.

*Fagan v. Lowy et al – October 2007 -- Fagan OSC Declaration – Page 9*

52) Defendants Lowy and ILG interception, retention and reading of mail and other wrongful acts have interfered with my ability to properly prosecute The Kupfer case.

53) Defendants Lowy and ILG interception, retention and reading of mail have prejudiced and continue to prejudice the prosecution and claims in The Kupfer Case.

### Defendants' Use of Privileged/Confidential Information to Gain Unfair Competitive Advantage

54) Defendants Lowy and ILG have used and continue to use confidential and privileged information such as my work product, litigation strategies, research, settlement models, client lists, business contacts and other information without my knowledge or consent.

55) Defendants Lowy and ILG are attempting to solicit clients and cooperating lawyers to abandon me and to hire them.

56) Defendants Lowy and ILG are using my own privileged and confidential information to gain an unfair competitive advantage over me as they attempt to compete for business.

### Defendants' Acts Are in Violation to Duty to Innocent Clients

57) Defendants' wrongful acts are a disservice to and cause or threaten damage to innocent clients and their claims. They are in violation of the duty to clients.

58) Defendants Lowy and ILG appear to be so overwhelmed by a desire to cheat me out of fees or to steal claims and/or clients from me, that they do not care about the prejudice they are causing to innocent clients.

59) Some of the innocent clients whose claims are being hurt are in The Kaprun Cases, others are in The Kupfer Case, others still are in The Alkow Case and related individual claims.

60) Defendants Lowy and ILG's actions must be enjoined.

---

*Fagan v. Lowy et al – October 2007 – Fagan OSC Declaration – Page 10*

## <u>AUTHORITIES IN SUPPORT OF REQUEST / NEED FOR INJUNCTION</u>

61) In pertinent part, CPLR § 6301 states that *"A preliminary injunction may be granted in any action where it appears that the defendant threatens or is about to do, or is doing or procuring or suffering to be done, an act in violation of the my rights respecting the subject of the action, and tending to render the judgment ineffectual, or in any action where the plaintiff has demanded and would be entitled to a judgment restraining the defendant from the commission or continuance of an act, which, if committed or continued during the pendency of the action, would produce injury to the plaintiff. A temporary restraining order may be granted pending a hearing for a preliminary injunction where it appears that immediate and irreparable injury, loss or damage will result unless the defendant is restrained before the hearing can be had."*

62) A party seeking a preliminary injunction must clearly demonstrate (1) likelihood of ultimate success on the merits; (2) prospect of irreparable injury if injunction is not issued; and (3) a balance of equities in the movant's favor. *See Doe v. Axelrod, 73 N.Y.2d 748, 750.*

63) Interception of confidential and proprietary information and attempts to gain improper competitive advantage are grounds for the entry of a temporary Restraining Order.

64) Solicitation of business of a former employer's customers is actionable where the customer list is a trade secret or where there was a wrongful taking or copying of the former employers customer list. *See Long Island Conservatory Ltd v. Jin, 17331-06 (1-19-2007) 2007 NY Slip Op 50088(U) (unpublished opinion); Amana Express International, Inc. v. Pier-Air International, Ltd., 211 AD2d 606 (2nd Dept. 1995).*

65) There is a legitimate interest in protecting proprietary information and secrets and preventing the use of any such information after entitlement or working relationship between plaintiff

---

and defendant expired or was terminated. *See, Emerging Vision Inc. v. Main Place Opt. Inc., 815 N.Y.S.2d 494 (2006) Wyndham Co. v. Wyndham Hotel Corp., 261 AD2d 242 (1st Dept. 1999); Props for Today, Inc. v. Kaplan 163 AD2d 177 (1st Dept. 1990); and First Coin Investors, Inc. v. First American Coin and Currency, Inc., 96 AD2d 925 (2nd Dept. 1983).*

66) As set forth in *Westbury Elec. V. Anglo-Amer. Total., 52 Misc.2d 1060, 277 N.Y.S.2d 553 (1967)* to obtain an injunction, the plaintiff must establish a clear legal right to the relief sought and irreparable harm if an injunction is not granted. *Citing Barricini, Inc. v. Barricini Shoes, 1 A.D.2d 905; Smith v. Robilotto, 25 A.D.2d 454.*

67) Further, irreparable injury is defined as a continuing harm caused by the act sought to be restrained if permitted to continue during the pendency of the action *(citing Allied-Crossroads Nuclear Corp. v. Atcor, Inc., 25 A.D.2d 643)*; a clear legal right is held to mean an indication of a strong possibility of ultimate success in the action together with immediate need *(Smith v. Robilotto, supra). See Westburg Elec. v. Anglo-Amer. Total., 52 Misc.2d 1060, 277 N.Y.S.2d 553 (1967).*

68) A defendant who has taken Plaintiff's property as a result of wrongful or bad faith actions, can and should be enjoined. *See Carleton v. Pindus, (8-8-2006), 2006 NY Slip Op 30124(U); citing CBS Corp. v Dumsday 268 AD2d 350 [1st Dept 2000], 7th Sense, Inc. v Liu 220 AD2d 215 [1st Dept 1995]).*

69) As explained in *Silfen v. Cream, 29 NY2d 387, 392 (1972),* injunctive relief that are based on or which result from a physical taking can be enjoined simply because they are the result of a egregious or wrongful behavior.

70) The need for the injunction is to prevent the ongoing irreparable damages that are being caused by Defendants' (i) interception and unauthorized access to my mail, (ii) interception

of voice or electronic information and data, and/or (iii) use of my confidential and
proprietary information.

71) Defendants actions have interfered with and/or are prejudicing pending cases or appeals and
have caused damage to my clients, my ability to discharge my duties, my cases, my business,
my family and me, personally.

72) There is a likelihood of success on my claims. The only issue for the jury to decide will be
the damages that should be awarded to me for the damages caused by the Defendants .

73) However, without the injunction, there will be irreparable harm and damages to innocent
clients and to me.

74) In the absence of a preliminary injunction, I will suffer loss of clients, permanent loss of
revenue and loss of good will, all of which are sufficient to warrant a preliminary injunction.
*See Battenkill Veterinary Equine P. C. v Cangelosi, 1 AD3d 856 [3rd Dept. 2003]).*

75) Defendants misappropriation and use of my trade secrets that can lead to loss of clients and a
loss of revenue constitutes irreparable injury sufficient to warrant the issuance of the
injunctive relief I am seeking. *See Chernoff Diamond & Co. v Fitzmaurice, Inc., 234 AD2d
200, 203 [1st Dept 1996].*

76) Defendants' solicitation of my clients and/or customers is actionable when the information
they are using to solicit my clients is the result of access to confidential information, trade
secrets, confidential and/or privileged information, settlement positions, litigation and
appellate strategies that Defendants acquired by wrongful conduct, such as a taking or
copying of files, data or information, as they have done here. *See Eastern Bus. Systems v.
Specialty Bus. 292 A.D.2d 336 [2d Dept 2002] 739 N.Y.S.2d 177; and Amana Express, Intl.
v. Pier-Air Intl., 211 A.D.2d 606).*

*Fagan v. Lowy et al – October 2007 – Fagan OSC Declaration – Page 13*

Nov 01 2007 1:19PM                                                                                    P.24

77) While there is no generally accepted definition of a trade secret, *"any formula, pattern, device or compilation of information which is used in one's business, and which gives one an opportunity to obtain an advantage over competitors"* is the type of trade secret or information that can and should be protected. *See Ashland Management v. Janien, 82 N.Y.2d 395, 407.*

78) That is exactly what has gone on in this case. In addition to the interception, retention and reading of my mail, Defendants have also gained access to and are using other information that is not available to the public. None of the information belongs to Defendants. All of the information is highly valuable to me, my colleagues and especially to my competitors and/or adversaries. Much of the information took me years to develop, cost millions of dollars and came through my taking of enormous risks to develop and be able to use the information. The Defendants have no right to use it.

79) Innocent clients and I will suffer irreparable harm unless a preliminary injunction is granted.

80) The balancing of equities on this application should be clear and support the granting of the injunction.

81) We are in the midst of appeals, settlement discussions and motion practice and Defendants actions are prejudicing all these efforts.

82) Futher, Defendants have intercepted, retained and opened my mail and/or intercepted voice and/or electronic data and/or have taken other acts to damage my clients and/or have taken other acts to interfere with representation of clients and/or have taken acts to interfere with my ability to perform my responsibilities to adversaries and Courts and/or have otherwise interfered with my clients' cases, my business, my family and me.

---

*Fagan v. Lowy et al – October 2007 – Fagan OSC Declaration – Page 14*

83) The goal appears to have been to steal my business, to discredit me, to breach contracts with me, to cheat me out of fees, to interfere with my business and to obtain a commercial advantage over me.

84) The balancing of the equities favors an injunction that can, if necessary be modified at a later date, depending on the further proofs to be submitted and evidence to be considered.

**NO PRIOR APPLICATION FOR THIS RELIEF MADE IN ANY OTHER COURT**

85) No prior application for the relief sought in this Order to Show Cause has been applied for in this or any other Court.

**CONCLUSION**

86) Innocent clients and I need to be protected from further damages by Defendants.

87) In view of the foregoing, I pray the Court grant my application for a temporary injunction is granted in its entirety.

88) The forgoing statements made by me are true and accurate to the best of my knowledge, information and belief.

Dated:   October 29, 2007            By: _____
         New York, NY                        Edward D. Fagan

                                     _____

State of New York
County of New York

Sworn to before me this
3 0 day of October 2007

                                     RICHARD B. MINOR
                                     Notary Public, State of New York
                                     Reg. No. 04MI6147382
                                     Qualified in New York County
                                     Commission Expires June 5, 2010

Pursuant to UCR 202.7(f), I further state that if I were to give advanced notice of this request for injunction I will suffer greater harm. Defendants would start deleting and erasing files, computer data, destroy documents, secret information for which the injunction is necessary. Also, Defendants would attempt to remove data from disks, computers and hard drives and it would be burdensome and expensive to try to recover that. Some of this has already started in Defendants Lowy's offices. Further the clients are being harrassed every day.

*Fagan v. Lowy et al – October 2007 – Fagan OSC Declaration – Page 15*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | X | |
| IN RE: SKI TRAIN FIRE IN KAPRUN AUSTRIA ON NOVEMBER 11, 2000 | : : | MDL # 1428 (SAS) |
| | X | |
| | X | |
| BLAIMAUER , et al,       Plaintiffs, vs. | : : : | Civil Action # 03–CV–8960 (SAS) |
| OMNIGLOW CORPORATION, et al       Defendants. | : : | |
| | X | |
| | X | |
| GEIER , et al,       Plaintiffs, vs. | : : : | Civil Action # 03–CV–8961 (SAS) |
| OMNIGLOW CORPORATION, et al       Defendants. | : : | |
| | X | |
| | X | |
| MITSUMOTO, et al,       Plaintiffs, vs. | : : : | Civil Action # 06–CV–2811 (SAS) |
| REPUBLIC OF AUSTRIA, et al       Defendants. | : : | |
| | X | |
| | X | |
| MITSUMOTO, et al,       Plaintiffs, vs. | : : : | Civil Action # 8:06–CV–01657–T–23EAJ (Filed in Florida) |
| REPUBLIC OF AUSTRIA, et al       Defendants. | : : | |
| | X | |

## EXECUTIVE SUMMARY OF KAPRUN TRAIN DISASTER CASES

## FOR LITIGATION INVESTORS OR PARTICIPATING LAWYERS (INCLUDING NEW DEVELOPMENTS AS OF SEPTEMBER 2006)

| | | |
|---|---|---|
| Edward D. Fagan Esq. | Robert Hantman Esq. | James Lowy Esq. |
| Law Offices | Bryan Ha Esq. | Florida Law Group |
| 80 Broad Street | Hantman & Associates | 3907 Henderson Blvd |
| 5th Floor | 432 Park Ave. So., 2nd Fl. | 2nd Floor |
| New York, NY  10004 | New York, NY  10016 | Tampa, FL  33629 |
| Tel. (212) 837-7836 | Tel. (212) 684-3933 | Tel. (813) 288-9525 |
| faganlawintl@aim.com | Hantmanrj@aol.com | jameslowy@ |
| | bhanyc@gmail.com | floridalawgroup.com |

*Plaintiffs' Counsel & Plaintiffs' Co-Counsel*

**EXHIBIT L**

From: "Edward D. Fagan" <ed.fagan@global-litigation-partners.com>
Subject: Fagan v. James Lowy, Robert Hantman et al (pending in NY Supreme Court)
Date: November 7, 2007 7:46:56 AM EST
To: HarveyG794@aol.com, DCCoolMom@aol.com
Cc: m.perie@earthlink.net, LIZZIE <elizfagan424@aol.com>

Dear Harvey & Debbie:

I learned yesterday that Michael Perle may be considering entering his appearance for one of the defendants in the above referenced matter.

Please be advised that I consider this action to be a conflict of interest and also adversely impacts and/or prejudices to the outstanding issues between us.

Kindly advise in writing if you have consented to, and waived the conflicts including those related to Mr. Perle's representation of Mr. Lowy or Mr. Hantman, so I can take any steps that I deem necessary to deal with this situation.

Thank you,

Ed

<div align="center">

Edward D. Fagan Esq.

5 Penn Plaza, 23rd Floor, New York, NY 10001

Tel. (646) 378-2225 & Fax (646) 417-5558

Email: ed.fagan@global-litigation-partners.com

</div>

From: "Edward D. Fagan" <ed.fagan@global-litigation-partners.com>
Subject: Fagan v. James Lowy, Robert Hantman et al (pending in NY Supreme Court)
Date: November 7, 2007 7:49:56 AM EST
To: HarveyG794@aol.com, DCCoolMom@aol.com
Cc: m.perle@earthlink.net, LIZZIE <alizfagan424@aol.com>

Dear Harvey & Debbie:

I learned yesterday that Michael Perle may be considering entering his appearance for one of the defendants in the above referenced matter.

Please be advised that I consider this action to be a conflict of interest and also adversely impacts and/or prejudices to the outstanding issues between us.

Kindly advise in writing if you have consented to, and waived the conflicts including those related to Mr. Perle's representation of Mr. Lowy or Mr. Hantman, so I can take any steps that I deem necessary to deal with this situation.

Thank you.

Ed

Edward D. Fagan Esq.

5 Penn Plaza, 23rd Floor, New York, NY 10001

Tel. (646) 376-2225 & Fax (646) 417-5558

Email: ed.fagan@global-litigation-partners.com

**EXHIBIT M**

# EDWARD D. FAGAN ESQ.
Five Penn Plaza, 23rd Floor, New York, NY 10001
Tel. (646) 378-2225, Fax # (646) 417-5558 & Email: faganlawintl@aim.com

# *FAX & EMAIL TRANSMISSION*

TO:        Michael R. Perle Esq  -  Via Email and Fax
Cc:        Harvey Grossman – Via Email and Fax
FROM:    Ed Fagan
RE:        Fagan v. Lowy et al 07-114562 & Alkow et al v. Pearlman et al 07-cv-2285 (GB)
DATE:    November 8, 2007                                     TOTAL # PAGES:  1
================================================================

As a follow up to my prior faxes and emails, please be advised that your statements at the Nov. 6, 2007 hearing before Judge Daniels have caused damage to me, The Kaprun Case, The Alkow Case, the Fagan v. Lowy case, my business, my ex-wife and my family.  I am informed you are about to execute contracts with James Lowy ("Lowy")/International Law Group ("LGL") or retainer agreements with or by which you will represent victims who I used to represent in The Alkow Case.  Your entry of appearance and taking of contracts or retainers in The Alkow Case prejudice my business interests.

Notwithstanding these damages, please note that I **will not object** to your appearance for certain plaintiffs in The Alkow Case. I will honor Judge Daniels' guidance and directions. I will work with you or any lawyer Lowy seeks to have as his new local counsel.  If in fact you enter your appearance in The Alkow Case, I expect you to also honor Judge Daniels' guidance and directions.

However, **I object** to your representation of Lowy in the Fagan v Lowy et al matter in NY State Court.

Your representation of Lowy in relation to his application for admission to the NY Bar is one matter. These cases are entirely different matters.  They impact relationships and interests of Grossman, LGL, my business, my clients, my family, my ex-wife and me.

Your decision to accept Lowy's request to appear in The Alkow Case is something you will be called upon to explain later and in a different forum.  For now, I am simply putting you, Grossman and LGL, on notice that, to the extent Grossman and LGL believe that – prior to Nov. 6, 2007 – Grossman and LGL believe they had any valid claims or liens or security interests against my revenues and/or future fees, I now have further objections to any such claims.


Ed Fagan

PS.    For my records, please provide me with the executed conflicts waivers that you received from
         Grossman, LGL, Lowy and ILG.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
## CONFIDENTIALITY WARNING & NOTICE
The information in this facsimile message and attachments is legally privileged and confidential information intended only for the us of the individual or entity named above. If the reader or recipient is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this facsimile is strictly prohibited. If you have received this facsimile in error, please notify the send immediately by calling us at (646) 378-2225 and thereafter please DESTROY the facsimile message.

**EXHIBIT N**

# EDWARD D. FAGAN ESQ.
Five Penn Plaza, 23rd Floor, New York, NY 10001
Tel. (646) 378-2225, New Fax # (646) 304-6446 (as of 30 Nov. 2007)
Email: ed.fagan@global-litigation-partners.com

# _FAX TRANSMISSION_

**TO:** Harvey Grossman \ (973) 325-2589
The Lions Group /

**Cc:** _____

**FROM:** Ed Fagan

**RE:** Fagan et al v Lowy et al - 07-115473

**DATE:** Dec. 14, 2007                    **TOTAL # PAGES:** 20

With this fax I am sending you a courtesy copy of the above complaint and the factual allegations that relate to you, your firm and Michael Perle. I urge you to consult with Mr. Perle and demand that he stop interfering in the Kaprun Cases, and my representation of people in the Transcontinental cases and my business in general

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CONFIDENTIALITY WARNING & NOTICE

The information in this facsimile message and attachments is legally privileged and confidential information intended only for the us of the individual or entity named above. If the reader or recipient is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this facsimile is strictly prohibited. If you have received this facsimile in error, please notify the send immediately by calling us at (646) 378-2225 and thereafter please DESTROY the facsimile message.

**EXHIBIT O**

# EDWARD D. FAGAN ESQ.

Five Penn Plaza, 23rd Floor, New York, NY 10001
Tel. (646) 378-2225, Fax # (646) 417-5558 & Email: faganlawintl@aim.com

# *FAX & EMAIL TRANSMISSION*

**TO:**   Michael R. Perle Esq - Via Email and Fax (201) 617-5500

**Cc:**   Harvey Grossman Esq. / Lions Group Ltd -- Via Email and Fax (973) 325-2589
James F. Lowy Esq. -- Via Email and Fax (813) 282-0384
Elizabeth Silver-Fagan -- Via Email and Fax

**FROM:**   Ed Fagan

**RE:**   Misc Issues

**DATE:**   November 9, 2007                    TOTAL # PAGES:   1

===================================================================

Kindly advise me if and how you have disclosed to all persons affected by your purported representation of James F. Lowy Esq. or International Law Group, or its/their interests in any action pending in New York State or Federal Court, of the potential conflicts that exist between Harvey Grossman Esq.,The Lions Group Ltd, James Lowy, International Law Group, Edward D. Fagan and Elizabeth Silver-Fagan.

Ed Fagan

*******************************************************************

## CONFIDENTIALITY WARNING & NOTICE

The information in this facsimile message and attachments is legally privileged and confidential information intended only for the us of the individual or entity named above. If the reader or recipient is not the intended recipient, you are hereby notified that any dissemination, distribution, or copy of this facsimile is strictly prohibited. If you have received this facsimile in error, please notify the send immediately by calling us at (646) 378-2225 and thereafter please DESTROY the facsimile message.

**EXHIBIT P**

EF to HSG and MRP 8-18-06 Kaprun - Report on Yesterday's Conference - WE DID GREAT ! ! !.txt
    From: Edward Fagan [thefagangroup@hotmail.com]
    Sent: Friday, August 18, 2006 8:45 AM
    To: m.perle@earthlink.net
    Cc: HarveyG694@aol.com; DGCoolMom@aol.com
    Subject: Kaprun - Report on Yesterday's Conference - WE DID GREAT ! ! !

    Attachments:
    Kaprun_3rd_Revised_Proposed_Pre-Trial_Scheduling__Case_Management_Order.
    doc; Ski_Train_August_10_Order_Of_Reference-1.pdf; Kaprun Presentation
    Aug 2006 Final.doc

Dear Michael:

It was good talking to you and you should know that things are FINALLY GOING GREAT
again in Kaprun.

Everything we wanted to achieve at yesterdays conference we achieved AND MORE.
Those present were the new US team (Ed Fagan, Robert Hantman, Bryan Ha and James
Lowy), Ken Nolan for the American victims, Gordon Haesloop for Omniglow, Brant
Bishop and Robert Gilmore for Siemens AG and Siemens Corp, Paul Rooney for Bosch
Rexroth Corp. and Arti Soni for Bosch Rexroth AG.
Counsel for OE, Verbund-AHP and GBK did not appear.

It was a 1 hour and 30 minute Conference and Oral Argument, during which I defended
the ability to file the Amended Complaints against US companies based on NEW
EVIDENCE, the ability to file the Amended Complaints against the Republic of Austria
and the ability to join the foreign defendants ONCE the Court decided we had
satisfied the exceptions to Sovereign Immunity. It was a very difficult hearing and at
times the Judge became frustrated by some of positions or arguments that each of the
lawyers took. This only reinforced the fact that she HAD to allow us to move
forward because what had made what she kept describing as a "facially appealing
argument" that was NOT before her when she decided to dismiss OE in 2002,
Verbund-AHP and GBK in 2003.

The most important things are that:

- we got permission to file Amended Complaints AGAINST US DEFENDANTS over whom there
is NO QUESTION ABOUT JURISDICTION;

- we got permission to move against the Republic of Austria;

- we got an expedited timetable that is good for us;

- the Judge consolidated and bifurcated the Omniglow, Siemens & Bosch claims from
all the other claims so these claims can go forward separately and fast (she told
the defendants they should be happy that she was giving us permission to file
Amended Complaints because it brings MORE DEFENDANTS and MORE MONEY to the table;
and

- ON HER OWN INITIATIVE SHE APPOINTED HER MAGISTRATE JUDGE THEODORE H. KATZ AS A
SETTLEMENT MASTER. I have found Judge Katz to be incredibly fair and KNOWS this
case and ALL the defendants including OE, Verbund-AHP, GBK and oters very well as he
has handled one or more of the discovery issues against every one of the defendants.
EVERYONE - ALL DEFENDANTS (Omniglow, Siemens, Bosch, Republic of Austria, its
ministires, agencies and other organs, OE, Verbund-AHP, GBK, Westinghouse, WIKA
Instruments, The Bosch Group), all of us as plaintiffs counsel and representatives
of the victims and survivors will be "invited" to participate in REAL SETTLEMENT
DISCUSSIONS.

You know full well what this combination now means in the context of this case and
as security for the funders.

E x 0   # 1

EF to HSG and MRP 8-18-06 Kaprun - Report on Yesterday's Conference - WE DID GREAT ! ! !.txt
With this email, I am sending you a copy of Judge Scheindlin's Order Referring the
Case to Judge Katz for Settlement - look at her handwritten note - "ASAP PLEASE" -
it speaks VOLUMES.

I am also sending the copy of the Proposed Case Managment Order # 3 that explains
what she did in greater detail and we are awaiting her signature on another Order.

Finally, I am sending you copies of MY PRESENTATION that got us to this legal
position.  Enjoy the reading and PLEASE help me with funders.  The Case desperately
needs money so we can finish it and I need money to
survive.   I will call later to see how you can help.  Hantman can help
because his fees will also guarantee the loan but this MUST be done within a matter
of weeks.

It helps us all - and protects the monies HARVEY has put into and has invested in me
and Kaprun.

Talk to you later.

All the best.

Ed Fagan

Express yourself instantly with MSN Messenger! Download today - it's FREE!
http://messenger.msn.click-url.com/go/onm00200471ave/direct/01/

Page 2

From: Edward Fagan [thefagangroup@hotmail.com]
Sent: Friday, August 18, 2006 4:08 PM
To: m.perle@earthlink.net
Cc: DGCoolMom@aol.com; HarveyG794@aol.com
Subject: Fagan v. Fagan FM-07-179-00

Attachments: Judge Convery Letter 18 August 2006.doc

Dear Michael:

Here is a copy of the letter I am sending to Judge Convery. I believe it is absolutely necessary to let him know from me what I think is going on and that I intend to take the appropriate action to respond to this, as outlined in my letter.

Please give me a call if you wish to discuss this and if you wish to join in an application against what Decter and Edry did without notice to any of the other legitimate and known creditors, such as Harvey Grossman and The Lions Group, and which I believe may prejudice the rights of such creditors.

You may reach me via email or on my Cell Phone (973) 568-6441. Thank you.

Ed Fagan

---

Express yourself instantly with MSN Messenger! Download today - it's FREE!
http://messenger.msn.click-url.com/go/onm00200471ave/direct/01/

E + P # 2

——Original Message——
From: thefagangroup@hotmail.com
To: HarveyG794@aol.com; m.perle@earthlink.net
Cc: DGCoolMom@aol.com
Sent: Mon, 28 Aug 2006 9:52 AM
Subject: Kaprun - I URGENTLY NEED $ HELP TO FINISH THIS CASE SUCCESSFULLY

Dear Harvey & Michael:

Here is a copy of what I sent to Judge Katz on Friday. It was to try to help schedule the Settlement Negotiations so we can PUSH the cases to settlement FASTER. It is self explanatory.

I am also working on filing the Amended & New Complaints which have to be filed by Sept. 8, 2006.

PLEASE PLEASE PLEASE - I NEED YOUR HELP IN GETTING THE MONEY OUTLINED IN THE EXECUTIVE SUMMARY I SENT LAST WEEK. AND, ELIZABETH HAS BEEN VERY PATIENT - AND HAS EVEN BEEN FINANCING THE CASE WITH WHATEVER MONEY SHE HAS - BUT SHE CANNOT AND SHOULD NOT HAVE TO DO THIS. I MUST GIVE HER CHUNK OF MONEY IN THE COMING DAYS.

On the one hand things are GREAT in the case. On the other hand, because they are GREAT we need to money to FINISH THEM.

Please get back to me ASAP.

Thanks

Ed

_____
Search from any web page with powerful protection. Get the FREE Windows Live Toolbar Today! http://get.live.com/toolbar/overview

**Check Out the new free AIM(R) Mail** -- 2 GB of storage and i

#) 3

**From:** faganlawintl@aim.com
**Sent:** Wednesday, August 30, 2006 10:07 AM
**To:** HarveyG794@aol.com; m.perle@earthlink.net
**Cc:** DGCoolMom@aol.com; thefagangroup@hotmail.com
**Subject:** Re: Kaprun - I URGENTLY NEED $ HELP TO FINISH THIS CASE
SUCCESSFULLY

**Attachments:** 30 August 2006 Letter Judge Katz Re Settlement.doc; Kaprun_-
_AJL_letter_to_Mag._Katz_re_Fagan's_proposals_.pdf
Dear Harvey & Michael:

On the one hand things are GREAT - we are getting EVERYTHING we asked for from the Two
Kaprun Judges. A copy of my most recent letter to Judge Katz is attached. We have discovered
NEW US Defendants - including Westinghouse - with deep pockets and DIRECT involvement.
AND EVERYONE IS SMELLING MONEY COMING ! ! !

On the other hand, things are HORRIBLE with the money I need to survive and to prosecute the
case. Hantman did NOT do what he said he was going to do. He did not provide the monies, he
has not provided the legal work. He is leaving it to me to do EVERYTHING. I am doing
everything and I am achieving INCREDIBLE results for all our benefits but we are at a VERY
BAD PLACE NOW. My PHONE IS OFF because I do NOT have money to turn it back on. I
cannot afford to waste money to travel into NYC to work on the case because I am conserving
EVERY PENNY. Worst of all, I cannot afford to pay Elizabeth the money that she and MY
children need to survive, let alone the back monies that are owed to her and them. It is ONLY
out of her generosity, that I have been able to stay alive and work on the cases.

We are back where we were in 2001 - with a Settlement and attorneys fees coming BUT NO
MONEY TO LIVE ON AND NO MONEY TO PUSH THE CASES or GET THE OTHER
MONIES IN ! ! !

I RESURRECTED this case. I made these cases STRONGER. I brought in new clients. I got
the Judges to give us almost everything we asked for in the past 6 months. And, all of this
brought us to this point. These claims WILL BE SETTLED - I am principal counsel and I WILL
GET the Lions Share, no pun - or maybe - pun intended. This helps us ALL - including you
Harvey. It will be another few big chunks if not payment in full. The cases are THAT big and I
dont have to share ANY significant fees for the existing claims of close to 1000 people and will
get between 1/3 - 40 % of the new cases for new client plaintiffs about to be filed next week .

BUT - AND THE BUT IS HUGE - I need $50,000 to get through next month - when we have
our first settlement meeting. The $50,000 can be paid in installments but it is essential that I
have it. The money goes to (i) keep me alive, (ii) file, translate and serve the Amended & New
Complaints, (iii) take depositions of certain witnesses and experts, (iv) get Supplemental Experts
Affidavits nailing the hydraulic and electrical companies. Most importantly, the money will help
me get an additional $ 100 - 150,000 from other funders who we trying to get more money from
SO WE CAN GET TO A SETTLEMENT THIS YEAR.



From: faganlawintl@aim.com
Sent: Wednesday, August 30, 2006 4:49 PM
To: HarveyG794@aol.com; m.perle@earthlink.net; dgcoolmom@aol.com
Subject: Fwd: Kaprun - Upcoming Settlement Discussions NEED DATES & AVAILABILITY FROM YOU ALL
TO ADVISE THE COURT

Harvey & Michael:

We are getting there BUT I NEED THE MONEY I told you about.

PLEASE RESPOND.

Ed


-----Original Message-----
From: faganlawintl@aim.com
To: aliederman@morrisonmahoney.com;  ASoni@morrisonmahoney.com;  bbishop@kirkland.com;
AvonWaldow@ReedSmith.com;  bhanyc@gmail.com;  fblock@kirkland.com;  Hantmanrj@aol.com;
JRice@NRMLAW.com; RGilmore@kirkland.com; rswift@kohnswift.com; PRooney@ReedSmith.com
Cc: info@greiter.lawfirm.com; kanzlei@hh-law.at; office@hinterwirth-neureiter.at; kigawa@kc4.so-net.ne.jp;
Dr.Gerhard@podovsovnik.com; ulrich@dr-schwab.at
Sent: Wed, 30 Aug 2006 4:46 PM
Subject: Re: Kaprun - Upcoming Settlement Discussions NEED DATES & AVAILABILITY FROM YOU ALL
TO ADVISE THE COURT


Dear All:

As per my letter this morning, I have contacted Judge Katz's chambers in an effort to try to find dates and time
that are convenient for the Court and for us to start the Settlement Negotiations.

The Judge's Courtroom Clerk has informed me that the Judge can give us 2 sets of back to back days. The
dates that are most convenient for the Court are during the weeks of October 2 - 6th, 2006 (but the Court has
something else scheduled for October 4th at 10 am - the rest of that day is free) and the week of November
6 - 10.

Please note that October 2nd is Yom Kippur and many of the Jewish lawyers involved in this case - myself
included will NOT be able to have that as the 1st of the two days.

The Court would give us the end of the first day and then we would come back the next day on these two
sessions.

Please advise me by return email by the end of the day tomorrow of your availability the weeks of October 3rd
- 6th and November 6 - 10 so that I can report these dates back to the Court. This way, hopefully by the end
of the day tomorrow or Friday at the earliest, the Court can fix these dates.

Your anticipated and prompt attention in this regard will be appreciated.

Ed Fagan


-------------------------------------------------------------------------
Check Out the new free AIM(R) Mail -- 2 GB of storage and industry-leading spam and email virus protection.

**From:** faganlawintl@aim.com
**Sent:** Wednesday, August 30, 2006 8:13 PM
**To:** HarveyG794@aol.com; m.perle@earthlink.net
**Cc:** dgcoolmom@aol.com
**Subject:** Fwd: Case management order

**Attachments:** MDL_1428_8_30_06_ORDER.pdf
Harvey & Michael:

We JUST got the order and it is HUGE for us. It has EVERYTHING we wanted her to include.

We are BACK like in the old days where we are WINNING everything.

We have potential days for Settlement Negotiations in October AND November and a Judge COMMITTED to settling.

We have the first defendant - Omniglow - that has TOLD us they want to settle with the European victim and survivor families.

We have THE JUDGE allowing us to move forward against the Republic, its ministries, its companies AND the FOREIGN DEFENDANTS.

We have OUR SCHEDULE.

Most of all we have the chance for the Kaprun victims to FINALLY get the justice that has eluded them these past years. It is ALL coming to a head and we ARE going to make it.

Enjoy the reading and PLEASE HELP WITH INTERIM MONEY OR ALL THIS IS MEANINGLESS.

Ed

**Check Out the new free AIM(R) Mail** -- 2 GB of storage and industry-leading spam and email virus protection.

From: faganlawintl@aim.com
Sent: Monday, September 11, 2006 9:49 AM
To: HarveyG794@aol.com; m.perle@earthlink.net
Subject: Fagan

Dear Harvey & Michael:

PLEASE respond to my emails and calls and help so we can finish the Kaprun case properly and quickly.

Ed

_____
Check Out the new free AIM(R) Mail -- 2 GB of storage and industry-leading spam and email virus
protection.

# 7

**Michael R Perle**

| | |
|---|---|
| **From:** | faganlawintl@aim.com |
| **Sent:** | Friday, September 15, 2006 2:46 PM |
| **To:** | m.perle@earthlink.net |
| **Subject:** | Re: Kaprun - Updated Executive Summary for Investors |

Thank you for this information and for the help. I hope the materials were also helpful and there are LOTS more to support the investment.

Ed


-----Original Message-----
From: m.perle@earthlink.net
To: faganlawintl@aim.com
Sent: Fri, 15 Sep 2006 11:18 AM
Subject: RE: Kaprun - Updated Executive Summary for Investors

Ed,

I may have a favorable response from potential funder today or Monday. I will contact you as soon as I hear anything meaningful.


From: faganlawintl@aim.com [mailto:faganlawintl@aim.com]
Sent: Thursday, September 14, 2006 10:48 AM
To: HarveyG794@aol.com; m.perle@earthlink.net
Subject: Kaprun - Updated Executive Summary for Investors

Dear Harvey & Michael:

Here is a Revised Executive Summary of the Potential Investment in the Kaprun Case.

I set it up in such a way that in relatively few pages, people can get a picture of what we are doing and then we can provide them with the additional bigger book we have with Court Orders, New Complaints, etc.

Please get this out to the potential funders you know. We REALLY NEED the money to help finish the case and to protect the investment we all have in it. If you set up the meetings, Hantman, Lowy and I will attend, but you guys should PLEASE make the initial contact so we know that the people we are talking to are interested and need to discuss details.

Please try to set up at least 3 meetings with potential funders between now and the end of the month.

Please get back to me today by phone to confirm that you have this and will start working on getting these funders lined up.

I am still in Tampa through mid-day but am travelling to NJ to be with my kids overnight and then to be in NY tomorrow to work on Kaprun and then I leave for Europe tomorrow night.



1/16/2008

Lets be in touch.

Thanks.

Ed

PS  I am going to "drop" in on Judge Katz's chambers tomorrow to give them the Courtesy copies of the new complaints - it is really just a way to be able to say "HEH, WHEN IS THE 1st SETTLEMENT MEETING"?

---

**Check Out the new free AIM(R) Mail** -- 2 GB of storage and industry-leading spam and email virus protection.

---

**Check Out the new free AIM(R) Mail** -- 2 GB of storage and industry-leading spam and email virus protection.

1/16/2008

From: faganlawintl@aim.com
Sent: Monday, September 25, 2006 12:56 PM
To: HarveyG794@aol.com; m.perle@earthlink.net
Subject: Kaprun - Budget and Settlement Preparations - Part 1

Attachments: Kaprun Budget Sept 2006 to Mar 2007.xls; Kaprun Analysis of Potential Recoveries per Defendant Based on NY & Florida Standards.doc; Kaprun Analysis Recoveries in NY and Florida Cases Relevant to Settlement Posture in US and Austria.doc; Law.com_ Judge Finds Three Minutes of Suffering in Fatal Fire...pdf; Case Report for Yaron Kaplan v. Shlomo, Uzi, and Rachel Einy ...pdf

Harvey & Mike:

Hope you all had a nice Rosh Hashanah with your families and I wish you and us all a Happy, Healthy and Successful New Year.

Now to business - PLEASE PLEASE PLEASE HELP. Here is what we need and here is the support for it.

No joke - I am in trouble of being able to live day to day and of being able to make it to the end. The end can and should be great and here is why.

With this email, I am providing you with a Budget that I worked out for the next 7 months. These are expense items that are absolutely necessary. You will note that the monies that were SUPPOSED to be raised when Robert and I first got together included monies that I needed to SURVIVE because I put everything I had into the case are NOT included in this budget. The budget is what the essential team members need to be able to do the work and to finish the case.

This is a REAL BUDGET coming from someone who knows budgets in cases like this.

You might think that I am CRAZY for believing we should spend this kind of money. Well I WOULD be crazy if I did NOT believe we need to spend this kind of money. The FACTS are on our side. The LAW is on our side. The JUDGES seem to be on our side. The DAMAGE awards in NY and Florida Court are on our side. The risks are minimal if non existent. The amount of money need will be recovered and paid back FIRST.

With this email you are getting 4 groups of documents, all of which flow from the Budget and the work we need to do in the coming weeks, months.

# 1 - The Budget - we MUST get this and I suggest that you Robert and Eric give this your most urgent attention.

# 2 - Analysis of Potential Settlement Amounts from Defendants in Both Groupings. Note: Even if my numbers are 20%, 30%, 40%, 50% 60 % or even 70% too high they STILL provide us with a HUGE Settlement Fund from which we can help meet the goals of our clients.

# 3 - Summary Selection of Some Relevant and Instructive Cases in Florida and NY - showing the Settlement Numbers I am projecting are REAL. One of the most important cases is the Hackert v. First Alert Inc case in NY Federal Court. It shows the standard and amounts Courts will allow based upon length and conditions of the suffering of the decedent and the injuries suffered by the family survivors. This is a VERY IMPORTANT case for us.

# 4 - Copies of the cases themselves - read and enjoy them. Note - The Florida Cases come with Part 2 of this email.

DO NOT GIVE THESE MATERIALS TO ANYONE ELSE WITHOUT DISCUSSING IT WITH ME FIRST.

PLEASE HELP.

#9

Thanks.

Ed

_____

Check Out the new free AIM(R) Mail -- 2 GB of storage and industry-leading spam and email virus protection.

From: faganlawintl@aim.com
Sent: Monday, September 25, 2006 12:58 PM
To: HarveyG794@aol.com; m.perle@earthlink.net
Cc: faganlawintl@aim.com
Subject: Kaprun - Budget and Settlement Preparations - Part 2

Attachments: Case Report for Palank v. CSX Transportation, Inc.,Circuit Co...pdf; Case Report for Pam
Grunow, et al. v. Valor Corporation,Circu...pdf; Case Report for Jerry Carter v. Gulf Power Company,First
Circ...pdf; Case Report for Martha Serrano and Jorge Cabrera, individuall...pdf; Case Report for Katherin
Vaughn, individually and as the admi...pdf; Case Report for Family and Estate of Steve Ross v. Robinson
A...pdf; Case Report for Gerri Crocker v. Ed Emmons Steel Erectors Inc...pdf; Case Report for Families
and Estates of Shawn King and Charle...pdf


Harvey & Mike:


Here are the Florida Cases.  PLEASE PLEASE PLEASE HELP.

Ed


_____
Check Out the new free AIM(R) Mail -- 2 GB of storage and industry-leading spam and email virus
protection.

**From:** faganlawintl@aim.com
**Sent:** Wednesday, September 27, 2006 2:31 PM
**To:** HarveyG794@aol.com; m.perle@earthlink.net
Harvey and Mike:

I have been calling for two days and I had hoped to hear from one of you.  Before that I sent you emails after emails and got nothing.

My situation is VERY SERIOUS.  I am worse off than I was in March 2006, when you sent me to Robert Hantman and we all know how that ended.

Let me see if I can put things into proper perspective.

If I do NOT get the money that is needed to finish Kaprun and to survive, I think you should consider whatever monies as you believe I owe you as LOST.

Ed

---

**Check Out the new free AIM(R) Mail** -- 2 GB of storage and industry-leading spam and email virus protection.

#10

**Michael R Perle**

| | |
|---|---|
| **From:** | faganlawintl@aim.com |
| **Sent:** | Thursday, September 28, 2006 9:31 AM |
| **To:** | HarveyG794@aol.com; m.perle@earthlink.net |
| **Subject:** | Kaprun - Preparation for Settlement and Trials |
| **Attachments:** | Hackert Case 2006 Conscious Pain and Suffering.pdf; Mono v Peter Pan 1998 Pain and Suffering Case Judge Scheindlin.pdf; Hollie v Korean Air Lines 1995 2nd Circuit Pain and Suffering and other Families Suffering.pdf; Cannellas v Lentz SDNY 2006 SoL and Alleged Lack of Standing Defendants Lose.pdf; Pinckert v Trucklease Corporation SDNY 2006 Pain and Suffering.pdf; Shatkin v McDonnel Douglas 1984 2nd Cir Standard on Conscious Pain and Suffering.pdf |

Dear Harvey & Mike:

It was good talking to you Harvey yesterday and I PRAY you and Mike can find a way to help with $23,000 per month for the next two months. You are absolutely right Harvey that a Chapter 11 WOULD weaken the positions of persons who ultimately should be paid from the fees I earn in Kaprun. Which is why I NEED this help and I NEED it NOW ! ! !  I believe it will ONLY be you or Mike who can help now. Hantman failed completely on this front. It does not mean that he will not be useful and helpful to us as far as guaranteeing repayment of these and other monies put in to the case. He will but realistically I cannot rely upon him for the things we thought he could or would or even committed to do regarding money for me/the case.

I did NOT put the number out of thin air. The number is so I can survive to get in a European investor who I have been working with - remember the budget I sent you - OR so I can get a written settlement offer from one of the defendants that we can use and KNOW we are going to get the money.

For your purposes, the $23,000 per month is broken down as follows:

# 1 - $ 6,500 for Elizabeth and the kids.

# 2 - $ 3,500 for me to be able to be in NJ/NY to push the cases.

# 3 - $ 4,000 per month for the expert to keep him happy and to get the reports needed to keep ALL the defendants in the cases.

# 4 - $ 4,000 per month for depositions (Reporters and witness fees) for legal standing and damages experts that we are taking in October and November and which are already scheduled for Vienna, South Carolina and maybe Germany or Japan.

# 5 - $ 2,000 per month for an economist to give damage projections;

# 6 - $ 1,500 for travel costs to and from Austria for meetings

# 7 - $ 1,000 office and support staff costs (copying, mails, fed ex etc to complete discovery and prepare for Settlement Discussions).

# 8 - $ 500 per month miscellaneous.

You can write the checks if you like - frankly I do NOT want the money - I just want to know that we can finish the case since we are SO CLOSE and can ALL end up whole IF we finish it

-----Original Message-----
From: faganlawintl@aim.com
To: HarveyG794@aol.com; m.perle@earthlink.net
Sent: Thu, 28 Sep 2006 6:35 AM
Subject: Kaprun - Preparation for Settlement and Trial

Harvey and Mike:

As a follow up, here are the notices that are going out. I am NOT sitting here twiddling my thumbs. I am working my - _ _ _ - off but *"To finish the race, this race car needs GAS ! ! !"*

It is not how much we will get - we will get plenty. It is GETTING to the finish line to collect the prize money.

To quote the inimitable Jerry McGuire *"Help me, help you"* so I can scream at the defendants *"Show Me The Money"*!

Ed

#12

**From:** faganlawintl@alm.com
**Sent:** Friday, September 29, 2006 2:00 PM
**To:** HarveyG794@aol.com; m.perle@earthlink.net
**Subject:** Re: Kaprun - HELP

**Attachments:** Kaprun Omniglow 30b6 Dep Notice.doc; Kaprun Omniglow Dep Notice Earl Cranor.doc; Kaprun Omniglow Dep Notice Richard Rosen.doc; Kaprun Omniglow Supplemental Document Requests.doc; Exhibit to Supplemental Deposition Notice Omniglow.doc
Harvey & Mike:

I spoke to Harvey yesterday and HOPED to hear something today. I KNOW it is before the holidays but I CANNOT last much longer and I am VERY WORRIED that you may NEVER see any more money from me.

The facts are simple, without your or one of your colleagues IMMEDIATE infusion of cash, I will NOT be able to take the Court Ordered depositions, I will NOT be able to afford to get the experts' report we need to keep the defendants in the case, and I will NOT be able to afford to prepare for the Settlement Conference. AND my family has NO MONEY.

So while on the one hand things are GREAT with the case - NO ONE KNOWS WE HAVE NO MONEY. And, therefore in a few days, UNLESS I GET YOUR HELP - when this becomes apparent whatever monies you - Harvey - think you may be entitled to - you should write them off !

PLEASE HELP me and PLEASE HELP protect your investment.

Ed

PS Here are Supplemental Discovery Demands I just served BUT CANNOT afford to finish.

#13

file:///C:/WP/Lowy/Fagan%20Issues/Pre2007%20Fagan%20E%20Ma...

**From:** faganlawintl@aim.com
**Sent:** Friday, September 29, 2006 2:06 PM
**To:** HarveyG794@aol.com; m.perle@earthlink.net
**Subject:** Re: Kaprun - Supplemental Depositions Notices & Document Requests of Omniglow
Harvey & Mike:

Here is an example of what I will NOT be able to do - then the cases fall apart and your investment is in the toilet.
PLEASE get me the $23,000 per month I told you is the minimum I need to get by and to be able to get more
money to sustain the cases, me and my family.

Ed


-----Original Message-----
From: faganlawintl@aim.com
To: egordon.haesloop@bmbmlaw.com
Cc: PRooney@ReedSmith.com; AvonWaldow@ReedSmith.com; bbishop@kirkland.com;
RGilmore@kirkland.com; aliederm@morrisonmahoney.com; asoni@morrisonmahoney.com;
JRice@NRMLAW.com; rswift@kohnswift.com; kpn@ny.speiserkrause.com; rsparklin@gibbsfirm.com;
Bennerbj@aol.com; Hantmanrj@aol.com; jameslowy@floridalawgroup.com; bhanyc@gmail.com
Sent: Fri, 29 Sep 2006 10:20 AM
Subject: Kaprun - Supplemental Depositions Notices & Document Requests of Omniglow

Gordon:

As we discussed earlier today, here are the Supplemental Deposition Notices and Document Requests.

They were designed to follow up on what I believe were not fully responsive answers to the originally served
requests and the fact that you had declined to produce your clients for depositions. As I have repeatedly stated,
the discovery which we are seeking from you and your client is not and will not duplicative of whatever was elicited
during the depositions that were conducted by former Class Counsel and as to which I had no notice and no
opportunity to attend and question your witnesses.

We can talk about this on Tuesday, when we are scheduled to speak about the upcoming depositions of your
expert (Dr. Andreas Kletecka) and our experts on standing. As I mentioned, over the weekend I will be in touch
with Dr. Greiter, Dr. Hinterwirth, Dr. Podovsovnik, Dr. Schwab, Dr. Hasslacher to finalize the schedule for
depositions between Wednesday, Thursday, Friday and Saturday (18 - 21 Oct). As I mentioned, we can do 2
depositions in Salzburg, then 1 or 2 in Vienna and then one in Munich. I will ask Dr. Schwab about his availability
to come to Salzburg on the 18th. I will ask Dr. Greiter whether Vienna or Salzburg or Munich are most convenient
for him. I will ask Dr. Hasslacher if he can come to Vienna. You did NOT tell me what the fee is for my being able
to depose Dr. Kletecka, please let me know his daily rate so I can organize this payment. Also, I will ask our
experts what their daily rate is so you can organize a check for their payment.

Have a nice weekend and we will talk on Tuesday.

Ed Fagan

**Check Out the new free AIM(R) Mail** -- 2 GB of storage and industry-leading spam and email virus protection.

#14

From: faganlawintl@aim.com
Sent: Friday, September 29, 2006 2:09 PM
To: HarveyG794@aol.com; m.perle@earthlink.net
Subject: Re: Kaprun - MD # 1428 - Motion to Transfer Florida Case to SDNY

Harvey & Mike:

I CAN SETTLE THIS but I need the $23,000 in October and $23,000 in November to be able to do this.

I have the evidence against these guys BUT I need to have the money to finish the damn case for us ALL.

PLEASE HELP me and PLEASE HELP yourselves.

Ed

#15

## Michael R Perle

| | |
|---|---|
| **From:** | faganlawintl@aim.com |
| **Sent:** | Wednesday, October 04, 2006 5:23 AM |
| **To:** | HarveyG794@aol.com; m.perle@earthlink.net |
| **Subject:** | Kaprun |
| **Attachments:** | Amended Complaint 29 Sept 2006 Final.pdf; Amended Summonses Bosch 2006.pdf; Amended Summonses HYDAC Oct 2006.pdf; Amended Summonses Siemens Oct 2006.pdf; Amended Summonses WIKA Oct 2006.pdf |

Dear Harvey and Mike:

Under separate emails, I will send you copies of recent reports to the Cooperating Lawyers in the case and copies of documents sent to the Court.

In short, the case is going GREAT.

The Florida case has been transferred to NY. Discovery is started. We have DEEP pocket defendants. We have upcoming Settlement Negotiations. I am pushing the claims very fast and the claims WILL start to settle in 90 - 120 days.

But, the money issue is HORRIBLE.

I cannot impress upon you enough the seriousness of the situation. Your investment is at risk and if I do NOT get the money I need to finish the case and to survive, you should consider your investment lost.

As for your discussing further investment from Hantman's guy, I believe that is a serious mistake. What happened to the guys that Mike told me he was getting in touch with? What happened to the guys Mike said he anticipated getting a favorable response from weeks ago?

You have much to protect and it is such a little amount that I am asking for. Please do NOT fall into a false sense of security that I will simple be able to survive and that I can get the money from somewhere else and that in the end, you will not have to put in more money and in the end you will still get whatever it is that you claim you are owed.

I MUST get this money by the end of this week. There are Court Ordered depositions in 10 days and there are many other things that need to be done and because Hantman failed to do his job to get more money I am behind in personal and professional financial obligations and these have already caused problems and things will only get worse.

Despite ALL the garbage, I have done wonders with this case and I have brought it to a point where it WILL be settled. But to do that I MUST survive for the next 90 - 120 days. I need $23,000 per month from you - or whomever you can find. I have sold off some of my interests to secure the expert - that does not reduce the amount needed, it only allows the money to be freed up to go to take care of my professional and personal expenses. I am trying to find money from other places but your help is needed. PLEASE confirm that you will get this to me by Friday. Thanks.

Ed

#16

**Check Out the new free AIM(R) Mail** -- 2 GB of storage and industry-leading spam and email virus protection.

**Michael R Perle**

| | |
|---|---|
| **From:** | faganlawintl@aim.com |
| **Sent:** | Wednesday, October 04, 2006 5:34 AM |
| **To:** | Hantmanrj@aol.com |
| **Cc:** | jameslowy@floridalawgroup.com; eric@leavergrp.com; HarveyG794@aol.com; m.perle@earthlink.net |

**Subject:** Fwd: Kaprun - Funding - URGENT - TIME SENSITIVE from rjh

Robert:

Please respond to this email.

And, please confirm that the Letters Rogatory were sent to the US State Department yesterday.

Please note that have raised money myself to pay the experts. That is MY contribution to the remaining $250,000 that is needed.

I am going to Germany this weekend to work on Kaprun and other cases, to prepare witnesses for upcoming deposition and to meet with potential investors.

Kindly advise in writing by return email that you will be putting in your $23-25,000 per month assessment/ contribution/share for the next 3 - 4 months either from your own money or by getting it from someone else *(not Jim Lowy who is already picking up some of the slack that resulted from the delay in getting in other monies)*. You can get it by working with Harvey or Mike if you like but just get it. The combination of all the money makes it possible for us to do the case properly, to have the necessary experts, to be able to pay the bills and for the core team members to be able to function properly.

Thanks.

Ed

-----Original Message-----
From: faganlawintl@aim.com
To: HANTMANRJ@aol.com; jameslowy@floridalawgroup.com
Cc: eric@leavergrp.com
Sent: Mon, 2 Oct 2006 7:20 AM
Subject: Re: Kaprun - Funding - URGENT - TIME SENSITIVE from rjh

Robert:

First of all - HAPPY NEW YEAR and have an EASY YOM KIPPUR.

Second of all, I find it disappointing that you would send such an email suggesting that you have no obligations, that you tried to address this in prior emails (which you suggest were not responded to) and that you are apparently waiting to get the money until after you have an agreement in place with me.

If there was an *"earlier email in which you state that neither Eric or I have any obligation etc"* and requested more information from me before you were going to go out and raise money, I dont know about it. Please send it again. The obligations between us are secondary to the obligations

4 17

to the Kaprun victim and survivor families.   Your primary obligation is to the named plaintiffs for whom you entered an appearance.

I am not interested in going over the past. What was done was done. What was not done was not done and it is documented.   The only real issue is whether or not you are going to get all or a portion of monies that we need. Not Jim, not me, not Harvey, not Bernd but you.  And, that should NOW be easier than ever.  Look at what we have. Look at the new cases. Look at the Orders.  All we are talking about is $250-300,000 for a case that is going to be over in a few months and the investors will get their money back FIRST - GUARANTEED ! ! ! !  I pray you see that as clearly as do others.

So, lets focus on certain objective issues - What "prospective fund raiser" are you talking to?  Who is he/she or they?  What did you forward he/her/them?  What did you offer him, her or them? When is the meeting with him/her or them?

The things that person you say you are talking to will need are the same things that Harvey & Mike will need and that Bernd's people will need etc.

As for you and Eric - I will be happy to sit and negotiate with you two to discuss an agreement with each of you.  However, there is really no reason to talk unless there is money on the table to get this finished properly.

You - as a NY lawyer in this case - understand that.  If the work that we have to do is not done and Court Ordered discovery is not taken because we did not have the money to pay for these things, I will not be the only one to take heat.

We simply need to raise the money that was discussed and committed to in April and then we can enter into any reasonable agreement.

On my front, I am pushing Harvey Grossman and Michael Perle to find someone to put money in and Bernd is working in Germany to try to find someone and he is trying to set up an appointment with 2 separate groups so that he and I can meet them later this week.   Jim put HIS MONEY IN and is going to try to find someone in Florida.

This is NOT hard and no one of us has to come up with it all.  If you raise $20-25,000 / mo for the next 3 months and I get Harvey & Mike to find someone for a similar amount and Bernd and I get someone for a similar amount we HAVE what we need . PLEASE GET THIS DONE.  And if Jim is able to come up with any additional money that is great.

Hell, we DONT need it all now but we DO NEED $50,000 NOW and another $50,000 in a month ! ! !  I am VERY conservative about monies and I know how to work on a shoe string budget as you do too. But we need to do this and the victims, survivors, your colleagues and I are counting on you bringing in some or all of this money.

PLEASE DO WHAT YOU DO SO WELL - BRING IN THE FUNDER/INVESTOR. I WILL CONTINUE TO PUSH ON ALL FRONTS and I WILL KEEP PUSHING THE LITIGATION.

Ed

PS - WHAT IS THE STATUS OF THE LETTERS ROGATORY - DID THEY GO OUT ON FRIDAY OR NOT? IF NOT, WHEN WILL THEY GO OUT?

-----Original Message-----
From: HANTMANRJ@aol.com
To: faganlawintl@aim.com; jameslowy@floridalawgroup.com
Cc: eric@leavergrp.com

Sent: Sun, 1 Oct 2006 11:53 PM
Subject: Re: Kaprun - Funding - URGENT - TIME SENSITIVE from rjh

While I will try to help raise funds -- per my earlier e mail-neither Eric or I have any obligation to do so and are not in a position to do more than what we have done and we are still waiting for you to send us confirmation of what agreement we have with you. I have forwarded certain information to a prospective fund raiser and am hoping to meet with him this week. I will keep you and Jim posted. regards rjh


**Robert J. Hantman, Esq.**
Hantman & Associates
Member, NY, NJ, Fla., and Pa. Bars
432 Park Ave South - 2nd FL.
New York, New York 10016-8013
Hantmanrj@aol.com
Office: 212. 684.3933 Fax: 212. 684-0920
www.Hantmanlaw.com

Litigation, Entertainment, Fashion, Film, Music, Intellectual Property, Copyright, Trademark, Immigration, Criminal, Corporate, Real Estate, International law, Mergers & Acquisitions, Matrimonial, Arbitration, Appeals.

---

**Check Out the new free AIM(R) Mail** -- 2 GB of storage and industry-leading spam and email virus protection.

From: faganlawintl@aim.com
Sent: Thursday, October 12, 2006 6:54 PM
To: HarveyG794@aol.com; m.perle@earthlink.net
Subject: Fwd: Kaprun - Status Report - Again Good News - CONFIDENTIAL NOT TO BE DISCLOSED
TO PERSONS OUTSIDE OUR GROUP

Attachments: 12 October 2006 Report to Cooperating Counsel.doc; 3 Oct 2006 Letter Judge Scheindlin
Successor Liability Letter.pdf; 3 Oct 2006 Letter Judge Scheindlin Summonses.pdf; roony.pdf; Amended
Complaint 29 Sept 2006 Final.pdf; Kaprun Proposed Pre-Trial, Scheduling & Case Management Order #
4.doc

Dear Harvey & Mike:

As you can see I have done INCREDIBLE things - almost inspite of all the problems caused by the person
to whom you sent me.

Bottom line is that I keep calling and get NO RETURN PHONE CALL. I have tried to work with you, I have
tried to explain the seriousness of the situation but it is as if you seem to believe that even if you do
nothing to help fix the situation that you will get paid. I would NOT assume that if I were you.

I am literally at the end of my rope. The case is going great BUT you are doing nothing to help protect
YOUR OWN INVESTMENT - whatever that is.

It is NOT fair that I should have to suffer with ALL these problems because the guy that I was directed too
by YOU Mike (and with whom you continue to try to work on this case) has caused and continues to cause
me so many problems by first not putting in the monies he was supposed to and then by NOT providing
the accounting he was supposed to provide and finally by not doing work that is need in the case.

If you want to protect your ability to get paid back WHATEVER monies you may thing I owe you, I suggest
you return my calls and organize the money I need to finish the case and to survive. Otherwise, you can
assume that you have NO FURTHER claim to any monies I may generate from Kaprun.

You can also assume that because of the enormous pressure, I may have to file a Chapter 11 (which
would NOT be good for anyone) just to protect the case, my business and my family. I have tried to avoid
that but your failure to cooperate with me is leaving me fewer and fewer oogtions.

Your UCC filing at this point is probably worthless.

I am very sorry to have had to write this down. I have called, left messages, tried to tell you of the good
things on the one hand and the hard things on the other hand. I have received NOTHING back. No
promised call or follow through from Harvey or from you Mike.

Please contact me urgently and advise me how you intend to help fix this and help protect your
investment. I cannot be responsible for protecting it any longer.

I need the money I told you about to survive and to finish Kaprun.    It is in your best interest to help me not
ignore me.

Ed

EXP, #18

From: faganlawintl@aim.com
Sent: Friday, October 13, 2006 10:33 AM
To: HarveyG794@aol.com; m.perle@earthlink.net
Subject: URGENT - Kaprun

Harvey & Mike:

As a follow up to yesterday, let me see if I can put things into perspective. I have COURT ORDERED depositions this coming week in Salzburg, Vienna and Munich. As I sit here today, (i) I do NOT have the money to pay the experts who are supposed to be deposed, (ii) I do NOT have the money to pay the Court reporter, (iii) I do NOT have money for hotels, travel or food, (iv) I do NOT have the money to do the things I have to do to keep the case going, (v) I do NOT have the money to get the experts needed to prepare the submission that is due to Judge Katz on 24 October to try to settle the case, and (vi) most importantly I do NOT have the money to maintain my family.

With that as a back drop, how can you possibly believe that your UCC filing is going to save me or you or anybody or that you would be entitled to re-payment of any monies given all that has happened in the last 6 months?

Things are GREAT on the one hand but DISASTEROUS on the other hand. I CAN settle this case (or at least one of the claims with one of the defendants) BEFORE the end of the year. BUT I NEED that $55,000 per month to make it.

PLEASE DO NOT IGNORE THIS ANYMORE and PLEASE CALL ME so we can find a way to fix this.

Ed

-----------------------------------------------------------------------------------

Check Out the new free AIM(R) Mail -- 2 GB of storage and industry-leading spam and email virus protection.

#19

**Michael R Perle**

---

**From:** Michael R perle [m.perle@earthlink.net]
**Sent:** Tuesday, October 24, 2006 5:43 PM
**To:** Hantman, Robert J.
**Subject:** FW: Kaprun - Finances

**From:** faganlawintl@aim.com [mailto:faganlawintl@aim.com]
**Sent:** Monday, October 23, 2006 5:50 AM
**To:** HarveyG794@aol.com; m.perle@earthlink.net
**Subject:** Kaprun - Finances

Dear Harvey & Mike:

I am on my way back to the US. I just completed a very big week with depositions but I CANNOT get the transcripts because we DONT have the money.

I NEED that additional $ 5,500 - $7,500 per month for October, November and December.

I have heard and received NOTHING from Hantman. I hope you fixed it otherwise there could be serious consequences for us all.

We MUST talk tomorrow to find a way to fix this. I CANNOT stall any longer. And, it is NOT fair that the people who SHOULD be contributing are sitting back and are NOT helping with the finances or the work and are just waiting to see if I can pull it off, if so, they think they will be able to recover whatever they claim to be their investment or their secured positions or be paid for services. The situations have drastically changed and such attitudes are prejudicial to the interests of others and to the case.

I look forward to finding a way to resolving what should be a MINOR issue.

Ed

#20

# Michael R Perle

**From:** faganlawintl@aim.com
**Sent:** Monday, October 30, 2006 9:14 AM
**To:** HarveyG794@aol.com; m.perle@earthlink.net
**Subject:** Kaprun - URGENT

Dear Harvey & Mike:

I waited for a return phone call from last week and got none. I tried calling and left multiple messages and got no return phone call.

I do NOT understand why it is that I am not getting help to survive and to finish the case. To the extent that Harvey actually believes he has an interest to protect, I would expect him to take actions to help protect that interest - whatever it is - especially in light of the actions/inactions and/or difficulties caused by Robert Hantman (the guy you sent me to) and the failure to come up with the promised and required monies and the actions that were detrimental to the case and which I had to spend tens of thousands of dollars in out of pocket monies, hundreds of hours and give up an additional percentage to try to quiet and fix the problems.

As I continue to point out on the one hand things are GREAT. On the other hand, things are horrible. I CANNOT be expected to fix these problems. I expected your help and have gotten NONE.

I/the case needs $ 55,000 in the coming two months. I expect you to find a way to put in money NOW to protect whatever you believe is your investment. The bigger you believe is your investment, the more I would expect you to put in.

Please do NOT kid yourselves into thinking that I will be able to get by and that there will be no advserse affect if you do NOT put in money.

I have stripped myself AGAIN down to the bone to be able to pay the costs of Kaprun. Given what has gone on in the last months and years, I can assure you that I am NOT doing that to help you, anyone other "investor" else get money from this case. If you help me finish the case and survive, I will fight for whatever is a reasonable amount of money for you to be re-paid. If you do not, you should consider your entire "investment" lost ! ! !

The case has enormous expenses. We have deposition transcripts to pay for. We have motion practice coming up. We have Settlement Conferences being convened. We need experts reports.

Also, my children need to eat. My ex-wife needs to money to take care of herself and the house. I have bankruptcy and ethics lawyers to pay. I have personal needs to be paid for. I will not go into personal health issues that should be taken care of but which are being postponed because I have to use money for other things.

I CANNOT do my job with all these distractions.

You went into this as a business and I am telling you that your business investment will NOT survive and will NOT be protected if you do NOT help with these monies. I have been told you are "working" on this for months now but NOTHING has happened. It is really simple. Either you find a way to put

# 21

in money or you can consider your "investment" GONE ! ! !

I do NOT understand why I have to write these emails and I do NOT understand why you have not started to put the needed monies in to help.

I know there have been times when payments did NOT come when they should have BUT that is not this case. You KNOW where we are in Kaprun. You see the Orders and the results I have been getting. You are experts in litigation funding. Plus, you - Harvey - and I have a long history. I would hate to see the final chapter in our history end this way. There is very little that you need to do to help fix these problems (some of which are directly related to someone you sent me to). By helping fix them, you do not just help me, you protect YOURSELF. We are close to resolving the case so everyone gets taken care of and your help is long overdue.

Please call me today to confirm that you have received this message and to inform me when I can expect the first contribution.

Ed

---

**Check Out the new free AIM(R) Mail** -- 2 GB of storage and industry-leading spam and email virus protection.

**Michael R Perle**

| | |
|---|---|
| **From:** | faganlawintl@aim.com |
| **Sent:** | Tuesday, October 31, 2006 8:02 AM |
| **To:** | hantmanrj@aol.com |
| **Cc:** | jameslowy@floridalawgroup.com |

**Subject:** Re: Kaprun Funding

Robert:

It appears you gave him the WRONG VIDEO.  The National Geographic Video is NOT the one he should have - he should have the Accident Reconstruction Video we prepared and gave to Judge Katz and the one I gave YOU!

In any event, regardless of whether he comes in or not, or whether or not Hunter puts in more money, you MUST dig into your pocket and HELP with money.  Please don't tell me you dont have any money.  You and I both know that is not entirely correct.  The only issue is how much can you put in without hurting other things.  PLEASE focus on that.  No one wants to hurt you but then again none of us want to get hurt any more financially as we push this case to the first settlement in the coming months.

Ed

-----Original Message-----
From: hantmanrj@aol.com
To: thefagangroup@hotmail.com; faganlawintl@aim.com; jameslowy@floridalawgroup.com
Sent: Mon, 30 Oct 2006 2:44 PM
Subject: Fwd: Kaprun Funding

please call him asap

**Robert J. Hantman, Esq.**
Hantman & Associates
Member, NY, NJ, Fla., and Pa. Bars
432 Park Ave South - 2nd FL.
New York, New York 10016-8013
Hantmanrj@aol.com
Office: 212. 684.3933
Fax: 212. 982.7815
www.Hantmanlaw.com

Litigation, Entertainment, Fashion, Film, Music, Intellectual Property, Copyright, Trademark, Immigration, Criminal, Corporate, Real Estate, International law, Mergers & Acquisitions, Matrimonial, Arbitration, Appeals.

| Attached Message | |
|---|---|
| From: | peterblaw@yahoo.com |
| To: | hantmanrj@aol-motw.com |
| Cc: | eric@leavergrp.com |
| Subject: | Kaprun Funding |
| Date: | Mon, 30 Oct 2006 1:05 PM |

Hello Robert,

It was nice to see you again on Friday.  Pursuant to our conversation, please be advised that I have the

#22.

litigation booklet which Eric prepared, the National Geographic narrative cd of the incident, as well as updated pleadings that you have e-mailed me. It will not be necessary fo me to talk to Fagen at this time. I have scheduled appointments with investors/litigation lenders for Thursday and Friday of this week to present facts on your behalf in an attempt to obtain financing. I realize that time is of the essence and will proceed accordingly. I will advise you of the status and arrange a meeting with you if there is reasonable interest in funding this case.

Peter

---

**Check Out the new free AIM(R) Mail** -- 2 GB of storage and industry-leading spam and email virus protection.

From: faganlawintl@aim.com
Sent: Tuesday, October 31, 2006 6:18 PM
To: HANTMANRJ@aol.com
Cc: jameslowy@floridalawgroup.com; m.perle@earthlink.net
Subject: Re: Kaprun Funding Threat from rjh 10-31-06

Robert:

There is no threat.  I find your choice of words - "serious, unethical and perhaps illegal" - unfortunate.

You are counsel of record in these cases with Jim Lowy and me.  There are expenses in the cases that MUST be paid and there is nothing improper about reminding you of your obligation to contribute to these expenses and helping move the cases forward.

As for the "$100,000", that you say you helped raise, that has already been dealt with in previous communications and discussions.  I told you that I was prepared to address the issue of Hunter's money separately and I still am.  I find this very interesting since you told me last Friday that you were already talking to Hunter about helping with these additional monies.  So, what is the problem with my pushing to make sure the money is there for the cases.

As for an agreement with you, I also told you that I am prepared to enter into a written agreement with you to insure that upon the successful conclusion of the cases, reasonable fees and out of pocket expenses are paid to you and your firm for the work in this case.

The bottom line is that you cannot simply assume that other people are going to pay the costs of prosecuting this case and to the extent you can, you must contribute going forward.  If you do not have money personally, then try to find an investor and ALL you can do is TRY.  But, you must TRY and I AM confidant that you can accomlish this so we do NOT have these headaches.  It is NOT much money and given how far we have come and how close we are to settling the 1st of these claims, it should be achievable.

I expect you to help just like Jim and others are helping, unless of course you are broke and/or cannot raise money from any source such as Hunter.

Ed

-----Original Message-----
From: HANTMANRJ@aol.com
To: faganlawintl@aim.com
Cc: jameslowy@floridalawgroup.com; m.perle@earthlink.net
Sent: Tue, 31 Oct 2006 12:45 PM
Subject: Re: Kaprun Funding Threat from rjh 10-31-06


What is your "threat" to hurt me ? Please clarify as this is a most serious, unethical and. perhaps, illegal threat considering I helped you raise over $ 100,,000, have put a substantial amount of time and money into this case and have supported the case without a signed written agreement from you in spite of promises to provide same.

I fully intend to bring this matter up with the Court unless your threat and demand for money is retracted immediately.

Robert J. Hantman, Esq.
Hantman & Associates
Member, NY, NJ, Fla., and Pa. Bars
432 Park Ave South - 2nd FL.

# 23

## Michael R Perle

| | |
|---|---|
| **From:** | faganlawintl@aim.com |
| **Sent:** | Tuesday, October 31, 2006 8:02 AM |
| **To:** | hantmanrj@aol.com |
| **Cc:** | jameslowy@floridalawgroup.com |
| **Subject:** | Re: Kaprun Funding |

Robert:

It appears you gave him the WRONG VIDEO. The National Geographic Video is NOT the one he should have - he should have the Accident Reconstruction Video we prepared and gave to Judge Katz and the one I gave YOU!

In any event, regardless of whether he comes in or not, or whether or not Hunter puts in more money, you MUST dig into your pocket and HELP with money. Please don't tell me you dont have any money. You and I both know that is not entirely correct. The only Issue is how much can you put in without hurting other things. PLEASE focus on that. No one wants to hurt you but then again none of us want to get hurt any more financially as we push this case to the first settlement in the coming months.

Ed


-----Original Message-----
From: hantmanrj@aol.com
To: thefagangroup@hotmail.com; faganlawintl@aim.com; jameslowy@floridalawgroup.com
Sent: Mon, 30 Oct 2006 2:44 PM
Subject: Fwd: Kaprun Funding

please call him asap

**Robert J. Hantman, Esq.**
Hantman & Associates
Member, NY, NJ, Fla., and Pa. Bars
432 Park Ave South - 2nd FL.
New York, New York 10016-8013
Hantmanrj@aol.com
Office: 212. 684.3933
Fax: 212. 982.7815
www.Hantmanlaw.com

Litigation, Entertainment, Fashion, Film, Music, Intellectual Property, Copyright, Trademark, Immigration, Criminal, Corporate, Real Estate, International law, Mergers & Acquisitions, Matrimonial, Arbitration, Appeals.

| Attached Message | |
|---|---|
| From: | peterblaw@yahoo.com |
| To: | hantmanrj@aol-motw.com |
| Cc: | eric@leavergrp.com |
| Subject: | Kaprun Funding |
| Date: | Mon, 30 Oct 2006 1:05 PM |

Hello Robert,

It was nice to see you again on Friday. Pursuant to our conversation, please be advised that I have the

litigation booklet which Eric prepared, the National Geographic narrative cd of the incident, as well as updated pleadings that you have e-mailed me. It will not be necessary fo me to talk to Fagen at this time. I have scheduled appointments with investors/litigation lenders for Thursday and Friday of this week to present facts on your behalf in an attempt to obtain financing. I realize that time is of the essence and will proceed accordingly. I will advise you of the status and arrange a meeting with you if there is reasonable interest in funding this case.

Peter

**Check Out the new free AIM(R) Mail** -- 2 GB of storage and industry-leading spam and email virus protection.

| | |
|---|---|
| **Michael R Perle** | |
| **From:** | Michael R Perle [m.perle@earthlink.net] |
| **Sent:** | Tuesday, November 14, 2006 4:09 PM |
| **To:** | thefagangroup@hotmail.com; faganlawintl@aim.com |
| **Cc:** | Grossman, Harvey G |

Dear Ed,

This is in response to your several recent e-mails.

In September 2004 you approached Harvey Grossman/Lions Group. You represented that Christofer Meili would be applying to have the balance of his settlement, $225,000, paid directly to him, and that it was being handled by Morse Geller. This money represented the fee you had sold, and assigned to Lions Group. You indicated then to Harvey that you had arrangement with Meili through which these funds would be distributed to you and in turn, from these funds, you would reimburse the advance you were then seeking.

Based upon these representations Harvey arranged third-party financing to provide to you an advance of $17,000 -- with the understanding that repayment to the third-party funder was assured and would occur promptly.

Harvey was subsequently advised by Geller that Geller had been advised by the court not to make such an application, and warned that if such an application were made not only would be denied, there could be additional adverse consequences.

As a result of this Harvey lost credibility with the funder, which was prejudicial to the continuation of his financing business.

Nevertheless, in order to help you Harvey indicated to me a willingness to accommodate your continuing needs by cooperating with any other potential funders in the Kaprun litigation. In this connection Harvey and I both had extensive discussions with Steve Goldman and others who might be able to provide further funding.

Although you have recently disparaged his contribution, it was through Robert Hantman, who Harvey and I put you in contact with, and Harvey's willingness to accommodate the needs of the funder produced by Robert that additional financing of $100,000 was secured for Kaprun.

There have also been additional efforts by us to help you raise funds. However, any potential funder engages in its own diligence and demands to see as much information as possible.  That includes investigation as to any issues of regarding security positions, which of course raises the potential impact of claims from Andy Dechter and Elizabeth, in addition to the lack of clarity as to the status of the case, and uncertainty as to how close the matters are to resolution.  Most critically, any funders Harvey or I might contact, including other clients of mine to whom I of course have a duty of full and candid disclosure, want to know of any problems Lions Group has encountered in the relationship, and insist on  reviewing the internal correspondence, not just the "Executive Summaries" and status memos.

\# 24

Harvey is winding down his financing business. He has no additional funds available, and is limiting his financing activities to supporting litigation which he is personally engaged as a lawyer.

That being said, Harvey continues his willingness to accommodate your needs. However you must address and overcome each of the foregoing concerns and be able to bring this matter to a close in the near future.

Michael R. Perle

**EXHIBIT  Q**

From: faganlawintl@aim.com
Sent: Monday, April 03, 2006 8:00 AM
To: HANTMANRJ@aol.com
Cc: m.perle@earthlink.net
Subject: Re: from rjh

Robert:

I too enjoyed meeting you and hope we can find a way to work together.  I will be in the City much of today
working on the train case and will then turn to the other matters we discussed.  Thanks for the advice and
ideas which I will incorporate to the pleadings I am filing today and will of course send you a copy of them so
you can see how your suggestions were incorporated into the new pleading.   I will be in touch at the latest
tomorrow.

Ed Fagan

-----Original Message-----
From: HANTMANRJ@aol.com
To: faganlawintl
Cc: m.perle@earthlink.net
Sent: Mon, 3 Apr 2006 12:41:18 AM Eastern Daylight Time
Subject: from rjh


It was great to meet you. Looking forward to hearing from you soon.  regards rjh

Robert J. Hantman, Esq.
Hantman & Associates
Member, NY, NJ, Fla., and Pa. Bars
432 Park Ave South - 2nd FL.
New York, New York 10016-8013
Hantmanrj@aol.com
Office: 212. 684.3933
Fax: 212. 684-0920
www.Hantmanlaw.com

Litigation, Entertainment, Fashion, Film, Music, Intellectual Property, Copyright, Trademark, Immigration,
Criminal, Corporate, Real Estate, International law, Mergers & Acquisitions, Matrimonial, Arbitration, Appeals.

------------------------------------------------------------------------------------
Check Out the new free AIM(R) Mail -- 2 GB of storage and industry-leading spam and email virus protection.

